**AMERICAN STANDARD INC., Plaintiff,**

v.

**PFIZER INC. and Howmedica, Inc., Defendants.**

**Civ. A. No. 83–834 LON.**

United States District Court, D. Delaware.

Oct. 10, 1989.

---

Douglas E. Whitney, and Mary B. Graham of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff; Jules P. Kirsch, Robert D. Katz, and Mavis K. Fowler of Cooper & Dunham, New York City.

Harold Pezzner of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for defendants; John E. Kidd and Leora Ben–Ami of Anderson Russell Kill & Olick, and Gidon D. Stern and Stephen J. Harbulak, of Pennie & Edmonds, New York City.

LONGOBARDI, Chief Judge.

This patent infringement suit was brought by American Standard Inc. ("American Standard") against Pfizer Inc. ("Pfizer") and Howmedica, Inc. ("Howmedica"). Docket Item ("D.I.") 27. American Standard charges Pfizer with willful and

literal infringement of United States Letters Patent No. 3,605,123 ("the '123 Patent") and seeks damages, treble damages and attorneys' fees pursuant to 35 U.S.C. §§ 284, 285. The Defendants deny the allegations of willful and literal infringement and filed a declaratory judgment counterclaim asserting that the '123 Patent is invalid in light of the prior art and unenforceable due to inequitable conduct before the United States Patent and Trademark Office ("PTO"). D.I. 34. The case was bifurcated such that damages will be the subject of a separate proceeding.

This Opinion represents the Court's findings of fact and conclusions of law. Because the parties raise a large number of separate and distinct issues, the Court's findings will be integrated and organized by issue.

## I. BACKGROUND

Plaintiff American Standard is a corporation of the State of Delaware and has its principal place of business in New York, New York. Pretrial Order, D.I. 324, ¶ 3B. At the time the suit was filed, Howmedica was a wholly owned subsidiary of Pfizer, which subsequently became a division of Pfizer Hospital Products Group, Inc. and which is also a subsidiary of Defendant Pfizer, Inc. D.I. 324, ¶ 3C.

Plaintiff American Standard is the owner of the entire right, title and interest in the '123 Patent. D.I. 324, ¶ 3D. The '123 Patent issued to Plaintiff on September 21, 1971, based upon an application (Serial No. 820,184) filed April 29, 1969, naming Henry Hahn as inventor. D.I. 324, ¶ 3E; Plaintiff's Exhibit ("PX") 28. The '123 Patent contains 31 claims and was originally assigned to Melpar, Inc., Hahn's employer in 1969. When American Standard acquired the Westinghouse Airbrake Company in 1968, it also acquired its partially owned subsidiary, Melpar, Inc. Transcript, D.I. 340, Volume ("Vol.") G at 1621. American Standard subsequently merged Melpar, Inc. into American Standard in 1969 and assumed the rights to the '123 Patent when it issued in 1970. PX–30.

After American Standard divested itself of the Melpar business in several stages, mostly in 1970, Hahn resigned from Melpar and founded Artech, Inc. ("Artech"), which then acquired the Materials Laboratory assets of Melpar. D.I. 340, Vol. F at 1189, Vol. G at 1623. Hahn is President and Chairman of the Board of Artech and owns 15% of its common stock. D.I. 340, Vol. F at 1189–90. Although it has never manufactured any products under the '123 Patent, American Standard granted an exclusive license of the '123 Patent to Artech even before the '123 Patent was issued on September 21, 1971. D.I. 340, Vol. G at 1629. In 1980, the Bristol–Myers Company ("Bristol–Myers) approached American Standard inquiring about an exclusive license of the '123 Patent. *Id.* at 1630–31. On October 7, 1980, American Standard entered into a license agreement with Artech and Bristol–Myers in which Artech gave up its exclusive license in return for a percentage of the royalties that were to be collected from the exclusive license granted to Bristol–Myers and its subsidiary Zimmer Corp. ("Zimmer"). *Id.* at 1631; DX–275; PX–138. In 1984, Bristol–Myers' exclusive license was changed to a non-exclusive one at the request of American Standard so that it would have the authority to settle several lawsuits brought for infringement of the '123 Patent. D.I. 340, Vol. G at 1634–36.

This Court has jurisdiction over the subject matter of the infringement action pursuant to 28 U.S.C. § 1338(a) and federal jurisdiction over the subject matter of the Defendants' declaratory judgment counterclaims pursuant to 28 U.S.C. § 2201. D.I. 324, ¶¶ 2, 3A. This Court also has personal jurisdiction over the parties and venue is proper as to the parties under 28 U.S.C. § 1400(b) and 28 U.S.C. § 1391(c). D.I. 324, ¶ 3A.

The relevant history of the invention at issue in this case begins with the use of modern biocompatible materials to replace damaged body parts such as hips and knees. Although wood, ivory and noble metals were initially used as prosthetic devices, they were not very useful because of the biological reaction of the body or the

inadequate strength of the implant material. D.I. 340, Vol. A at 72. Metals with a smooth surface, such as Vitallium, titanium, tantalum and stainless steel were then used as prosthetic devices. Although each of these metals are biocompatible and have high strength to withstand the normal load bearing stresses of the body, each has also demonstrated a failure to provide a strong union between the prosthetic device itself and the surrounding bone tissue. PX–28, column ("col.") 2, lines 30–39.

Thus, one of the fundamental problems plaguing the development of prosthetic devices or implants for major joints such as the knee or hip is the attachment or fixation of the implant to the adjacent bone. Defendants' Exhibit ("DX") 102 at 101; DX–101A at 456; PX–28, col.·1, lines 39–53. The most common problem was the fixation of a prosthesis involving replacement of the upper portion of the femur or thigh bone and of the socket or acetabulum in the pelvis in which the upper ball shaped end of the femur rotates. At the time of the invention of the '123 Patent, there were three methods used to anchor a prosthetic device to the surrounding bone surface: (1) impaction of the prosthetic stem into the medullary cavity of the bone and held in place by comprehensive residual stress interaction (*i.e.*, press-fit technique), (2) mechanical internal fixation through the use of screws, pins, nails or plates, and (3) methylmethacrylate polymerizing *in situ* as a cement or filler between the prosthesis and the bone. DX–102 at 101; DX–101A at 456; PX–28, col. 1, lines 33–38; D.I. 340, Vol. A at 71–72, 81, Vol. B at 249–50. Each one of these techniques, however, had problems that prevented the successful skeletal fixation of the implants. For example, prosthetic devices which were implanted by a press-fit technique could loosen when the areas of stress interaction between the implant and the bone were relaxed. DX–102 at 101. Similarly, mechanical devices used to achieve fixation of the prosthetic device often become loose over an extended period of time. *Id.* Finally, cemented implants proved not so advantageous because they predominantly fail at the interface between the bone and the outer surface of the cement due to a low level of adhesion strength. D.I. 340, Vol. A at 87, 90. If a prosthetic device or bone implant loosens, the results to the patient can be catastrophic, including failure of the implant or of the remaining bone which would require corrective surgery. D.I. 340, Vol. A at 87–88. Thus, scientists in the 1960's sought to resolve this problem of inadequate fixation of prosthetic devices.

Hahn, a metallurgist, sought to overcome the problem of inadequate prosthetic fixation to bone by proposing what he believed was a novel combination of biological and metallurgical concepts and materials. Hahn's concept was "to stimulate growth of bone tissue into [an] implant (for improved adhesion)" by using plasma flame spray technology to create a porous metal coating or surface layer into which bone tissue would grow and thereby attach the implant to the contacting bone surface. DX–6. The second concept was "the combination of [the plasma flame] sprayed coatings and wrought or cast [metal] substrates in surgical implants." *Id.* At trial, Hahn admitted that at the time of his invention it was well known that one could plasma flame spray a porous metal coating on metal and that open pores would promote bone ingrowth. Thus, Hahn testified that his invention was only a "combination of [these] known technologies." D.I. 340, Vol. G at 1571–72.

## II. INFRINGEMENT

Prior to trial Plaintiff asserted literal infringement by Defendants' PCA products of claims 1–4, 9–18, 20–22 and 29–31 of the '123 Patent and infringement under the doctrine of equivalents of the remaining claims. D.I. 324, ¶ 3(F). At trial, however, Plaintiff withdrew sixteen claims and limited its case to proving the literal infringement of claims 1, 2, 10–16, 18, 21, 22 and 29–31 and has expressly not contended infringement by the doctrine of equivalents of those claims.

Section 27 of Title 35 of the United States Code provides that "whoever without authority makes, uses or sells any patented invention, within the United States

during the term of the patent therefor infringes the patent." The Federal Circuit has stated that an allegation of literal infringement raises "at least two questions: (1) what is patented, and (2) has what is patented been made, used or sold by another." *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983); *Phillips Petroleum Co. v. U.S. Steel Corp.*, 673 F.Supp. 1278, 1344 (D.Del.1987), aff'd, 865 F.2d 1247 (Fed.Cir.1989). In other words, the Court's infringement analysis follows a two-step process of first construing the language of the asserted claims of the '123 Patent,[1] and then applying the properly construed claims to Defendants' accused PCA products to determine if they fall within the scope of the asserted claims. *SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1118 (Fed.Cir. 1985); *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985).

## A. Claim Interpretation

■■■ In interpreting the disputed claims, the Court should resort to several factors, including (1) the literal language of the claims, (2) the patent specification, (3) prosecution history, and (4) the testimony of experts who can aid in interpreting the asserted claims in the same manner as those skilled in the art. *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 866–67 (Fed. Cir.1985). The threshold requirement in claim construction is an examination of the language of the claims at issue. *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 672 (Fed.Cir.1984). In undertaking such an examination, "the terms of the claims will be

given their ordinary meaning, unless it appears that the inventor used them differently." *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1579 (Fed.Cir. 1988) (citing *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir. 1984)).

The claims at issue in this suit are claims 1–2, 10–16, 18, 21–22 and 29–31. In claim 1, Hahn claims:

A prosthetic part for use on a bone implant, comprising a strong metal base, said metal base being substantially non-toxic to the biological system of the host into whose bone structure said prosthetic part is to be implanted, and a highly porous metallic region at a surface of said base, said porous region being extremely thin relative to the thickness of said base and extending over substantially that portion of the surface of said base which is to be in contact with the bone structure after implantation.

PX–28, col. 5, lines 59–68. Dependent claim 2 adds the requirement that the base is composed of titanium, stainless steel, tantalum or Vitallium. *Id.*, col. 5, lines 69–72.

Claim 10 states:

A member adapted to promote adherence of bone tissue thereto, said member comprising a highly dense base portion of metal, and a region of high porosity metal coating on the surface of said base portion, said region being thin relative to the thickness of said base portion and arranged for promoting the growth of bone tissue to said member when said

---

1. Plaintiff contends that since Defendants have admitted literal infringement, the Court may "dispense" with the need for claim interpretation. Plaintiff relies upon *Smith Intern., Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1579 (Fed.Cir. 1983), and *Phillips*, 673 F.Supp. at 1345–46, in support of this proposition. However, these cases are inapposite under the facts of this case. In the Pretrial Order, Defendants stated: "Defendants concede that the accused devices literally fall within the words of claim 29 *if bone implant is construed to mean prosthesis* but there is no infringement in law because of the 'reverse doctrine of equivalents.'" [Citation omitted]. D.I. 324 at 69b, ¶ B. Although the language "fall within the words" is synonymous with an admission of literal infringement, *see,*

*e.g., Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950) ("falls clearly within the claim"); *Smith Intern.*, 718 F.2d at 1580 n. 2 (admission of "claim coverage" is admission of literal infringement); *Phillips*, 673 F.Supp. at 1345 (stipulation that product "literally embraced" the claims constitutes admission of literal infringement), the Defendants have qualified their "admission" to apply only if the term " 'bone implant' is construed [by the Court] to mean prosthesis." D.I. 324 at 69b, ¶ b. Since the Defendants' admission would not apply if this Court did not interpret bone implant to mean only prosthesis, the Court finds it necessary to first interpret the meaning of the claims in this suit.

member is implanted with said region adjacent living bone tissue. *Id.*, col. 6, lines 21–28. Dependent claim 11 adds the limitation that the porous metal surface constitutes a separate layer bonded to the metal substrate. *Id.*, col. 6, lines 29–31. Dependent claims 12 and 13 require the porous metal surface to extend "over only a part of the surface" of the metal substrate and to be composed of the same metal as the substrate. *Id.*, lines 32–38.

Claim 14 specifies that:

For use as a permanent bone implant, a structural member including a base composed of metal substantially free of interstices, said member possessing a shape commensurate with bone repair function; and a porous metallic region, thin relative to the thickness of said base located on the surface of said base.

*Id.*, col. 6, lines 39–44. Like claims 11–13, dependent claims 15 and 16 merely add the limitations that the porous metal surface covers only a part of the surface of the metal substrate and constitutes a separate layer "overlying and bonded to the surface of said base." *Id.*, col. 6, lines 45–51.

Claim 18 requires "An implant for bone tissue including a base portion of high strength metal and a porous metal layer overlying and bonded to said base portion." *Id.*, col. 6, lines 54–56. Dependent claims 21 and 22 add the limitations that the porous metal layer and the metal substrate be composed of the same metal material. *Id.*, col. 6, lines 63–68.

Claim 29 provides for "[a] metallic bone implant having a porous metallic surface layer." *Id.*, col. 7, lines 15–16. Dependent claims 30 and 31 merely add the limitations that the porous metal surface layer and the underlying substrate be "chemically, electrochemically, and thermally compatible and non-toxic to said bone" and are composed of essentially the same metal. *Id.*, col. 6, line 17 to col. 7, line 5.

### 1. *Claims Do Not Require Bone Ingrowth*

Defendants argue that the claims of the '123 Patent should be interpreted to include the requirement of bone tissue ingrowth. Specifically, it is the Defendants' position that the claims of the '123 Patent are limited to porous coated implants manufactured and sold only for adhesion by means of bone tissue ingrowth. Howmedica's PCA products are made by a special sintering technique that creates a porous metal surface with uniform interconnectedness and porosity. In February, 1981, and February, 1984, Howmedica began marketing the PCA knee and hip implants solely for use with bone cement in accordance with FDA regulations, except for investigational devices. D.I. 340, Vol. A at 154, 225, Vol. N at 3317–18, 3336; PX–61. Since bone tissue cannot penetrate the cement material, Defendants contend that their PCA products do not literally infringe the claims of the '123 Patent.

In support of their contention that the claims of the '123 Patent require bone ingrowth, Defendants cite to several references in the specification of the '123 Patent. For example, in the "Abstract of the Disclosure" of the '123 Patent, it states: "The porous layer may cover only that part of the surface of the base portion which is to be in contact with the bone tissue after implantation, and permits the growth of bone tissue into the pores." PX–28, col. 1, lines 19–23. In addition, the "Background of the Invention" emphasizes that the invention is directed to bone ingrowth: "The present invention relates generally to prosthetic parts, and is particularly concerned with improvements in prosthetic devices for use as high strength artificial bone implants adapted to promote a strong union with the bone matter into which such devices are implanted." *Id.*, col. 1, lines 28–32. The "Summary of Invention" also states: "The principal object of the present invention is to provide a prosthesis of high structural strength with a capability of promoting substantially complete integration with the bone structure in which it is implanted." *Id.*, col. 2, lines 20–23. Defendants contend that "integration with the bone structure" means "bone ingrowth." Finally, Defendants point to the "Description of the Preferred Embodiment" and argue that the implantation of porous coated pins in sheep was directed to determine

if bone tissue would grow into the pores. *Id.*, col. 4, line 46 to col. 5, line 46.

■ It is an elementary proposition that the property right bestowed by a patent is measured in the first instance by the claims. *See A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed.Cir.1983) (citing *Aro Mfg. Co. v. Convertible Top Co.*, 365 U.S. 336, 339, 81 S.Ct. 599, 600–01, 5 L.Ed.2d 592 (1961)). Indeed, Title 35, Section 112 provides in pertinent part that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention...." 35 U.S.C. § 112. One commentator has noted: "[t]he function of the claims is twofold: to point out what the invention is in such a way as to distinguish it from the prior art; and to define the scope of protection afforded by the patent." R. Harmon, *Patents and the Federal Circuit* at 93 (1988). Thus, it is the claim, not the specification, that measures and defines the metes and bounds of the invention. *See, e.g., W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1548 (Fed.Cir.1983).

The significance of the claims in defining an invention was recently expressed by the Federal Circuit in *E.I. Du Pont de Nemours & Co. v. Phillips Petro.*, 849 F.2d 1430, 1433 (Fed.Cir.1988) (quoting *Autogiro Company of America v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 395–96 (1967)), when Judge Bissell stated:

> The claims of the patent provide the concise formal definition of the invention. They are the numbered paragraphs which "particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. It is to these wordings that one must look to determine whether there has been infringement. [Footnote omitted]. Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth. [Footnote omitted]. No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them.

In accordance with this instruction, the Federal Circuit has consistently adhered to the proposition that courts "cannot alter what the patentee has chosen to claim as his invention." *SSIH Equipment S.A. v. U.S. Intern. Trade Com'n*, 718 F.2d 365, 378 (Fed.Cir.1983) (citing *Autogiro*, 384 F.2d at 396).

■ It is also well settled that "when claim construction is required, claims are construable ... in light of the patent specification" as well as a number of other factors, such as the prosecution history and expert testimony. *SRI*, 775 F.2d at 1121; *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983). Nevertheless, the fact "[t]hat claims are interpreted in light of the specification does not mean that everything expressed in the specification *must* be read into all the claims." *SRI*, 775 F.2d at 1121 (emphasis added). The language in *Kalman* indicating that claims be interpreted "in light" of their specification to construe their proper meaning only requires the decision maker to consider the specification as one factor in claim interpretation and should "not be confused with adding an extraneous limitation appearing in the specification, which is improper." *E.I. Du Pont de Nemours & Co.*, 849 F.2d at 1433. By "extraneous", the Federal Circuit means "a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *Id.*

■ In the present case, there is nothing in the plain language of the claims of the '123 Patent which suggests that bone ingrowth is required. Instead, the claims of the '123 Patent reflect Hahn's conception of combining plasma flame spray technology with a high strength metal base to create a porous metal surface layer so as to achieve fixation by *permitting* the growth of bone tissue into the pores. D.I. 340, Vol. G. at 1571–72. Indeed, in his "Summary of Invention", Hahn stated that the principal objective of his invention was to provide a prosthesis with a *"capability* of *promoting* substantially complete integration with the bone structure." PX–28,

col. 2, lines 21 to 22 (emphasis added). For example, the broadest claim, claim 29, states "[a] metallic bone implant having a porous metallic surface layer." PX–28, col. 7, lines 15–16. There is no suggestion in the language of this claim that it requires the function of bone ingrowth as one of its elements. This conclusion is further supported by Hahn's trial testimony when he stated that there is no requirement of his invention that bone tissue actually grow into the porous metal surface. D.I. 340, Vol. G at 1433–34. Thus, Hahn did not consider his invention to be the discovery that bone tissue can grow into a porous surface. D.I. 340, Vol. G at 1521.

Defendants further argue that the prosecution history of the '123 Patent supports the conclusion that the claimed implant is directed only to an implant into which bone tissue grows. The application of the '123 Patent as originally filed presented 18 claims that broadly covered a bone implant with any type of porous coating on a metal base so as to promote the growth of bone tissue against and into the pores. PX–15 at 16–19. On November 10, 1970, the Patent Office rejected these 18 claims as being anticipated under 35 U.S.C. § 102 by two patents, U.S. Patent No. 448, 745 (the "Wright Patent") and a French Patent No. 1,122,634 (the "Steenbrugghe Patent"). *Id.* at 22.

In response, Hahn filed an amended patent application on January 5, 1971, in which he amended claims 1, 10 and 14 and added new claims 19–32. *Id.* at 25–28. In addition, Hahn submitted a 1–½ page statement in which he argued that the Wright and Steenbrugghe Patents "do not disclose a porous metal coating on a strong base, in a bone implant." *Id.* at 28–29. Instead, Hahn claimed that these prior patents only:

disclose a porous material used as an implant. In the case of Steenbrugghe, the implant is not a bone implant. In the case of Wright, the teaching is of a bone implant, and the coating is porous, but the coating is not metallic. Therefore, the references can only apply to claims which require any type of porous coating on a base. None of the claims as now amended are of this breadth.... The rejected claims are amended to recite that the coating is metallic.

*Id.* at 28. For example, the new claim 30 defines "a metallic implant with a metallic porous surface." *Id.* at 29.[2] Thus, the amended claims broadly cover any metal bone implant having a porous metal coating without claiming a functional requirement of bone tissue ingrowth. Kummer Deposition ("Dep.") DX–978 at 47–50.

Defendants contend that the Patent Examiner believed the claims of the '123 Patent required bone ingrowth by stating in his rejection: "Smith et al. and Jardon are cited to show other devices into which the tissue grows." PX–15 at 22.[3] This argument is misplaced, however, because the Patent Examiner's statement does not reject the claims of the '123 Patent as anticipated or otherwise invalidated by the Smith and Jardon references. Instead, it appears

---

**2.** To the extent that Defendants' argument is directed toward limiting the interpretation of the claims of the '123 Patent to a porous metallic coating that is *plasma flame sprayed,* the argument is misplaced. Defendants' argument is inconsistent with the express language of the specification which states that although plasma flame spraying was the preferred technique, "I do not limit my invention to use of the plasma spray process." PX–28, col. 3, lines 37–38. Moreover, under well settled principles of claim construction, it is improper for the trier of fact to read a preferred embodiment for the specification into the claims. *Environmental Designs v. Union Oil Co. of Cal.,* 713 F.2d 693, 699 (Fed.Cir.1983). It is also improper for the Court to read a limitation of plasma flame spraying contained in non-asserted claims 5–8, 19–20, 23–24 and 26 into the asserted claims

1–2, 10–16, 18, 21–22 and 29–31 which do not contain such a limitation. *SRI Intern.,* 775 F.2d at 1122.

**3.** U.S. Patent 2,688,139 (issued September 7, 1954) (the "Jardon Patent") discloses an artificial eye which is porous throughout in order to encourage the growth of tissue into the pores. The reference to "Smith, et al." is to U.S. Patent 3,314,420 (issued April 18, 1967) and to the article entitled "Ceramic–Plastic Material as a Bone Substitute" by Dr. Lyman Smith published in 87 *Archives of Surgery* 653–661 (1963), DX–880. These references describe a porous ceramic prosthesis filled with an epoxy resin which is then rinsed away with methylene chloride to leach away the superficial resin leaving a porous surface into which bone tissue could grow.

the Patent Examiner cited to these references generally as types of prosthetic devices which permitted tissue to grow into holes. The claims of the '123 Patent, however, are directed toward the growth of tissue into a porous metal surface layer added to the substrate. Under these circumstances, the Court cannot properly attribute any particular opinion about the scope of the claims to the Patent Examiner with respect to the issue of bone ingrowth. Therefore, the Court finds that the amended claims and the arguments submitted in support thereof demonstrate that Hahn intended his invention to be limited to the combination of a porous metal coating to a solid metal substrate without claiming a limitation that requires bone ingrowth.

This interpretation of the scope of the claims is further supported by the language of claim 10, one of the narrowest claims of the '123 Patent. Claim 10 states, in pertinent part, "[a] member adapted *to promote* adherence of bone tissue thereto...." PX–28, col. 6, lines 21–22. Although Defendants believe that this phrase should be interpreted to require bone ingrowth, claim 10 merely provides that the porous metal surface promotes "adherence" of bone tissue to the metal substrate. This could mean either that bone tissue grow up against the metal substrate or that the porous metal surface contain sufficient porosity so as to allow bone tissue to grow into the pores. Neither interpretation, however, suggests reading into the claim a requirement that bone tissue *actually* grow into the pores. Even if the meaning of claim 10 could be stretched to include the requirement of growth of bone tissue into the pores, such an interpretation would not apply to other claims in the '123 Patent because "[w]here some claims are broad and others are narrow, the narrow limitations cannot be read into the broad whether to avoid invalidity or to escape infringement." *Kalman,* 713 F.2d at 770. Thus, the Court will not read a functional limitation such as requiring the growth of bone tissue into the pores of the metal surface into the claims of the '123 Patent in contravention to the express language of the claims.

Defendants next argue that the term "bone implant" as used in the claims of the '123 Patent, such as claim 18, "an implant for bone tissue", should be interpreted to mean that bone tissue is required to grow into the porous surface layer. The Defendants cannot point to any ambiguity in the term "bone implant" so as to justify reading a limitation contained in the specification into the claim to require bone tissue ingrowth. Plaintiff has introduced evidence, on the other hand, that the term "bone implant" has an accepted meaning in the orthopedic community and refers to "manufactured devices which are intended to be placed in the human body *against or within the bone* itself." D.I. 340, Vol. A at 173. A "bone implant" could thus include a prosthetic device in which bone tissue grows either up against or into the device. The Court concludes the term "bone implant" to refer generally to prosthetic devices used for implantation. Thus, the claims of the '123 Patent are not limited solely to porous coated implants manufactured and sold only for adhesion by bone ingrowth.

2. *Claims Require Pore Sizes Ranging From 30 Microns to 200 Microns*

Defendants next argue that the porous surface of the claims of the '123 Patent should be interpreted to include surfaces with pores of all sizes. The only claim of the '123 Patent which expressly refers to the size of the pores is claim 7, which is not an asserted claim. Claim 7 is a narrow claim which is dependent upon claim 1 and provides in pertinent part that "the pore openings at the exterior surface of said layer have widths in the range of about 30 microns to about 200 microns." PX–28, col. 6, lines 11–14. It is well settled that a limitation contained within a narrow claim cannot be read into a broader claim so as to avoid invalidity. *Kalman,* 713 F.2d at 770. It is proper, however, "to use the specification to interpret what the patentee meant by a word or phrase in the claim." *E.I. Du Pont de Nemours & Co.,* 849 F.2d at 1433. Because none of the claims define the term "porous", an inherently relative term, it is appropriate to in-

terpret the claims in light of the specification to determine the particular meaning of that term. In the present case, the specification defines the relevant pore size of the metal surface. For example, the specification states: "[i]n practice, the pores will range from about 30 microns to about 200 microns wide at the opening, although the range of widths from about 40 microns to about 70 microns appears to be optimum." PX–28, col. 3, lines 63–66. Since the term "porous" is used similarly in all the independent claims, the Court concludes that the claims of the '123 Patent require pore size openings that range from 30 microns to about 200 microns.

### 3. *Claims Require Interconnected Pores*

Defendants next argue that the claims of the '123 Patent do not require interconnection of the pores. In support of their contention, Defendants point to the express language of various claims of the '123 Patent such as claim 1 which refers to a "highly porous metallic region", PX–28, col. 5, line 63, claim 10 which specifies "a region of high porosity metal coating", *id.*, col. 6, lines 21–22, claim 14 which specifies "a porous metallic region", *id.*, col. 6, lines 42–43, claim 18 which speaks only of "a porous metal layer", *id.*, col. 6, line 55, and claim 29 which only describes a "porous metallic surface layer", *id.*, col. 7, lines 14–15. Although the Defendants point out that there is no express language in the claims which requires interconnected pores, the general term "porous" should be defined in light of the specification. *See E.I. Du Pont de Nemours & Co.*, 849 F.2d at 1433. The specification of the '123 Patent provides that pores contained within the porous metallic surface are of three types:

(1) one type connected to the exterior surface and with other pores "by interior passageways", (2) a second type with pores "exposed at the exterior surface", and (3) still other pores "cut off from the surrounding environment." PX–28, col. 3, lines 55–63. Dr. Ducheyne testified at trial that in order to obtain the "ideal image [for] ... skeletal integration" necessary for fixation, Hahn applied a porous metal surface by a plasma flame spray technique that resulted in some interconnected pores. D.I. 340, Vol. Q at 3841. Dr. Ducheyne also noted that because plasma flame spraying produces a wide variety of possibilities in terms of pores, interconnected pores were not the exclusive type of pores. *Id.* at 3837–38. Similarly, Defendants' expert witness, Dr. Burstein, testified at trial that the '123 Patent revealed "a material that displays some interconnection." D.I. 340, Vol. N at 3432. Although the term "porous" must then necessarily include some pores which are not interconnected due to the technique of plasma flame spraying, the word includes within its definition some pores which are interconnected. D.I. 340, Vol. Q at 3838.[4]

### 4. *Claims Require a Separate Surface Layer*

Defendants contend that claims 29–31 do not require the porous metal surface to be a separate entity bonded to the metal substrate. In support of this contention, Defendants point out that the language of claim 18 specifically requires "a porous metal layer overlying and bonded to said base portion", PX–28, col. 6, lines 55–56, whereas the language used in claim 29 is simply "[a] metallic bone implant having a porous metallic surface layer." PX–28, col. 7, lines 15–16. Defendants argue that if

---

**4.** Defendants maintain that the alternative method cited by Hahn to create a porous metal surface, chemical milling, does not produce pores which are interconnected. Although Defendants cite to the trial testimony of Dr. Burstein who stated that chemical milling only creates "voids or holes or hills or valleys", D.I. 340, Vol. N at 3451, Plaintiff introduced the testimony of Dr. Lemons who stated that conventional chemical milling as disclosed in the specification can produce a porous surface having interconnected pores. D.I. 340, Vol. Q at 3968–69.

In any event, since Hahn himself discounted the possibility of obtaining "suitable pore openings [by chemical milling] such as those obtained by plasma flame spray coating", PX–28, col. 3, lines 8–9, the Court does not consider Dr. Burstein's testimony conclusive. Since the specification discounts chemical milling as a method for producing suitable pores, the Court finds that the claims of the '123 Patent cannot be fairly read so as to exclude the requirement of interconnection of the pores which comprise the porous metal surface layer.

the term "layer" means a bonded coating in claim 29, then the language "overlying and bonded to said base" in claim 18 is superfluous. This argument, however, elevates form over substance. Defendants' interpretation of claims 29–31 overlooks the adjective "surface" as it is used in these claims. Since the term "surface" is used to modify the term "layer", the only reasonable inference is that porous metal is intended to be applied as a separate coating to the metal substrate. If the term "layer" did not refer to a separate porous metal coating to be applied to the metal substrate, then the combined terms of "surface" and "layer" are redundant. The Court refuses to adopt such a narrow characterization of the claims.[5] Although claims 29–31 do not mention the term "coating", the terms "coating" and "layer" are used interchangeably throughout the '123 Patent.[6] Although some claims specifically state that the porous metal layer must be bonded to the substrate, see, e.g., claims 3, 11 and 16, the omission of the word "bond" from claims 29–31 does not compel the conclusion that the porous metal surface need not be a separate layer. Thus, the Court concludes that claims 29–31 require a metal base with a separate and distinct layer of porous metal.

The Court concludes, subject to the interpretation of certain words and phrases, the explanation of which follows, that the scope of the claims has these elements:

*Claim 1:* (a) bone implant, (b) implant constructed of a strong metal base, and (c) with a highly porous metallic region at a surface of said base which is extremely thin relative to the thickness of the base.

Under this claim, the inventor has claimed an invention necessarily covering a bone implant. A person skilled in the art at the time of the invention would consider that to mean "manufactured devices which are intended to be placed in the human body against or within the bone itself." D.I. 340, Vol. A at 173. The strong metal base refers to a device suitable to withstand the loads and stresses associated with the area of the body to be accommodated. The highly porous surface has meaning only in the context of pores having some interconnection and ranging from 30 microns to about 200 microns.

The surface layer thinness is described as "extremely thin", an inherently general term which needs some elaboration. Webster's Third International Dictionary defines the term thin as "having little extent from one surface to its opposite ... [and] implies comparatively little extension between two surfaces." Webster's Third International Dictionary (1981) at 2375. Thus, "thin" can be described as a relative term indicating a general reduction in thickness in comparison to another object. Since resort to the specification reveals that Hahn described by way of example a layer having a thickness up to approximately 0.1 inch with the preferred thickness ranging from .015 inches to .030 inches, PX–28, col. 3, lines 49–53, an "extremely thin" layer must necessarily be less thick

---

**5.** Defendants contend that Hahn has characterized his own invention as not to require a "coating process." Defendants' argument, however, is based upon Hahn's statement in the "Description of Preferred Embodiment" where he states: "Again, I do not restrict my invention to use of the plasma flame spray process, although that is preferred, and I again emphasize that a porous surface region may be provided on a base metal without use of any *coating process*, but instead by employing a chemical milling process." PX–28, col. 4, lines 37–42 (emphasis added). Defendants' reliance upon this statement is misplaced because it is taken out of context. Hahn admitted in the specification that he knew no method of chemical milling which would produce the desired porosity. Hahn's reference to chemical milling in the specification was by way of exam-ple and should not be read to limit the scope of the claims. Instead, Hahn's reference to chemical milling is explained by Hahn's desire not to limit his invention to the plasma flame spray "coating" of a metal surface on a metal substrate and should be interpreted to include any metal base with a separate and distinct metal layer of porous metal. Thus, Hahn's refusal to limit his invention to a "coating process" does not compel the Court to find that mere fenestrations or holes in the metal substrate would come within the scope of the claims.

**6.** For example, claim 10 specifies "a region of high porosity metal *coating* on the surface of said base." PX–28, col. 6, lines 23–24 (emphasis added).

than the aforementioned layer which is "thin" in comparison to the metal base.

*Claim 2:* This claim is dependent on claim 1 and, as indicated earlier, adds the requirement that the base be composed of titanium, stainless steel, tantalum or Vitallium.

*Claim 10:* (a) a device adapted to allow adherence to bone, (b) with a highly dense metal base, and (c) a region of high porosity metal coating that is thin relative to the thickness of the base portion.

Under claim 10, the device need not be a structural replacement of the body but any device designed to be anchored by bone. Again, this is a construction within the ordinary meaning of a prosthesis. *See,* D.I. 340, Vol. A at 173. As previously discussed, the thinness of the porous metal layer may be construed by example from the specification, *i.e.,* 0.1 inch or preferably .015 inches to .030 inches. One skilled in the art would have known or could have determined with perfunctory experimentation the thinness required depending upon the purpose of the device and where it was to be used. D.I. 340, Vol. F at 1363–64.

*Claims 11, 12, 13:* As previously discussed, these are claims dependent upon claim 10. Claim 11 adds the limitation that the porous metal surface constitutes a separate layer bonded to the base. Claims 12 and 13 require the porous metal surface to cover "over only a part of the surface" of the base and to be composed of the same metal as the base. PX–28, col. 6, lines 29–38.

*Claim 14:* (a) bone implant, (b) a base substantially free of interstices, and (c) porous metallic region thin relative to thickness of base and located on surface of the base.

This claim covers a bone implant or prosthetic device in a shape commensurate with a bone repair function. The base is of a metal composition substantially free of voids or interstices. This claim imposes the additional limitation of using a "dense" metal. *See* PX–28, col. 2, line 41. That term connotes a solid metal base with a compactness sufficient to exclude voids, cracks or surface pores. The thinness limi-

tation has previously been construed and is adopted here.

*Claim 15,* which is dependent upon claim 14, merely adds the limitation that the porous metal surface should cover only a part of the implant, not its entire surface. PX–28, col. 6, lines 44, 48.

*Claim 16,* also dependent upon claim 14, requires that the porous metal layer be bonded to the bone. PX–28, col. 6, lines 49–51.

*Claim 18:* (a) bone implant, (b) base of high strength metal, and (c) porous metal layer overlying and bonded to the base.

*Claim 21,* which is dependent upon claim 18, adds the limitation that the porous metal layer and the base be composed of the same metal. PX–28, col. 6, lines 63–65.

*Claim 22,* also dependent upon claim 18, adds the requirement that the base be incapable of forming a union with the bone tissue without the porous metal layer. PX–28, col. 6, lines 60–68.

*Claim 29:* (a) metallic bone implant and (b) porous metallic surface layer.

The term bone implant has been previously construed and that interpretation applies here. In addition, the term metallic should be limited to those metals described earlier in claim 2. Finally, the porous metallic surface layer, as previously construed, is a separate entity applied to the metallic bone implant.

*Claim 30,* which is dependent upon claim 29, adds the limitation that the bone implant and the porous metallic layer are chemically, electrochemically and thermally compatible and non-toxic to the bone. PX–28, col. 7, line 17 to col. 8, line 2.

*Claim 31,* also dependent on claim 29, adds the limitation that the base and the porous surface layer be composed of the same metal. PX–28, col. 8, lines 3–5.

**B. Literal Infringement**

■ Plaintiff has the burden of proving infringement by a preponderance of the evidence. *Envirotech,* 730 F.2d at 758; *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983). Once the

claims have been properly construed, the Court must compare the accused devices with the claims of the '123 Patent in order to determine literal infringement. Literal infringement is made out where the accused product falls within the literal scope of the claims of the patent as properly construed. *Palumbo*, 762 F.2d at 974; *Phillips*, 673 F.Supp. at 1344.

■ In general, Howmedica's PCA knee and hip products consist of a separate and distinct porous metal coating with interconnected pores applied to part of a solid metal base comprised of a cast cobalt-chrome-molybdenum alloy. PX–262; PX–268B; PX–84. The porous metal coating of the PCA products "consists of a two layer coating of spherical Vitallium powder which has been sintered in place with 20–30 mesh powder ... to yield an interconnected porosity with metallurgically-bonded powdered particles." D.I. 340, Vol. L at 2940. The porous coating is approximately 1.55 mm thick measured from the solid core substrate to the more prominent edge of the porous coating. D.I. 324, Admitted Fact, ¶ (H). The porous coating is also comprised of pores ranging in size from 20 microns to 1000 microns with approximately 80% of the pores in excess of 200 microns and an average pore size between 400 to 450 microns. D.I. 340, Vol L at 2944, 2987–88; DX–376 at 2. The Defendants' PCA products were designed so that fixation could be achieved with or without bone cement. D.I. 324, Admitted Fact, ¶¶ (H), (L).

At trial, Dr. Lemons compared Defendants' PCA revision femoral component, PX–36, with the asserted claims of the '123 Patent and testified that the accused device "reads on" claims 1–2, 10–16, 18, 21–22 and 29–31 of the '123 Patent. D.I. 340, Vol. D at 718, 721–22, 725–32, 734–35, 738–40. In addition, Dr. Lemons testified that the acetabular cup component of the PCA Total Hip, PX–33, the porous hip stem, PX–32, and the other PCA knee components, PX–37, PX–38, PX–39, PX–40, "read on" claims 1, 10 and 14 as that term is used in patent law. *Id.* Defendants stipulated that Dr. Lemons' testimony comparing these prostheses against the elements and limitations of claims 2, 10–13, 16–18, 21–22 and 29–31 would be the same testimony previously rendered for the PCA revision femoral component, PX–36. D.I. 340, Vol. D at 804. Defendants have not challenged Dr. Lemons' testimony of literal infringement of claims 18, 21–22 and 29–31.[7]

Independent claim 1 of the '123 Patent requires that the thickness of the porous coating must be "extremely thin" relative to the thickness of the base, while independent claims 10 and 14 require that the coating must be "thin." PX–28, col. 3, lines 64–65 and col. 6, line 25. Defendants contend there is no literal infringement of claims 1–2 and 10–16 because Plaintiff has failed to meet its burden of either defining the terms "thin" and "extremely thin" or establishing correspondence between these claims and the accused PCA products.[8] At

---

**7.** Moreover, in the Pretrial Order, Defendants stated: "Defendants concede that the accused devices literally fall within the words of claim 29 *if bone implant is construed to mean prosthesis* but there is no infringement in law because of the 'reverse doctrine of equivalents.'" [citation omitted] (emphasis added). D.I. 324 at 69b, ¶ B. Since the Court has previously construed the term "bone implant" to mean a prosthetic device, as opposed to requiring "bone ingrowth" as an element of the claims, the Defendants have admitted the literal infringement of claim 29. Moreover, Mr. Akers, Assistant General Patent Counsel for Defendants, testified that sometime before the end of 1983 he had compared the actual physical structure of the prototype PCA knee against some of the claims of the '123 Patent and concluded that claims 18 and 29 probably covered the Defendants' proto-

type product. D.I. 340, Vol. C at 462, 465, 468–69.

**8.** Defendants also contend that claims 1–2 are indefinite under 35 U.S.C. § 112 because Dr. Lemons could not articulate the meaning of "extremely thin." D.I. 340, Vol. D at 753. The test for determining the adequacy or definiteness of a claim under Section 112 is whether "one skilled in the art would understand the language in the claims read in light of the specification." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed.Cir.1986); *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546–47. Dr. Lemons testified that he could not determine whether the porous coating of the accused device is "thin" or "extremely thin" by looking at the device alone. D.I. 340, Vol. E at 980. This testimony does not

trial, Dr. Lemons measured the dimensions of the base of the accused devices based on the actual manufacturing blueprints of each of the accused PCA implants. The relative dimensions of coating and base are included in the following table which compares as a ratio the dimension of the base with the admitted thickness of the porous metal coating of "approximately 1.5mm thick measured from the solid core substrate to the more prominent edge of the porous coating away from the substrate." D.I. 324, ¶ 3(H).

| Exhibit No. | Part Name | | Thickness of Part | | Thickness of Part | | Ratio |
|---|---|---|---|---|---|---|---|
| 32D | PCA Femoral Hip Stem | a)<br>b) | 12.6 mm<br>25.0 mm | a)<br>b) | 1.5 mm<br>1.5 mm | a)<br>b) | 8.4:1<br>16.7:1 |
| 33D | PCA Total Hip Acetabular Cup | a)<br>b) | 1.52 mm<br>11.5 mm | a)<br>b) | 1.5 mm<br>1.5 mm | a)<br>b) | 1.01:1<br>7.67:1 |
| 36D | PCA Revision Knee Femoral Component | | 15.01 mm | | 1.5 mm | | 10:1 |
| 37D | PCA Knee Patella Disc Plate | a)<br>b) | 9.80 mm<br>6.83 mm | a)<br>b) | 1.5 mm<br>1.5 mm | a)<br>b) | 6.53:1<br>9.11:1 |
| 38D | PCA Knee Small | | 8.00 mm | | 1.5 mm | | 5.33:1 |
| 39D | PCA Knee Medium Revision Tibial Component | a)<br>b)<br>c)<br>d)<br>e)<br>f) | 12.50 mm<br>5.00 mm<br>6.50 mm<br>8.00 mm<br>9.50 mm<br>11.00 mm | a)<br>b)<br>c)<br>d)<br>e)<br>f) | 1.5 mm<br>1.5 mm<br>1.5 mm<br>1.5 mm<br>1.5 mm<br>1.5 mm | a)<br>b)<br>c)<br>d)<br>e)<br>f) | 8.33:1<br>3.33:1<br>4.33:1<br>5.33:1<br>6.33:1<br>7.33:1 |
| 40D | Small Resurfacing Tibial Component | a)<br>b)<br>c)<br>d)<br>e) | 6.50 mm<br>7.50 mm<br>8.50 mm<br>11.00 mm<br>9.50 mm | a)<br>b)<br>c)<br>d)<br>e) | 1.5 mm<br>1.5 mm<br>1.5 mm<br>1.5 mm<br>1.5 mm | a)<br>b)<br>c)<br>d)<br>e) | 4.33:1<br>5.0:1<br>5.67:1<br>7.33:1<br>6.33:1 |

Defendants contend that these ratios do not establish that their PCA products meet the limitations of claims 1–2 and 10–16 because they do not differentiate between "thin" and "extremely thin." The smallest ratio of the thickness of the base to the porous coating listed in the table is approximately 1 to 1 of the acetabular cup, PX–33, but the range of ratios is 7.67 to 1 around its periphery. The highest ratio involves the PCA hip stem, PX–32, with a ratio of 8.4 to 1 between the base and the coating and 16.1 to 1 when measured across the diameter of the underlying substrate. These ratios corroborate the testimony of Dr. Lemons that each PCA product reads on the limitations contained in claims 1–2 and 10–16 that the porous coating be "thin" or "relatively thin" to the thickness of the base.

Hahn also testified at trial that he characterized the terms "thin" and "extremely

demonstrate, however, the indefiniteness of claims 1–2 because the specification provides by way of example that the "thin" coat preferably be .1 inch and optimally between .015 to about 0.03 inches. PX–28, col. 3, lines 50–54. As previously construed, the "extremely thin" coat must be less thick than the "thin" coat.

Furthermore, Dr. Lemons testified that he could make a determination of "thin" or "extremely thin" by measuring the coating of the accused PCA products. D.I. 340, Vol. D at 754–55, 759, 762, 766.

thin" for Melpar's outside patent counsel, Mr. Hurvitz:

> Since the purpose of this coating was to achieve bony ingrowth with [sic without] sacrifice in [the] strength of the implant, the desired attribute would be to have the coating as thin as possible in those structures which are highly stressed, such as a bone stem or a hip stem. I mean, or something which was in—which was loaded heavily in operation in either bending or tension or shear. By this I meant extremely thin; in other words, the coating, itself, is considerably weaker than the forged or cast substrate, and therefore, in a highly stressed part, where the thickness or the cross-section of the part is critical, we wanted it reduced as little as possible, and that's where I advocated an extremely thin coating. In other parts such as those that are loaded in compression, such as an acetabular cup or the portion that was shown of the milling to be a Lee [sic, knee] joint or other prostheses which contained sections that are not loaded, there, the coating need merely be thin, since it would not detract from the load carrying capacity of that particular implant.

D.I. 340, Vol. F at 1363–64. In short, Hahn's testimony was that highly stressed parts such as a hip stem would have an "extremely thin" coating and parts loaded in compression such as an acetabular cup would have a "thin" coating. For example, the data in the table lists the ratios for the PCA hip stem as 8.4 to 1 and 16.7 to 1 as compared to a ratio of 1 to 1 and 7.67 to 1 of the acetabular cup. Because the testimony establishes that the Defendants' PCA products, PX–32, PX–34, PX–37, PX–38, PX–39, PX–40, have a porous coating which is "extremely thin" or "thin" as required by the claims at issue, the accused devices literally read on claims 1–2 and 10–16 of the '123 Patent. Plaintiff's Exhibit 33 has a porous coating which is thin relative to the base but not extremely thin as required in claims 1 and 2. Nevertheless, it reads on claims 10–16.

Defendants contend that the PCA products at issue in this suit are sold only for use with bone cement and do not infringe the claims of the '123 Patent if the Court were to read into the claims a limitation of bone ingrowth. The Defendants further contend that the only products made for adhesion by bone ingrowth were made for clinical investigation in order to obtain FDA approval to market the PCA products after the '123 Patent expired on September 20, 1988. Therefore, Defendants contend that the only PCA products which could conceivably come within the scope of the claims were those products made and sold for investigational use for adhesion by bone tissue ingrowth. In support of this argument, the Defendants argue that the Federal Circuit's recent opinion in *Eli Lilly and Co. v. Medtronic, Inc.*, 872 F.2d 402 (Fed.Cir.1989), ruled that the exemption from infringement provided for in 35 U.S.C. § 271(e)(1) applies not only to investigative use of patented drugs for purposes of obtaining FDA approval but also to "medical devices" such as the PCA products.

Before Defendants' argument can be addressed, however, Section 271(e)(1) must be viewed in the proper historical context. In *Roche Products v. Bolar Pharmaceutical Co.*, 733 F.2d 858 (Fed.Cir.1984), the Federal Circuit said there was no experimental use exception to infringement under 35 U.S.C. § 271(a) for a nonlicensee to use a patented drug product before the patent's expiration. The court concluded that infringement could be found for the investigational testing of an infringing medical device even though such testing is required to obtain FDA approval under 21 U.S.C. § 360e. *Id.* at 864–65. In response, Congress amended 35 U.S.C. § 271(a) by adding Section 271(e)(1) which provides, in pertinent part, that "[i]t shall not be an act of infringement to make, use, or sell a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs." In *Eli Lilly*, the Federal Circuit concluded "that section 271(e)(1) was added to overrule this court's decision in *Roche*." *Eli Lilly*, 872 F.2d at 406. The court then

held that "section 271(e)(1) allows a party to make, use, or sell *any* type of 'patented invention' [including medical devices] if 'solely' for the restricted uses stated therein." *Id.* The Federal Circuit made it clear in *Eli Lilly* that the exemption from patent infringement for investigational devices under Section 271(e)(1) is limited to medical devices used "solely for purposes reasonably related to [the] submission of information" to the FDA. *Id.*

■ In the present case, however, the evidence demonstrates that Defendants manufactured and marketed the PCA products for the purpose of engaging in the commercial exploitation of the '123 Patent prior to its expiration. *See* D.I. 340, Vol. L at 2908; PX–74 at W10774; PX–65 at 6. Defendants admit that Howmedica first marketed its PCA knee products in February, 1981, and first marketed its PCA hip products in February, 1984. D.I. 324, Admitted Fact, ¶ 3(G). The Defendants have also admitted that the PCA products "were designed so that fixation could be achieved with or without bone cement." *Id.* at ¶ 3(L). Since there is no difference in the products designed for "investigational" use and those designed for sale with bone cement only, it stands to reason that the PCA products were not used *solely* for investigative purposes to submit information to the FDA for approval of the products without the use of bone cement. This conclusion is even more compelling given the fact that the PCA products sold for fixation by bone cement could be and were, in fact, implanted for fixation by tissue ingrowth. D.I. 340, Vol. A at 149. Therefore, it strains the bounds of logic for the Defendants to argue that they should fall under the protective umbrella of Section 271(e)(1) which encourages investigational uses of patented medical devices when they are manufacturing infringing products for commercial purposes.

Even if Section 271(e)(1) could be construed to exempt the PCA products made for investigational use with adhesion by bone tissue ingrowth, it would not apply to exempt those PCA products marketed with the labeling instruction "Device is intended for cemented use only", *see, e.g.,* PX–33, because the Court has previously interpreted the claims of the '123 Patent as not limited to those implants where fixation is achieved by bone ingrowth. Moreover, it is well settled that the mere labeling of a product to advise customers of an allegedly noninfringing use of the product is insufficient as a matter of law to avoid infringement. *Huck Manufacturing Co. v. Textron, Inc.,* 187 U.S.P.Q. 388, 408 (E.D.Mich. 1975); *National Electric Products Corp. v. Circle F. Conduit Co.,* 62 F.2d 996, 999 (2nd Cir.1933); *Sandusky Foundry & Machine Co. v. De Lavaud,* 274 F. 607, 610–11 (6th Cir.1921). Furthermore, the FDA has no jurisdiction to prevent a doctor from using an approved drug or device in a manner different from the labeling instructions on the package. *United States v. Evers,* 453 F.Supp. 1141, 1149 (M.D.Ala. 1978), *aff'd* 643 F.2d 1043 (5th Cir.1981); *see also* D.I. 340, Vol. A at 233, Vol. N at 3337. Dr. Mayor testified at trial that the Defendants' package label would have little effect on the surgeon's decision on whether to use bone cement or permit fixation of the PCA product by means of bone tissue ingrowth. D.I. 340, Vol. A at 155. Indeed, Dr. Mayor testified that the preferred medical technique today is to implant porous coated prosthetic devices without bone cement. *Id.* at 149.

Since an inventor is entitled to all applications to which his invention can be put to use, including those not mentioned in the specification, the fact the PCA products were capable of being used so that fixation could be achieved with or without bone cement is sufficient for the purpose of showing infringement. D.I. 324, Admitted Fact, ¶ 3(L); *see B.G. Corporation v. Walter Kidde & Co.,* 79 F.2d 20, 22 (2nd Cir. 1935); *Ansul Company v. Uniroyal, Inc.,* 448 F.2d 872, 878 (2nd Cir.1971). Thus, as a matter of law, the Defendants cannot shield themselves from liability for infringing the '123 Patent by merely affixing a label to their PCA products admonishing the surgeon to use the PCA product only with bone cement when the PCA product is equally capable of being used without bone cement.

## C. Doctrine of Reverse Equivalents

A determination that the words of a claim literally read on the subject matter of an accused device is but an initial hurdle for the patentee to clear and does not necessarily end the infringement inquiry. *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 568, 18 S.Ct. 707, 722, 42 L.Ed. 1136 (1898); *Autogiro*, 384 F.2d at 397; *SRI*, 775 F.2d at 1118. When the patentee, as here, has met the burden of demonstrating literal infringement, "the accused infringer may undertake the burden of going forward [with evidence] to establish the fact of non-infringement under the reverse doctrine of equivalents." *SRI*, 775 F.2d at 1123–24. Under that doctrine, "where a device is so far changed in principle from a patented article that it performs the same or similar function in a substantially different way but nevertheless falls within the literal words of the claim", infringement liability will not be found. *Graver Tank*, 339 U.S. at 608–09, 70 S.Ct. at 856; *SRI*, 775 F.2d at 1123; *Phillips*, 673 F.Supp. at 1350, *aff'd*, 865 F.2d 1247. The Federal Circuit has noted, however, that a defense based on the doctrine of reverse equivalents is rarely successful because "products on which patent claims are readable word for word often are in fact the same" in substance as the claimed invention. *SRI*, 775 F.2d at 1123 n. 19. Consequently, "the defense is seldom raised." *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1112 n. 3 (Fed.Cir. 1983).

In the instant case, the Defendants argue that their PCA products do not infringe under the reverse doctrine of equivalents because they do not achieve the same result in the same way as the '123 Patent. They contend that the sintering technique used to make the PCA products results in a surface structure characterized as a uniform, completely interconnected porous layer which is "completely different" from the type of "structure" obtained by the plasma flame sprayed method disclosed in the '123 Patent. In support of their argument, Defendants claim that the '123 Patent yielded a coating which did not have inter-connecting porosity, was not porous and in which bone could not grow to the surface of the substrate.[9] Thus, the Defendants emphasize these characteristics of the sintering technique as demonstrating the substantially different character of their PCA products.

In relying upon these differences in the characteristics of the porous metallic coatings, the Defendants have completely misconstrued the inquiry under the reverse doctrine of equivalents. They have not introduced any evidence to demonstrate that the sintering processing technique used in making the PCA products is any different in principle from the claims of the '123 Patent.

In order to determine whether the Defendants' PCA products are so far changed in principle from the claimed invention as to be noninfringing under the reverse doctrine of equivalents, the Court must first determine the "principle" of Hahn's invention. *SRI*, 775 F.2d at 1124; *Phillips*, 673 F.Supp. at 1354. The invention of the '123 Patent is the combination for the first time of a porous metal coating bonded to the surface of a metal substrate. D.I. 340, Vol. G at 1571–72. The presence of pores permits the growth of soft or hard tissue into the porous coating for the purpose of achieving "substantially complete integration with the bone structure." PX–28, col. 2, lines 22–23. The accused PCA product is alleged to be changed by reason of the degree of interconnectedness of the sintered coated surface and the regularity of the average size of the pores which is "completely different" from the structure obtained by the plasma flame sprayed technique which yields a coating that does not have any interconnecting porosity or any

---

9. Defendants further argue that these differences were, in fact, acknowledged by the Patent Office when it issued Patent No. 3,855,638 (the "'638 Patent") on December 24, 1974, on Dr. Pilliar's porous coated sintered implants over its earlier rejection based upon the prior art reference of the '123 Patent. But the validity of the '638 Patent is not at issue in the present case and the Court refuses to express any opinion on the matter.

pores.[10] Evidence introduced at trial demonstrated, however, that the porous metallic layer produced by the plasma flame sprayed method disclosed in the '123 Patent contained some interconnected pores and open pores which would permit the growth of soft or hard tissue for bone fixation. For example, the Defendant's own witness, Dr. Albert Burstein, testified that photographs of the plasma sprayed surface of the pins produced by Mr. Hahn revealed "a material that displays some interconnection or open pore structure." D.I. 340, Vol. N at 3432. Although the specification of the '123 Patent indicates that at the exterior surface of the plasma coating "some pores [are] cut off from the surrounding environment", PX–28, col. 3, lines 60–61, the same sentence also states that other pores are "still ... connected by interior passageways." *Id.* at lines 62–63. Thus, it cannot be argued by the Defendants that the sintering processing technique employed in making the PCA products is substantially different from the method disclosed in the '123 Patent because the structure produced by the plasma flame spray method does not produce any interconnected porosity.

Furthermore, it is undisputed that the porous coating of the PCA products has the capacity to perform the function of bone fixation "without cement" through tissue ingrowth in exactly the same manner as disclosed in the '123 Patent. D.I. 324, Admitted Fact, ¶ 3(L). Although the uniform porosity produced by the sintering technique produces a greater degree of interconnectedness, it does not alter the primary function of interconnectedness in accomplishing fixation in a substantially different manner from Hahn's invention. The fact that the PCA product may be superior to Hahn's invention because the uniform porosity of the sintered coating enhances fixation by increased pore interconnectedness and by permitting tissue ingrowth to the underlying surface of the metal substrate does not demonstrate that the "principle" of bone fixation through a porous layer attached to a metal substrate as disclosed in the '123 Patent has been so far changed that the reverse doctrine of equivalents should be applied. *Studiengesellschaft Kohle v. Dart Industries,* 726 F.2d 724, 728 (Fed.Cir.1984); *see also O'Reilly v. Morse,* 56 U.S. (15 How.) 62, 123, 14 L.Ed. 601 (1853) (The mere "improvement" or "change in the form" of the patented device which does not essentially vary the device, its operation or organization will not make the new device a new invention.).

The Defendants also contend that the plasma flame spray coating was not porous. Presumably, Defendants mean that the PCA products perform the function of bone fixation in a substantially different manner because the '123 Patent does not disclose a range of pore sizes which is sufficient to sustain bone ingrowth. The average size of the pores of the sintered coating range from 400 to 450 microns,[11] whereas the pore size range disclosed in the '123 Patent is "from about 30 microns to about 200 microns wide at the opening, although the range of widths from about 40 microns to about 70 microns appears to be optimum." PX–28, col. 3, lines 63–66. Professor Williams testified at trial that "functional bone ingrowth" into a porous surface is defined as that which "is going to provide for that fixation between the material and the bone which will be adequate for use in the patient." D.I. 340, Vol. M at 3043. Although there was inconsistent testimony at trial concerning the minimum pore size that would permit bone

---

10. In determining whether the PCA product performs the principle of bone fixation in a substantially different manner from the '123 Patent, one may not escape infringement by merely taking the claimed structure and using it in a way that differs from the description contained in the preferred embodiment. *Smith v. Snow,* 294 U.S. 1, 15–16, 55 S.Ct. 279, 285, 79 L.Ed. 721 (1935); *SRI,* 775 F.2d 1121 n. 14.

11. In a document entitled "Summary Report P.C.A. Porous Knee Coating", DX–376, the Defendants describe "[t]he pore structure [of the sintered coated PCA products] being a function of the packing density of the applied powder is comprised of pores ranging from as large as 1000 microns to as fine as 20 microns ... [while] 80 percent of the pores are in excess of 200 microns with a median pore size of about 400–450 microns." DX–376 at 2; D.I. 340, Vol. M at 2944.

ingrowth for functional bone fixation,[12] all of the minimum pore sizes mentioned, 75, 100 and 150 microns, are within the range of about 30 to 200 microns as specified in the '123 Patent. Although the PCA products have larger pore size openings to permit greater bone ingrowth to achieve better fixation, the PCA products do not present any different means of providing for fixation other than that which is disclosed in the '123 Patent. Thus, the PCA products produced by the sintered processing technique may represent optimum conditions for achieving bone fixation but such conditions merely reflect changes to a matter of degree. They do not, however, suggest that these changes cause the PCA products to perform the function of fixation in a substantially different way. Since the equivalence of the subsequently developed devices is established by showing only accomplishment of the same result, the sum total of the technological changes effecting the characteristics of the sintered coating does not alter the primary function of bone fixation beyond what the inventor disclosed and, therefore, does not place the accused PCA products beyond the scope of the claims in the '123 Patent. *See, e.g., Texas Instruments v. U.S. Intern. Trade Com'n,* 805 F.2d 1558, 1570–71 (Fed.Cir. 1986); *Phillips,* 673 F.Supp. at 1357.

The Court concludes that American Standard has met its burden of proving by a preponderance of the evidence that Defendants' PCA products infringe claims 1, 2, 10–16, 18, 21, 22, 29–31 of the '123 Patent.

## D. Willful Infringment

 In determining whether an infringer acted in bad faith so as to merit treble damages, the Court should consider the "totality of the circumstances." *Shiley, Inc. v. Bentley Laboratories, Inc.,* 794 F.2d 1561, 1568 (Fed.Cir.1986). Specifically, the Court should consider:

(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and (3) the infringer's behavior as a party to the litigation.

*Bott v. Four Star Corp.,* 807 F.2d 1567, 1572 (Fed.Cir.1986). "Willfulness is established only where it is shown that there was a deliberate purpose to infringe, and such a purpose is not found where the validity of the patent and any possible infringement is open to honest doubt." *International Manufacturing Co. v. Landon, Inc.,* 336 F.2d 723, 728 (9th Cir.1964). For example, the Federal Circuit has decided:

A party who has obtained advice of competent counsel, or otherwise acquired a basis for *bona fide* belief that a patent is invalid, can be said to serve the patent system in challenging that patent in a law suit conducted fairly, honestly, and in good faith. Such a party should not have increased damages or attorney fees imposed solely because a court subsequently holds that belief unfounded, particularly when the issues may be fairly described as "close."

*Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565, 1581 (Fed.Cir.1986). Moreover, "[t]he jurisprudence ... uniformly requires clear and convincing evidence in support of increased damages." *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 628 (Fed.Cir.1985).

 Plaintiff argues in this case that, commencing in April, 1979, the Defendants embarked on a reckless and deliberate course to willfully infringe the claims of the '123 Patent when it began its project to develop the PCA product. Defendants counter that Pfizer sought and received a

---

**12.** Dr. Hulbert testified as to the minimum pore size of 75 microns for bone ingrowth to occur. Dr. Rostoker testified that Galante–Rostoker patent application specified a useful range of 75 to 375 microns to achieve functional bone tissue ingrowth. D.I. 340, Vol. I at 1959–60. Professor Pilliar then testified that the minimum pore size into which bone will grow is about 100 microns. D.I. 340, Vol. L at 2690–91; *see also* D.I. 340, Vol. A at 93–94. Finally, Professor Williams testified that in 1968 the relevant literature suggested that a minimum of 100 microns was necessary for functional bone ingrowth. D.I. 340, Vol. M at 3031–34.

competent legal opinion from outside counsel prior to development of a PCA prototype device which was relied upon by management in making the decision to manufacture and sell such a device. Of course, a letter opinion from counsel by itself is insufficient to prove a good faith belief that the '123 Patent is invalid. *See, e.g., Lam, Inc. v. Johns–Manville Corp.*, 668 F.2d 462, 475 (10th Cir.1982). The Court must evaluate all the evidence to ensure that such an opinion does not represent an attempt to circumvent the consequences of deliberately deciding to infringe a patent. Accordingly, "[t]he timing of the inquiries to counsel, before or after manufacture and sale of the infringing device, and the strength of counsel's arguments are important." *Id.*

In support of their contention of willfulness, Plaintiff introduced evidence that the PCA project was initiated in April, 1979, for commercial and competitive reasons. For example, Mr. Kenna, the PCA project manager, stated in a proposal for the project:

The risk of not developing a well designed porous coated system within the next two years could be monumental to a company like Howmedica whose business is approximately 85% joint replacement prostheses.... Today the competition is becoming much more intense as companies become more aware of the threat facing them if they do not have a marketable porous coated system within the next two years.

PX–74 at W10774. The evidence also shows that the goal of the PCA project was to develop a commercial product as reflected in an internal memorandum prepared on June 6, 1979, by Dr. Kummer: "6. *Sintered Surface*—Status: R. Kenna is working on this project at Rutherford with

the goal of a commercial product (and in-house production capability)." PX–65 at 6. On December 20, 1979, a Pfizer circular letter announced that a prototype of the PCA product at issue was available for clinical trials. PX–77. Furthermore, the record shows that by January 25, 1980, a prototype of the PCA knee product had been implanted in a human patient. DX–84 at W–01452. Plaintiff maintains that Pfizer's willfulness and the timeliness of the validity opinion must be judged against this background of Pfizer's recognition of the market importance of porous coated implants.

Plaintiff also introduced evidence to show that Pfizer knew its prototype infringed the claims of the '123 Patent. For example, on May 29, 1979, Dr. Kummer initiated a formal request for a patent search after a discussion with Mr. Akers about the '123 Patent which stated: "Current experimental fabrication—infringes (1) [the '123 Patent]." PX–67; DX–978 at 55–56.[13] This was followed by a conversation between Dr. Kummer and Mr. Akers about the possibility of infringing the '123 Patent. They discussed whether the '123 Patent had "ramifications for other things that were being done other than just plasma spraying" and concluded that "within the Hahn patent is any porous coating on a metal substrate." DX–978 at 48–49. In the summer of 1979, Mr. Akers compared "developmental candidates" of the PCA product with the claims of the '123 Patent and concluded that the prototype would read on at least claims 1, 2, 10–18, 21, 22 and 29–31. D.I. 340, Vol. C at 460, 475–77.[14] Thus, the evidence indicates that Pfizer was aware in the summer of 1979 of the existence of the '123 Patent and that the PCA developmental candidate would

13. Nevertheless, at the time Dr. Kummer requested the patent search, Mr. Kenna's project group had not yet developed a prototype of the PCA product. In fact, Dr. Kummer never saw any of Mr. Kenna's prototypes and Dr. Kummer left Howmedica in July, 1979, before any prototype was made. DX–978 at C–59, 84–85, 87. Indeed, the record reveals that as of the summer, 1979, there was no identified PCA product,

only "developmental candidates." D.I. 340, Vol. C at 477, 495–96.

14. The record also demonstrates that Mr. Akers only made a determination that the prototype came within the scope of the claims. He did not opine about infringement liability because that would require a determination of the validity of the '123 Patent. D.I. 340, Vol. C at 459–61.

come within the scope of the claims of the '123 Patent.[15]

After concluding that the PCA prototype device might literally infringe some claims of the '123 Patent, Mr. Akers, on August 3, 1979, asked Mr. Kidd, then of Pennie & Edmonds, for an opinion about the validity of claims 1, 2, 10–18, 21, 22 and 29–31 of the '123 Patent. D.I. 340, Vol. C at 477; PX–55. The Defendants received Mr. Kidd's opinion on October 3, 1979, "that *all* of the claims of the '123 Patent are unpatentable under 35 U.S.C. § 103 over either one of U.S. Patents Nos. 2, 721,387 or 3,576,074, either taken alone or (depending upon interpretation) in combination with U.S. Patent No. 448,745." PX–293 at 1. This letter was seven pages long and thoroughly evaluated the claims of the '123 Patent. Although Plaintiff believes that Mr. Kidd should have made an independent search for prior art instead of relying upon material sent to him by Mr. Akers, the Plaintiff does not contest the substance of the opinion letter. Plaintiff does argue, however, that the opinion letter represented only a "belated formality" to circumvent the consequences of a prior commitment to market an infringing product.

Plaintiff's argument is misplaced because the decision to market the PCA product was not made until the end of 1980 or the beginning of 1981. D.I. 340, Vol. J at 2304–05. After receiving the October 3, 1979, letter, Mr. Akers reported that letter to Mr. John Balkowski, general counsel to Howmedica, and Ms. Ann LaRue, a staff attorney, in a letter dated November 14, 1979, which concluded that Howmedica's PCA project did not infringe the '123 Patent since it was invalid. DX–1033B; D.I. 340, Vol. C at 494, Vol. J at 2303. Thereafter, as part of the corporate policy of Howmedica, Mr. Balkowski considered and relied upon these opinion letters in making the decision to authorize the manufacture of the PCA product sometime at the end of 1980 or in early 1981. D.X. 340, Vol. J at 2304–05, 2307.[16] This evidence clearly demonstrates that Defendants relied upon the validity opinion of October 3, 1979, in making their decision to manufacture the PCA product. The fact that the Defendants began working on the project prior to the issuance of the opinion does not suggest willfulness especially since no PCA prototype product was developed until December, 1979.

The Court concludes that infringement in this case was not willful and calculated. Although there is no question that Defendants were aware of the existence of the '123 Patent and that their PCA product fell within the scope of claims 18 and 29, the totality of the circumstances clearly demonstrates that the Defendants had a good faith basis for believing that the '123 Patent was invalid. The Court concludes that this is not one of those cases where the Defendants knew that their product violated the patent at issue and did not have a good faith basis for challenging its validity.

## III. ANTICIPATION—35 U.S.C. § 102(a)

The '123 Patent is presumed valid and the Defendants have the burden of establishing invalidity under 35 U.S.C. § 282.

---

**15.** This evidence also establishes that Defendants learned about the '123 Patent before American Standard gave notice of their belief that the Defendants' product infringed the '123 Patent. The fact that Defendants learned of the '123 Patent based upon a corporate policy not to infringe patents and then diligently sought the opinion of counsel without the threat of an infringement suit is probative evidence of non-willfulness. *See, e.g., American Original Corp. v. Jenkins Food Corp.,* 774 F.2d 459, 465 (Fed.Cir.1985); *Studinegesellschaft Kohle mbH. v. Dart Industries,* 666 F.Supp. 674, 689 (D.Del. 1987), *aff'd,* 862 F.2d 1564 (Fed.Cir.1988).

**16.** Mr. Balkowski's reliance on the validity opinions is corroborated by further evidence. In mid–1983, Bristol–Myers contacted Pfizer to suggest entering into negotiations for licensing the '123 Patent and Mr. Balkowski recommended that the Pfizer patent group re-examine the validity of the '123 Patent. D.I. 340, Vol. J at 2305–06. As a result, another legal opinion was prepared which also concluded that the '123 Patent was invalid. D.I. 340, Vol. J at 2305–06; DX–1033C. Based upon these three opinions on invalidity, Mr. Balkowski recommended to Pfizer management that they decline the invitation to enter into negotiations to licence the '123 Patent. D.I. 340, Vol. J at 2306.

This presumption can be rebutted only by clear and convincing evidence. *Loctite,* 781 F.2d at 861; *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1360 (Fed.Cir.1984).

 The doctrine of anticipation relates to the novelty and priority of invention. In order to prove anticipation of a patent claim under 35 U.S.C. § 102(a), a party must demonstrate by clear and convincing evidence, *inter alia,* identity of invention. *Kalman,* 713 F.2d at 771; *Phillips,* 673 F.Supp. at 1287. Identity of invention is a question of fact. *Kalman,* 713 F.2d at 771 (citing *Coupe v. Royer,* 155 U.S. 565, 578–79, 15 S.Ct. 199, 205, 39 L.Ed. 263 (1895)); *see Tyler Refrigeration v. Kysor Indus. Corp.,* 777 F.2d 687, 689 (Fed. Cir.1985); *Lindemann Maschinenfabrik v. Am. Hoist and Derrick,* 730 F.2d 1452, 1458 (Fed.Cir.1984). As the Federal Circuit has noted:

> [O]ne who seeks such a finding must show that each element of the claim in issue is found, either expressly described or under the principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice.

*Kalman,* 713 F.2d at 771. The prior art need not, however, state the elements of the claim in identical language. *See, e.g., Akzo N.V. v. U.S. Intern. Trade Com'n,* 808 F.2d 1471, 1479 (Fed.Cir.1986) (noting *Application of Brown,* 329 F.2d 1006, 1011 (C.C.P.A.1964)). In addition to identity of invention, anticipation requires that the prior art reference must be enabling, thus "placing the allegedly disclosed matter in the possession of the public." *Akzo,* 808 F.2d at 1479; *see also In re Donahue,* 766 F.2d 531, 533 (Fed.Cir.1985) (citing *Application of Borst,* 345 F.2d 851, 855 (C.C.P. A.1965)).

## A. The Effective Date of the '123 Patent

 In order to receive an effective date earlier than the filing date of the '123 Patent for the purpose of determining whether a reference is prior art, "a patentee has the burden of proving by clear and unequivocal evidence, that the invention was both conceived and reduced to practice before the application date." *Freeman,* 693 F.Supp. at 145; *Polaroid Corp. v. Eastman Kodak Co.,* 641 F.Supp. 828, 862 (D.Mass.1985), *aff'd,* 789 F.2d 1556 (Fed.Cir.1986). Thus, a patentee is entitled to his conception date as the date of the invention only if he proves by clear and convincing evidence that he acted with due diligence in reducing the invention to practice. *Freeman,* 693 F.Supp. at 146. In order to show due diligence, the patentee must "account for the entire critical period [between the date of conception and the date of reduction to practice] by showing either activity aimed at reduction to practice or legally adequate excuses for inactivity." 3 D. Chisum, *Patents* § 10.07 (1987); *Freeman,* 693 F.Supp. at 146. In addition, the law requires corroboration of diligence during the critical period.

Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed. Cir.1986) (quoting 1 *Robinson on Patents* at 532 (1890)); *Coleman,* 754 F.2d at 359. "Actual reduction to practice occurs when the inventor constructs a product or performs a process that is within the scope of the patent claims and demonstrates the capacity of the inventive idea to achieve its intended purpose." 3 D. Chisum *Patents* § 10.06 at 10–84 (citing *UMC Electronics Co. v. U.S.,* 816 F.2d 647, 656 (Fed.Cir. 1987)). Of course, "constructive reduction to practice occurs when a patent application on the claimed invention is filed." *Hybritech,* 802 F.2d at 1376; *Weil v. Fritz,* 572 F.2d 856, 865 n. 16 (C.C.P.A.1978).

In this case, the critical period is between May 24, 1968, and April 29, 1969. Defendants argue that Hahn undertook no efforts to reduce his invention to practice for substantial periods of time and the evidence offered by the Plaintiff in support of Hahn's work was scattered, equivocal, inconclusive and failed to corroborate Hahn's activity aimed at reducing his invention to practice during this period. Thus, Defen-

dants contend that Hahn's effective date of invention is limited to either the constructive reduction to practice date of his application dated April 29, 1969, or the alleged actual reduction to practice dated March 11, 1969. But even this latter date is attacked by the Defendants in a footnote in their post-trial brief. Their argument is that Hahn never proved bone ingrowth and that his "histological study" and torque tests were not conclusive. Testimony at trial established that a "histological study" at the time in question referred to a general examination of tissue by a variety of means, including microscopic examination done by reflected light as used by Hahn. *See* discussion, *infra* at 149. Further, the torque tests, combined with the "histological study", were corroborative of Hahn's conclusions about bone ingrowth. As will be seen *infra*, however, the argument about the March 11, 1969, date may be a moot question.

### 1. *Conception*

In 1968, Melpar had an established procedure for the submission of inventions by its employees which included the completion of an "Invention Disclosure" form, PX–6, PX–8 at 2, "Evaluation of Invention", PX–7, "Invention Questionnaire", PX–8 at 1, and "Abstract of Invention", PX–9; *see also* D.I. 340, Vol. E at 1114. These forms were utilized by Hahn and his co-workers during the course of their activities designed to reduce the invention to practice. Hahn testified at trial that he conceived the subject matter of the '123 patent on May 24, 1968, while on a plane traveling back from a materials technology conference in San Antonio, Texas, and "immediately" signed an invention disclosure form upon returning to his office at Melpar. D.I. 340, Vol. E at 1114; PX–6; PX–8. Hahn listed his claimed invention on the Invention Disclosure as "[t]he combination of [plasma flame] sprayed coatings and wrought or

cast substrates in surgical implants ... [t]o stimulate the growth of bone tissue into implant (for improved adhesion) without necessitating use of a structurally weak material." PX–6; PX–8 at 1.[17] Moreover, after Hahn conceived his invention, he disclosed it to his co-worker, Mr. Ban, in the spring of 1968. Ban Dep., DX–952 at 23–24. Thus, Plaintiff has met its burden of showing conception of the claimed invention and the necessary corroboration.

### 2. *Reduction To Practice*

The process of reducing Hahn's invention to practice began almost immediately after Hahn returned from the San Antonio conference and followed a two-tiered approach: the development of an experimental protocol and the solicitation of funds to conduct the experiments.

Hahn testified that a day or two after he returned from San Antonio he met with Mr. Speaker, manager of the Melpar life sciences laboratory, Dr. Palich, a veterinarian in Mr. Speaker's laboratory, and other members of his staff at Melpar to request their assistance in implanting a plasma flame sprayed pin into animals. D.I. 340, Vol. E at 1139–40, 1142–43. Beginning in early June, 1968, a number of different metals, such as stainless steel, cobalt chrome alloy and titanium, were considered as possible sources for the pin specimen. *Id.* at 1143; DX–952 at 23. In addition, Mr. Hahn contacted several commercial vendors who could supply titanium or cobalt chrome powder suitable for plasma flame spraying a porous coating on the pin implant specimen. *Id.* at 1143–45; DX–983 at 34–35; PX–12; PX–178. In June, 1968, there were preliminary experiments using stainless steel. By the end of July, the steps of the experimental protocol had been formulated. DX–983 at 78; D.I. 340, Vol. E at 1142; DX–952 at 23. The experimental protocol provided for a series of experi-

---

17. Although the invention disclosure form was not witnessed by Mr. R.B. Power until November 26, 1968, this delay does not prove by itself a failure of corroboration or even a failure of proof of conception on the date claimed. *See, e.g., Hybritech,* 802 F.2d at 1376–77 (Federal Circuit reversed lower court's finding that laboratory notebooks and internal documents wit-

nessed months later failed to corroborate the inventor's claimed invention). Similarly, the "Evaluation of Invention", PX–7, "Invention Questionnaire", PX–8 at 1, and "Abstract of Invention", PX–9, which were not completed until November 26, 1968, do not fail to corroborate Hahn's conception in May, 1968.

ments: (1) the determination of whether a porous metal coating could be sufficiently bonded to a solid metal substrate, and (2) a schedule was also established for the implantation of plasma flame sprayed pin specimens into the femurs of sheep and the subsequent sacrifice of the animals in order to determine the degree of adhesion between the implants and the bone. D.I. 340, Vol. E at 1143; DX–952 at 23; DX–983 at 51–52.

In July, 1968, staff members at the Melpar laboratories had conducted initial trials to determine the feasibility of applying a porous metal coating using the plasma flame spraying technology to a solid metal substrate. DX–952 at 23–25. Subsequently, in August, 1968, the staff members at the Melpar laboratories successfully completed shear tests of the bond strength between the porous coating and the metal substrate to determine the adhesion of the porous coating to the underlying metal substrate. DX–983 at 51–52, 58–60, 105; PX–181. Defendants claim that this evidence is not credible because Plaintiff has failed to produce any non-hearsay, documentary evidence to corroborate these tests. To the contrary, the July–August adhesion tests were part of a formulated experimental protocol conducted by at least two staff members, Messrs. Ban and Speaker. In addition, Mr. Russell Rowe testified at trial that he began applying the porous metal coatings to the test pins by the flame spray technology starting on September 24, 1968, and continuing through November, 1968. D.I. 340, Vol. G at 1597, 1603–04; PX–5. Defendants point out that Mr. Rowe inexplicably took from September to November, 1968, to coat 30 pins for implantation into the sheep. Although Defendants claim that no reasonable explanation was given at trial to explain why it took over two and one-half months to spray the test specimens, the Court does not find such a period *prima facie* unreasonable or significant evidence that Hahn and/or his associates did not act diligently in reducing his invention to practice. To impose such temporal restrictions on inventors in their studied approach to experimentation would be not only burdensome but foolhardy and could frustrate and, in many situations, defeat the goals of fostering the inventive spirit.

In November, 1968, a total of 12 pins were implanted into the femora of three young sheep. Palich Dep., DX–970 at 51–53; PX–31 at 573. The experiment was designed to determine whether bone tissue would grow into the porous metal surface coated pins and whether the pins would have any toxic effect on the biological environment. Dr. Palich implanted three types of titanium pins in each femur: one was a "fine" coated pin, a "coarse" coated pin (the difference was in the size of the pore openings) and a control pin with no porous coating. DX–970 at 40, 52–54; DX–983 at 78, 80–81; PX–31 at 573. The first sheep was sacrificed approximately 14 weeks after the implantation in early March, 1969. DX–970 at 61; PX–14; PX–31 at 574. The pins were then removed from the sheep's femurs utilizing a torque test to determine the extent of the union of bone tissue with the pins. DX–970 at 63, 65–66, 91; PX–163–171. The control pin with no porous coating was removed without any problem. The heads of the porous coated pins were either deformed or sheared off under the pressure applied to remove them. DX–970 at 65; PX–145, PX–28, col. 4, line 73 to col. 5, line 12; PX–31 at 574. Dr. Palich examined sections of the pin specimens and observed "tissue in the pore spaces" which he concluded was "bony ingrowth." DX–970 at 77–8; D.I. 340, Vol. E at 1050–51. In addition, Mr. Speaker observed "pretty clear evidence of ingrowth of osteoblasts." DX–983 at 115; PX–182. The results of these tests were reported in an internal memorandum on March 11, 1969. PX–14.

The Defendants contend that the Plaintiff has failed to corroborate its claim of due diligence by "clear and unequivocal evidence" because Hahn did not undertake any serious efforts to reduce his invention to practice for substantial periods of time. The Court concludes, however, that there is substantial evidence of continuous activity to reduce the invention to practice from May, 1968, to April, 1969, a period of approximately eleven months from conception

to the conclusion of experiments. Once Hahn conceived his invention, he wasted no time assembling a team to investigate the proper type of metal from which to make the pins, the proper pore size openings and adhesion strength of the plasma flame sprayed coating to the metal substrate by establishing an experimental protocol. In addition, Hahn disclosed his invention to others in the marketplace by seeking public and private funding to conduct his research.

At the same time as the experimental protocol was being formulated, Hahn and other personnel at Melpar had discussions in May, June, July and August of 1968 with potential outside sources for funding of the experimental work on Hahn's invention. At the request of Hahn, Mr. D.S. Levine of Melpar contacted Dr. Eugene Murphy at the Veterans Administration Hospital in New York in May, 1968, in order to discuss Hahn's conception and obtain funding for experiments to test it. D.I. 340, Vol. C at 601–04; PX–201. In June, 1968, Hahn met with Dr. George Hyatt at the Georgetown University Hospital to discuss the invention and funding. D.I. 340, Vol. E at 1157. In July, 1968, Messrs. Hahn, Speaker and Richardson met with Dr. Fred Leonard at Walter Reed Hospital on two occasions attempting to solicit funds for the research project. D.I. 340, Vol. E at 1158; PX–180. In August, 1968, Messrs. Hahn, Speaker and Palich met with Colonel Rose and his staff at the Army Surgeon General's Office. D.I. 340, Vol. E at 1164, 1169–73; DX–983 at 96–7; PX–181.

Defendants contend that Plaintiff's repeated attempts during the summer of 1968 to achieve funding for the project were not focused on reducing his invention to practice but instead on soliciting a government contract so that Melpar could make a profit on any commercialization. *See, e.g., Lutzker v. Plet,* 843 F.2d 1364, 1367 (Fed.Cir.1988); *Griffith v. Kanamaru,* 816 F.2d 624, 627 (Fed.Cir.1987). Defendants failed to appreciate, however, Plaintiff's efforts to work toward reducing the invention to practice while simultaneously seeking funding from outside sources and following an experimental protocol. Funding could not be achieved without the existence of such an experimental protocol. D.I. 340, Vol. E at 1161; DX–179. The funding was not aimed at producing or manufacturing a developed product but instead was focused on conducting experiments to prove that a plasma flame spray coated surface on a metal substrate could result in bone ingrowth. Moreover, an inventor may rely on activities directed toward raising capital or funding for a project in order to prove that he acted with due diligence in reducing his invention to practice. *See, e.g., Marconi Wireless Co. v. U.S.,* 320 U.S. 1, 34, 63 S.Ct. 1393, 1408–09, 87 L.Ed. 1731 (1943). Indeed, those efforts were related to reducing the claimed invention of the '123 Patent to practice.

The Court concludes, therefore, that Plaintiff has proved by clear and convincing evidence that Hahn continuously and diligently reduced to practice the invention claimed in the '123 Patent. Thus, the effective date of the '123 Patent is the date of conception, May 24, 1968.

## B. The Work of Hirschhorn and Reynolds

■ Defendants argue that the '123 Patent is anticipated under 35 U.S.C. § 102 by the work of Dr. Joel Hirschhorn and his graduate student John Reynolds. Defendants assert that the work of Dr. Hirschhorn and Mr. Reynolds was placed in the public domain prior to the date of Hahn's invention in three instances: (1) the Reynolds Thesis, DX–1, dated June 14, 1968, and made accessible through both the University of Wisconsin library and Dr. Hirschhorn sometime in the late summer-early fall of 1968, (2) Dr. Hirschhorn's speech in October, 1968, in Detroit at the AIME symposium on biomaterials and biomechanics, and (3) the publication of Dr. Hirschhorn's Detroit speech in *Research In Dental And Medical Materials* in early 1969. DX–52. Defendants believe that the work of Dr. Hirschhorn and Mr. Reynolds anticipates the '123 Patent because these "three pieces of prior art *each* taught the creation of a metal bone implant with a porous metal

coating bonded to a metal base...." D.I. 347 at 22 (emphasis added).

The Reynolds Thesis, DX–1, is the Master's Thesis by Mr. John T. Reynolds entitled "Powdered Metallurgy Fabrication of Cobalt–Base Alloy Surgical Implants" which was approved by his Thesis Advisor, Dr. Joel Hirschhorn, at the University of Wisconsin on June 14, 1968. Plaintiff contends that the Reynolds Thesis is not valid prior art because it was not a printed publication under 35 U.S.C. § 102(a) before the effective date of the '123 Patent.[18] A printed publication in the United States is prior art under Section 102(a) if it was published prior to the date of invention. 35 U.S.C. § 102(a). Because advances in technology have created a wide variety of means to disseminate a reference to interested members of the public, the Federal Circuit has held that in determining whether a printed document constitutes a statutory bar "the touchstone is public accessibility." *Application of Bayer*, 568 F.2d 1357, 1359 (C.C.P.A.1978); *In re Hall*, 781 F.2d 897, 898–99 (Fed.Cir.1986). The statutory phrase "printed publication" has been interpreted to mean that "so long as accessibility is sufficient 'to raise a presumption that the public concerned with the art would know of [the invention]'" prior to the critical date, *Bayer*, 568 F.2d at 1361 (quoting *Camp Bros. & Co. v. Portable Wagon Dump & Elevator Co.*, 251 F. 603, 607 n. 10 (7th Cir.1917)), then the reference may be considered "published" under Section 102. *Constant v. Advance Micro–Devices, Inc.*, 848 F.2d 1560, 1568 (Fed.Cir. 1988); *Hall*, 781 F.2d at 899. Accessibility does not have to be shown by evidence of a specific date of cataloging and shelving a thesis. Instead, competent evidence of the general library practice or evidence of routine business practice may be relied upon to prove that the reference was available prior to the critical date. *Id.* at 899.

American Standard argues that the Reynolds Thesis is not valid prior art because it was not publicly available prior to May 24, 1968, when Mr. Hahn conceived his invention claimed in the '123 Patent. In order for the Reynolds Thesis to be valid prior art, Pfizer must establish that the Reynolds Thesis became a publicly accessible reference to the public concerned in the art prior to May 24, 1968. Dr. Hirschhorn approved the Reynolds Thesis on June 14, 1968, and indicated that, apart from indexing and shelving in the library at the University of Wisconsin, the Thesis was made generally available in the summer of 1968. In light of this evidence, the Court concludes it was not publically available prior to May 24, 1968, and is, therefore, not prior art under Section 102(a). *In re Bayer*, 568 F.2d at 1361. In addition, the Court similarly concludes that the October 1968 speech in Detroit by Dr. Hirschhorn and the subsequent article published in early 1969, DX–52, fail to qualify as valid prior art under Section 102(a) because these references occurred *after* the May 24, 1968, invention date of the '123 Patent.

## IV. PRIOR INVENTION OF ANOTHER—35 U.S.C. § 102(g)

■ Although the work of Dr. Hirschhorn and Mr. Reynolds as disclosed in the Reynolds Thesis is not relevant prior art under 35 U.S.C. § 102(a), it may still be valid prior art under Section 102(g).[19] Several recent opinions by the Federal Circuit hold that 35 U.S.C. § 102(g) does not require public disclosure of the work or that the work be "known to the art" in order to qualify as prior art so long as: (1) the prior art at issue has been reduced to practice, and (2) there has been no abandonment, suppression or concealment. *E.I. Du Pont de Nemours*, 849 F.2d at 1437; *Hybritech*, 802 F.2d at 1376; *Kimberly–Clark v.*

---

**18.** Title 35, Section 102(a) of the United States Code reads in pertinent part: "A person shall be entitled to a patent unless—(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent."

**19.** The Federal Circuit has held that 35 U.S.C. § 102(g) "is one type of 'anticipation', *i.e.*, prior invention by another of the same invention." *Hybritech*, 802 F.2d at 1379. Accordingly, "[i]t is axiomatic that for prior art to anticipate under § 102 [including § 102(g) ] it has to meet every element of the claimed invention." *Id.*

*Johnson & Johnson,* 745 F.2d 1437, 1444 (Fed.Cir.1984); *Application of Bass,* 474 F.2d 1276, 1292 (C.C.P.A.1973) (Baldwin, J., concurring). Thus, in order to determine whether a reference constitutes prior art in this case, the Court must first determine whether there was a conception and reduction to practice of the invention at issue and then apply the basic rules of priority under Section 102(g).

The United States patent law is grounded on the fundamental principle that "the patent right is granted to the first inventor rather than the first to file a patent application." *Paulik v. Rizkalla,* 760 F.2d 1270, 1272 (Fed.Cir.1985). The "mere lapse of time" will not prevent the inventor from receiving a patent. *Mason v. Hepburn,* 13 App.D.C. 86, 91 (D.C.Cir.1898). The sole exception to this principle exists in 35 U.S.C. § 102(g) and the exigencies of the priority contest. *Paulik,* 760 F.2d at 1272.[20] The basic rule of priority under Section 102(g) is that "the party who establishes that he is [both] the first to conceive and the first to reduce to practice is entitled to a patent thereon" as the first inventor of the subject matter in question. *Lutzker,* 843 F.2d at 1366; *see also* 3 D. Chisum *Patents* § 10.03[1] at 10–20.

However, this rule is subject to an important exception. If the first to conceive the subject matter of the invention fails to reduce it to practice, either actually or constructively, before another inventor does, the first to conceive is still considered the inventor if he can show that he exercised

reasonable diligence in reducing the idea to practice from a time just prior to when the second inventor entered the field. *Marconi,* 320 U.S. at 34–35, 63 S.Ct. at 1409; *Boyce v. Anderson,* 451 F.2d 818, 820 (9th Cir.1971); *see also Griffith,* 816 F.2d at 626.[21]

### A. The Work of Dr. Hirschhorn and Mr. Reynolds

The Defendants carry the burden of proving by "clear and unequivocal evidence" that the invention of Dr. Hirschhorn and Mr. Reynolds was both conceived and reduced to practice prior to the invention date of the '123 patent in order to qualify as prior under 35 U.S.C. § 102(g). *See Lutzker,* 843 F.2d at 1366. In the instant case, it is uncontested that Dr. Hirschhorn conceived of the use of powder metallurgy techniques in 1967 to produce a bone implant covered with a porous metal surface.[22] By April, 1968, it is alleged Mr. Reynolds had fabricated, implanted and evaluated such an implant specimen and concluded that tissue ingrowth had occurred. Thus, the question before the Court is whether the work of Dr. Hirschhorn and Mr. Reynolds as disclosed in the Reynolds Thesis was reduced to practice and therefore constitutes prior art under the priority rules established in 35 U.S.C. § 102(g).

Dr. Hirschhorn initially developed the idea researched and described by Mr. Reynolds in his Thesis.[23] The idea was to create

---

**20.** Title 35, Section 102(g) of the United States Code provides that:

A person shall be entitled to a patent unless * * * (g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and the last to reduce to practice, from a time prior to conception by the other.

**21.** It is well settled that the critical period of diligence is from the time just before the entry of a second inventor into the field until a reduction to practice. *Driscoll v. Cebalo,* 5 U.S.P.Q.2d 1477, 1481 n. 6 (P.T.O.1982), *aff'd in part, rev'd*

*in part and remanded,* 731 F.2d 878 (Fed.Cir. 1984) ("§ 102(g) requires diligence only 'from a time prior to the conception of another'"); *see also In re Mulder,* 716 F.2d 1542, 1544–45 (Fed. Cir.1983) (same rule applies in an interference action); 3 D. Chisum *Patents* § 10.03[1] at 10–23 to 10–25.

**22.** Even though these arguments under Section 102(g) were raised at trial, Plaintiff failed to address the issue in its post-trial brief, proposed findings of facts and conclusions of law.

**23.** In fact, Dr. Hirschhorn had spent considerable time before June 14, 1968, developing this idea. For example, in November, 1966, he had applied for and received funding from the University of Wisconsin to research "Surgical Implants Produced By Powder Metallurgy" for the

surgical implants, such as artificial hips, made of porous metal through the use of powder metallurgy in order to achieve fixation of the implant through bone ingrowth. D.I. 340, Vol. M at 3121–25; *see also* DX–79 at 2. Mr. Reynolds began working on Dr. Hirschhorn's project during the summer of 1967. The initial stage of the project involved making porous implant specimens which were *porous throughout* with powder metallurgical techniques. These tests lasted until the fall of 1967. D.I. 340, Vol. M at 3126. In December of 1967 and January of 1968, Dr. James Whiffen, a surgeon in the biomedical engineering interdisciplinary program at the University's medical school, first began implanting specimens into the muscle tissue of dogs' rib cages. DX–340, Vol. M at 3128–3131. These implant specimens remained in the animals approximately 28 days before being removed, with the last seven specimens removed from the dog in April, 1968. After removing the surgical implants from the animals, both Dr. Hirschhorn and Mr. Reynolds observed the implants in various ways [24] and concluded that the adherence between the animal tissue and the porous metal demonstrated that living tissue had indeed grown into the interconnected porous layer. D.I. 340, Vol. M at 3136–37; DX–948 at 63; DX–1 at 49. Mr. Reynolds then completed his Thesis, in collaboration with Dr. Hirschhorn as editor and advisor, who officially approved the Reynolds Thesis on June 14, 1968. D.I. 340, Vol. M at 3200.

Defendants claim that the Reynolds Thesis was conceived and reduced to practice prior to Hahn's invention and anticipates the '123 Patent under 35 U.S.C. § 102(g). The Thesis specifically states at page 50:

Sintering powder particles to the cast or wrought implants could conceivably give a surface porosity effect that would help hold the device in place. This process might be used in cases where, for example, a smooth surface (hip ball and socket joint) is required on the end of a stem which will be used to hold the prosthesis in place. The stem of the ball is normally inserted into the soft intramedullary region of the human femur, where tissue ingrowth would be beneficial.

DX–1 at 50. Plaintiff contends that the Reynolds Thesis is not anticipating because it lacks an enabling disclosure and only constitutes a "mere concept."

The Reynolds Thesis primarily seeks to prove the availability of powder metallurgy to prosthetic devices. The theory was that powder metallurgy provided a means to attain strength and density as required under the particular circumstances of a needed implant. In pursuit of these goals, experiments were conducted wherein the implants were compressed with varying degrees of density (conversely, with varying

---

period covering July 1, 1967, to June 30, 1968. DX–79 at 1. Moreover, prior to his matriculation as a graduate student in January, 1967, Mr. Reynolds had discussed the project with Dr. Hirschhorn "to decide a research program for me to pursue in graduate school." DX–948 at 16; *see also* DX–79 at 14–17, 21–4; D.I. 340, Vol. M at 3125. A pamphlet describing the Powder Metallurgy Program at the University of Wisconsin in 1966–1967 listed Dr. Hirschhorn's project entitled "Production of Surgical Implant Materials by Powder Metallurgy Techniques." DX–77 at 4. Mr. Reynolds testified that Dr. Hirschhorn "was looking for somebody to do research in ... [the] area [of porous powder metallurgic implants] to test the physical properties of such implants and plant them in the tissues of a living organism to see if the tissue would grow into the porous metal implant." DX–948 at 18. In other words, Dr. Hirschhorn disclosed to Mr. Reynolds prior to January, 1967, "a porous metal bone implant into which tissue will grow for fixation of the implant in the bone." *Id.* at 18–19.

24. For example, Dr. Hirschhorn and Mr. Reynolds observed the specimens under a microscope. D.I. 340, Vol. M at 3132. They also visually observed the specimens without magnification to determine if there were any signs of infection and whether there was adherence between the animal tissue and the porous metal. *Id.* The investigators devised experimental techniques to test their hypothesis that tissue would grow into the porous surface, "including at one point fracturing these samples, the metal themselves so that we could pull the halves of a particular specimen apart [and] test the degree of adhesion between the dog tissue and the porous metal." *Id.* Dr. Hirschhorn and Mr. Reynolds then examined the exposed tissue under a microscope and took pictures of their observations. D.I. 340, Vol. M at 3133; *see, e.g.,* DX–1A and DX–1B.

degrees of porosity). The experiments, it must be remembered, were completed with these porous metal implants constructed by powder metallurgy techniques. They were not porous metal implants with a layer attached to the substrate or base. Admittedly, several facets of the theory were apparently established. Powder metallurgy allowed easy construction as to the shape, size and angle necessary for the substitution of a body part. The implant specimens contained varying porosity which demonstrated that soft tissue would grow into the pores. (Although, as will be demonstrated herein, it was generally known at this time and prior thereto that tissue, both soft and bone, would grow into pores or cavities. Hahn himself admitted this.) But this was not Hahn's invention. The '123 Patent involves a metal base sometimes described as solid or dense but with a surface layer of metal porosity. The solid metal substrate was designed to alleviate the structural strength deficiencies of a porous or less dense substrate. Admittedly, page 50 of the Reynolds Thesis refers to the conception, maybe more appropriately, possibility, that sintering a porous layer on the base would provide the basis for fixation. With that reference, the Defendants base their argument on Section 102(g).

The argument is easily dismissed. There is no evidence from the publication that the idea or conception was ever reduced to practice as that term is used in Section 102(g). Although the record indicates that Dr. Hirschhorn conceived of the idea to create an all porous metal bone implant prior to May 24, 1968, the experiments conducted by Mr. Reynolds did not involve a porous metal layer applied to a solid metal substrate. Thus, the reference on page 50 of the Reynolds Thesis does not constitute a reduction to practice under Section 102(g).

B. The Work of Drs. Rostoker and Galante

Defendants claim that before the invention date of the '123 Patent, Drs. William Rostoker and Jorge Galante conceived of a metal bone implant with a porous fiber mesh "coating" that meets every limitation of the claims of the '123 Patent and therefore, is invalid under 35 U.S.C. § 102(g). Defendants contend that Rostoker and Galante were the first to conceive the idea of bonding a porous metal coating or fiber mesh sleeve to a metal substrate in order to achieve fixation by the growth of bone tissue into the porous surface and were the first to actually reduce the idea to practice even though there was no publication of their work until after Hahn filed his application for the '123 Patent.[25] Alternatively, the Defendants maintain that if Hahn were the first to reduce the invention at issue to practice, the work of Rostoker and Galante is still valid prior art under Section 102(g) because they worked diligently and continuously and never abandoned, suppressed or concealed their conception and work. Plaintiff counters that Hahn was the first to reduce the invention to practice and that Rostoker and Galante are not entitled to priority because they failed to exercise reasonable diligence for the critical period between October, 1967, and May 24, 1968.

### 1. Conception Date

The Court of Customs and Patent Appeals has defined the conception of an invention as:

> ... the complete performance of the mental part of the inventive act. All that remains to be accomplished, in order to perfect the act or instrument, belongs to the department of construction, not invention. It is therefore the formation, in the mind of the inventor *of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice,* that constitutes an available conception....

*Gunter v. Stream,* 573 F.2d 77, 80 (C.C.P.A.1978) (emphasis in original); *see also Coleman v. Dines,* 754 F.2d 353, 359 (Fed. Cir.1985); *Hybritech,* 802 F.2d at 1376. In establishing conception, the Federal Circuit has held that "a party must show posses-

---

**25.** Thus, the work of Rostoker and Galante fails to qualify as prior art under either Section 102(a) or (b) and Defendants do not contend otherwise.

sion of every feature recited in the count, and that every limitation of the count must have been known to the inventor at the time of the alleged conception." *Coleman*, 754 F.2d at 359 (citing *Davis v. Reddy*, 620 F.2d 885, 889 (C.C.P.A.1980)). In addition, "conception must be proved by corroborating evidence which shows that the inventor disclosed to others his 'completed thought expressed in such clear terms as to enable those skilled in the art' to make the invention." *Coleman*, 754 F.2d at 359 (quoting *Field v. Knowles*, 183 F.2d 593, 601 (C.C.P. A.1950)).

Dr. Rostoker testified at trial that he attended a lecture given by Dr. Galante in late April or early May, 1967, in which he presented his desire to form a collegial effort "for certain major areas of improvement in the use of orthopedic implantable devices." D.I. 340, Vol. H at 1775. Specifically, Dr. Rostoker testified that Dr. Galante wished to develop a means of fixing a hip stem femoral component of a total hip arthroplasty by bonding the component to the living bone tissue instead of using bone cement. *Id.* at 1776–77. According to Dr. Rostoker, Dr. Galante cited literature references from 1955 to 1963 which demonstrated that tissue would grow into the pores of a porous material which was biocompatible. *Id.* at 1777; *see also* DX–86 at 26–29. Dr. Rostoker further testified that Dr. Galante believed these references strongly suggested the inference that bony ingrowth could be expected if a porous metal material were bonded to a load-bearing prosthetic device. *Id.* Dr. Rostoker testified that he approached Dr. Galante the day after the lecture and informed him that fiber metallurgy material could be used to achieve the desired objective and provided him with a sample within a week. It was at this time that the two doctors agreed to collaborate on the project. *Id.* at 1779–80.

Defendants maintain that Dr. Galante fully corroborated the facts and circumstances surrounding the conception date of April–May, 1967, at his deposition. For example, they submit that Dr. Galante testified that his "idea was to use a porous

material as a way of fixing a device to bone . . . the basic idea was to use a fiber metal composite to which bone would grow, and use that as an interface for attaching a prosthesis to it." Galante Dep., DX–950 at 15. Although there is no suggestion from this evidence that Dr. Galante's lecture originally disclosed the concept of bonding the porous fiber mesh to a solid metal substrate, Dr. Galante further testified that part of his idea in May, 1967, was to bond the porous surface to a solid metal base by a sintering procedure, DX–950 at 21–23, and that his invention "comprised of the porous coating bonded to the solid substrate." *Id.* at 23. However, Dr. Galante also testified that it was Dr. Rostoker who initially had the idea of attaching a *porous metal material* as a way of fixing an implant to a bone. DX–950 at 15–16. The inconsistency is sufficient for the Court to conclude that Dr. Galante failed to corroborate Dr. Rostoker's testimony concerning the idea actually disclosed in the April–May lecture. Moreover, Dr. Galante testified that he could not remember exactly when he contemplated this invention except that it occurred "sometime in 1967." *Id.* at 15.

Further doubt is cast on the subject matter of the disclosure by the deposition testimony of Dr. Robert Ray who stated that the idea of bonding the fiber mesh to a solid metal base did not occur until after an initial experiment in which a porous fiber mesh material was implanted into the femur of a German shepherd sometime in 1967. Ray Dep., DX–949 at 12–13. Although Dr. Ray testified that the concept of bonding the fiber mesh to a solid substrate occurred prior to the submission of the National Institute of Health ("NIH") grant application in October, 1967, he could not specify the date when the dog experiment occurred nor could he corroborate the details of Dr. Galante's April–May speech. Dr. Ray did testify, however, that either Dr. Rostoker or Dr. Galante disclosed to him the concept of a porous coating bonded to a solid substrate sometime between Dr. Galante's return from Sweden in late May, 1967, and the date the University of Illinois awarded a small grant to Drs. Rostoker

and Galante to fund their work on an interim basis on July 25, 1967. *Id.* at 23.[26]

Defendants further argue that the testimony of Drs. Rostoker and Galante is corroborated by their "Application For Research Grant", DX–86, submitted to the NIH on October 1, 1967, and by their "Notice of Grant Awarded", DX–87, on June 24, 1968. In their "Application For Research Grant", Drs. Rostoker and Galante described the characteristics of their idea as follows: "(c) A very porous, load bearing material with elastic energy absorbing characteristics as a mechanical transition link between the prosthesis and the bone. This material must be strongly bonded at the interface with the prosthetic body and allow bone growth into the pore cavities at the other interface." DX–86 at 18. Plaintiffs correctly argue, however, that this description does not contain sufficient information that would enable one of ordinary skill in the art to make the invention. *See Coleman,* 754 F.2d at 359.

Finally, Defendants argue that the April–May conception date is corroborated by their Disclosure Of Invention document, DX–88, DX–90, of May 16, 1969. In Section 4(b) of the "Invention Disclosure" document, Drs. Rostoker and Galante listed June, 1967, not April or May as the "earliest date and place of conception." DX–90. At trial, Dr. Rostoker testified that the June, 1967, date listed on the "Invention Disclosure" was "about the time that we could verify the ability to produce a porous material that would serve the purpose of providing a porous layer to a load-bearing structure." D.I. 340, Vol. H at 1852–53. However, the "Invention Disclosure" does

not indicate that each element of the invention claimed in the '123 Patent, namely whether the fiber mesh was to be bonded to a metal substrate, was conceived by Drs. Rostoker and Galante in April–May, 1967. The Court concludes there is a lack of corroboration and sufficient detail which would enable one skilled in the art to make the invention. *See Coleman,* 754 F.2d at 359.

The Court finds that the Defendants have failed to meet their burden of proof of corroborating that Drs. Rostoker and Galante conceived of an implant consisting of a porous metal coating bonded to a solid metal substrate in April–May, 1967. The facts in this case indicate that at his lecture in April–May, Dr. Galante only disclosed his desire to establish a collegial effort to discover an alternative means of achieving the fixation of a bone implant. The record does not indicate that Dr. Galante suggested an implant with a thin porous metal coating bonded to a solid substrate at this lecture. Instead, the record indicates that the concept of using the fiber mesh technology occurred *after* the lecture and only "sometime" in 1967. Indeed, the "Invention Disclosure" of Drs. Rostoker and Galante lists June, 1967, as the earliest date of conception but this occurred only after it was determined bone ingrowth would occur. DX–90. Nevertheless, the same disclosure makes no reference to bonding the fiber mesh to a solid substrate.[27] Thus, the Defendants have not carried their burden of producing credible evidence that corroborates the *date* of conception as late April or early May, 1967. Although absence of a

---

26. Defendants also point out that other individuals at the University of Illinois, such as Drs. Schultz and Kuettner, and Messrs. Domagala, Bartlett and Soble, were told about the conception before October, 1967. *See, e.g.,* DX–86 at 2. Nevertheless, Defendants have not offered their testimony as evidence of corroboration of the date of conception and the Court declines to draw any inference from the allegation that they were informed about the work of Drs. Rostoker and Galante during this period.

27. The record does indicate, however, that Drs. Rostoker and Galante filed a supplemental disclosure in essay form on June 15, 1969. DX–88; D.I. 340, Vol. H at 1850. On page 3 of the

supplemental disclosure, Drs. Rostoker and Galante state: "[t]he porous aggregate which provides the bone or tissue interlock can be attached to a prosthetic or other implantation device by the same diffusion processes that produced bonding between the fibers. Thus, a sleeve of fiber aggregate can be molded or fitted over a rod of solid material and the bond produced at that interface by a diffusion heat treatment at elevated temperatures." DX–88 at 3. This supplemental disclosure represents an attempt to disclose the final *product* of the work of Drs. Rostoker and Galante, not their *conception* of that product in April–June, 1967.

specific date is not determinative in proving a conception, it is probative evidence that the conception did not take place as claimed. This underscores the requirement for corroboration of the inventor's work.

### 2. *Reduction To Practice*

Assuming *arguendo* that Rostoker and Galante conceived the idea of their invention sometime in April–May, 1967, Defendants must still prove by clear and unequivocal evidence either due diligence from the point of conception to an actual reduction to practice or filing of a patent application or an actual reduction to practice prior to the effective date of the '123 Patent of May 24, 1968, in order to be entitled to an earlier date than the constructive reduction to practice accorded the filing date of their patent application on September 8, 1970.

The evidence at trial established that there were three different kinds of implants constructed and implanted by Dr. Rostoker and Galante during the late sixties. The first specimen made was a cylindrical coupon of compressed metal fibers which was porous through and through (*e.g.*, the "all-porous" specimens). The second was a cylindrical fiber metal coupon with a solid central rod and a solid end cap which was used to determine the strength of the bonding between the bone tissue and the porous surface. Finally, Drs. Rostoker and Galante developed a canine hip stem comprising a fiber metal sleeve covering a solid metal base. D.I. 340, Vol. I at 1961–62; DX–102, fig. 9.

### (a) All–Porous Implants

Defendants offered evidence that in September–October, 1967, before Drs. Rostoker and Galante received a grant from the NIH, Dr. Rostoker manufactured a small number of all-porous specimens which Dr. Galante implanted into the femurs of two or three rabbits in order to verify their expectation that bone tissue would grow into the pores. D.I. 340, Vol. H at 1780–1803, 2023–29; DX–950 at 27–28, 49–50.

Dr. Rostoker testified that these implants remained in the rabbits for periods of three weeks to three months, D.I. 340, Vol. H at 1802, although it is more likely that it was a shorter period of time because these were preliminary experiments funded by a University of Illinois grant and must have been completed by October 1 when they applied for further funding from the NIH. DX–950 at 49–50; DX–86; DX–949 at 11–13. After the animal was sacrificed, the implant and the bone tissue were removed from the rabbits and the specimen was denatured, sectioned, mounted and stained. *Id.* Dr. Rostoker also testified that subsequent histological examinations were performed within one to two months after the sacrifice and revealed the growth of bone tissue into the all-porous fiber metal coupon. D.I. 340, Vol. H at 1802, 1806–07, Vol. I at 2023; DX–950 at 27–30; DX–949 at 11–13.[28] There is no evidence in the record that Drs. Rostoker and Galante conducted any further experimental activities between October 1, 1967, and June 24, 1968.

Defendants also offered evidence that once Drs. Rostoker and Galante received in June, 1968, the money from their NIH grant, they continued their earlier implantations of all-porous specimens into the femurs of rabbits beginning in August 1968. DX–950 at 34–35. Dr. Galante testified from memory that subsequent histological examinations demonstrated that there was a "complete penetration of the implant by bone [tissue]." DX–950 at 81–84, 302–04; *see also* DX–949 at 30–31.

Defendants contend that these preliminary experiments with all-porous metal implants constitute an actual reduction to practice because it would have been "absolutely obvious" to a person of ordinary skill in the art that a bone implant would have to have a porous metal surface bonded to a *solid*, not porous, metal base. D.I. 340, Vol. H at 1832, 1932. Defendants attempt to bolster their argument by claiming that it was the intention of Drs. Rostoker and

---

**28.** The record is devoid of evidence which identified the actual slides or, alternatively, documentation to corroborate this early work.

Galante to bond the fiber mesh layer to a solid metal substrate from the very beginning of their collaboration. *Id.* at 1807; DX–950 at 13–18. Nevertheless, in order to have an actual reduction to practice, the all porous implant product must have embodied all the limitations of the *claimed* invention. Accordingly, the work of Drs. Rostoker and Galante can be considered as a reduction to practice only as of the date of the implantation and successful histological examination revealing tissue ingrowth into a porous metal surface actually bonded to a solid metal substrate. Since those early experiments consisting of the implantation of an all-porous fiber metal mesh were not bonded to a metal substrate as clearly required by the claims of the '123 Patent, the work of Drs. Rostoker and Galante as of October, 1967, and August, 1968, cannot be considered an actual reduction to practice as a matter of law.

### (b) Fiber Mesh Sleeve Bonded To a Solid Metal Substrate

Defendants also contend that Drs. Rostoker and Galante achieved a reduction to practice prior to the date of the reduction to practice of the '123 Patent by virtue of the successful implantation and histological examination of a fiber mesh sleeve bonded to a solid metal substrate in August, 1968, which is independent of the all-porous implants previously discussed. The issue is whether the Defendants have sufficiently corroborated this claim.

In their "Invention Disclosure", Drs. Rostoker and Galante claimed August, 1968, as the date of actual reduction to practice. DX–90. The evidence introduced at trial fails to corroborate this August date. For example, Dr. Rostoker testified that he implanted all-porous fiber metal coupons in dogs "probably" in May, 1968. Dr. Rostoker testified that these porous cylinders remained in the dogs for a period of three weeks to three months and, when these implants were removed, histological examinations confirming bone ingrowth

into the cylinder were performed within one to two months. D.I. 340, Vol. H at 1804–05. Dr. Rostoker also testified that he would have to *interpret* from the "Invention Disclosure" document that porous coated specimens on a solid metal rod (*e.g.,* the second type of specimen) were implanted in dogs to determine the strength of the attachment of the bone tissue to the fiber mesh in the "late summer of 1968." D.I. 340, Vol. H at 1805–06, 1815–16; DX–90. But the "Invention Disclosure" document reveals that the August implantation did not involve a solid metal coupon implanted into a dog. Instead, it stated: "Implantation of titanium fiber metal coupon in the femur of rabbits both in the supercondylar and in the trychanteric area." DX–90 at 2. The inconsistencies seriously erode the credibility of the evidence on reduction to practice.

Further inconsistencies are revealed by the additional evidence that the first documented implant of a porous coated implant on a solid metal substrate into dogs occurred on January 6, 1969. Cooper Dep., DX–955 at 17–18, 52–53, 66–67, 75–77, 79–84; DX–950 at 138–141; DX–947 at 39; DX–103.[29] By Dr. Rostoker's own admission, it would take anywhere from three weeks to three months to complete a histological examination on these animals. *See, e.g.,* D.I. 340, Vol. H at 1802. Roger Lueck and Bernard Feldman's laboratory notebook reveals that the first dog to receive a fiber metal mesh sleeve which was bonded to a solid metal substrate was sacrificed on January 28, 1969. DX–103. Thus, the histological examination would be completed somewhere between February 18, 1969, and April 28, 1969. The Defendants simply failed to establish clear and convincing evidence of the date of Drs. Rostoker and Galante's actual reduction to practice.

Proof of a prior conception date alone does not suffice to establish Rostoker and Galante's work as prior art under Section 102(g). *Kimberly–Clark,* 745 F.2d at 1445. As the facts in this case demonstrate, "When the invention has not quite passed

---

**29.** More importantly, there is absolutely no corroborating testimony or documentary evidence from Dr. Galante or anyone else which con-

firms the dog implants occurred beginning in May, 1968.

beyond experiment and has not quite attained certainty and has fallen short of demonstrating the capacity of the invention to produce the desired result, the invention itself is still inchoate." *Kimberly–Clark,* 745 F.2d at 1445 (quoting 1 *Deller's Walker on Patents* § 46 at 202 (2d ed. 1964). Since the invention claimed in the '123 Patent was entitled to an effective conception date of May 24, 1969, the work of Drs. Rostoker and Galante is not prior to that of Hahn's and cannot be considered prior art under 35 U.S.C. § 102(g).

### 3. *Diligence*

The Defendants may establish the priority of Rostoker and Galante's work by showing continuous and reasonable diligence toward reduction to practice during the critical period from May 24, 1968, until their actual or constructive reduction to practice. *See* discussion *supra* at 109, 114. Although constant effort is not required, the inventor must account for the entire critical period by showing either activity directed toward reduction to practice or a legally adequate excuse for inactivity. *Freeman,* 693 F.Supp. at 147 (citing D. Chisum *Patents* § 10.07). To establish diligence, the Defendants must provide specific details as to what Rostoker and Galante did during the critical period. Furthermore, the testimony of the inventor must be corroborated. *Gould v. Schawlow,* 363 F.2d 908 (C.C.P.A.1966).

Defendants argue that Drs. Rostoker and Galante worked continuously and diligently on their project from: (1) April–May, 1967, when they allegedly conceived of their porous coated implants, (2) July 25,

1967, when they received a grant from the University of Illinois and began drafting their NIH application and until its submission on October 1, 1967, (3) October, 1967, until May, 1968, when they implanted all-porous specimens into rabbits, (4) August, 1968, when they implanted porous coated implants bonded to a metal substrate into dogs, and (5) at all times after they received their grant money from the NIH on June 24, 1968. Although Defendants point out that both Drs. Rostoker and Galante testified that they never "abandoned" their project, the proper issue before the Court is whether they acted diligently to reduce their invention to practice.

The record provides a confused and unconvincing account that any fiber metal coupons were manufactured or implanted from October 1, 1967, until June 24, 1968.[30] Instead, there was a period of inactivity for approximately nine to ten months while Drs. Rostoker and Galante awaited funding from the NIH. This period of inactivity is inexplicable given the fact that Drs. Rostoker and Galante had received a grant from the University of Illinois covering the period from July 25, 1967, until July 24, 1968, to perform preliminary experiments and to purchase equipment necessary to conduct research into developing the desired bone implant. D.I. 340, Vol. H at 1797–1800; DX–950 at 49–50; DX–949 at 15–25; DX–87 at 3.[31] Although Dr. Rostoker testified that by May, 1968, he had prepared all-porous specimens for implantation into dogs, D.I. 340, Vol. H. at 1804, there is no convincing corroborating oral or documentary testimony that this work oc-

---

**30.** Although Dr. Rostoker testified that the implantations occurred from September–October, 1967, until May, 1968, and resumed in August, 1968, there is absolutely no corroborating evidence that any implants were made during that period from October 1, 1967, to June 24, 1968, until the NIH grant was approved. In fact, Ms. Florence Cooper, who was Dr. Galante's histologist from 1968–1980, testified that rabbit implantations were done from September 20, 1968, until December 31, 1968. DX–955 at 17–18, 52–53, 66–67, 75–77, 79–84. This fact is corroborated by the laboratory notebook of Roger Lueck and Bernard Feldman, which indicated that "Implants of Titanium Porous Metal" were first made in rabbits on September 20, 1968.

DX–103. Dr. Rostoker testified that he implanted all-porous fiber metal coupons in dogs "probably" in May, 1968. D.I. 340, Vol. H at 1800.

**31.** Defendants contend that Drs. Rostoker and Galante devoted essentially all of their non-teaching time, approximately 30%, during the school year to the research and 100% during the summer months. DX–87 at 6. Moreover, the Defendants point out that several individuals spent 100% of their entire working schedule on the project. *Id.* Nevertheless, the time period covering this activity was *after* the critical period in which Drs. Rostoker and Galante failed to account for their work on the project.

curred between October 1, 1967, and June 24, 1968.

The Court concludes that there is no oral or documentary evidence to corroborate Dr. Rostoker's testimony that the rabbit experiments conducted in October, 1967, continued throughout the winter and spring of 1968. In fact, the evidence tends to suggest that these experiments involved only a small number of animals to determine if bone tissue would grow into a porous fiber mesh coupon for the purpose of obtaining their NIH grant. The Court also finds that there is no evidence to corroborate the bald assertions of Dr. Rostoker that specimens were manufactured by May, 1968, or implanted into dogs in May, 1968. Indeed, the documentary evidence in this case supports the inference that such implantations did not occur until January of 1969. Since general assertions of diligence without corroboration are insufficient to permit the Defendants to meet their burden of proof, the Court concludes that Drs. Rostoker and Galante did not act with due diligence for a period lasting approximately nine to ten months during which Mr. Hahn conceived the invention claimed in the '123 Patent and worked diligently to reduce it to practice prior to Drs. Rostoker and Galante. *Kendall v. Searles,* 173 F.2d 986, 993 (C.C.P.A.1949); *Fraze v. Siemonson,* 186 U.S.P.Q. 480, 484 (Pat.Off. Bd.Int.1974); *Wells v. Fremount,* 177 U.S. P.Q. 22, 26 (Pat.Off.Bd.Int.1972).

### 4. *Abandonment, Suppression or Concealment*

Section 102(g) provides that the first party to conceive and reduce his invention loses his right to priority if he thereafter abandons, suppresses or conceals the invention. *Lutzker,* 843 F.2d at 1366; *Paulik,* 760 F.2d at 1272. If the first party has abandoned, suppressed or concealed his invention after reducing it to practice but thereafter resumes activity on the invention prior to the entry of a second inventor into the field and diligently files a patent application or discloses the invention to the

public, then the first party is entitled to rely upon the resumption date as the date of the invention. *Paulik,* 760 F.2d at 1272–73 and cases cited therein.

It is uncontested that Rostoker and Galante did not abandon, suppress or conceal their work *after* they reduced their invention to practice as evidenced by speeches in October, 1969, and January, 1970, several publications, *see, e.g.,* DX–101A, DX–102, and a patent application filed on September 8, 1970, DX–118. *Id.*

### 5. *Conclusion*

After carefully and painstakingly reviewing the trial testimony and exhibits and the deposition testimony in this case, the Court concludes that Defendants failed to establish a date of conception by Drs. Rostoker and/or Galante in April–May, 1967. Assuming *arguendo* that they did conceive of a porous coated bone implant bonded to a solid metal substrate at that time, the Court finds that the Defendants cannot establish that Drs. Rostoker and Galante reduced their invention to practice before Hahn did so. The Court specifically finds that Drs. Rostoker and Galante failed to establish that they acted with due diligence in reducing their invention to practice and, during this period of inactivity, Hahn "stepped into the gap" and, since he did work diligently to reduce his invention to practice, he is entitled to priority under Section 102(g). Accordingly, the work of Drs. Rostoker and Galante does not constitute prior art under the priority rules established under 35 U.S.C. § 102(g).

## C. Other Anticipatory References
### 1. *The Gault Patent*

Defendants contend that U.S. Patent No. 3,576,076 (the "Gault patent"), DX–519, describes the elements of all the claims of the '123 Patent and anticipates the '123 Patent under 35 U.S.C. § 102(e).[32] The Gault patent was filed on July 15, 1968, approximately seven weeks after the May 24, 1968, effective date of the *invention* disclosed in the '123 Patent. Thus, the

---

**32.** Section 102(e) states, in relevant part, that a patent will not be granted where "the invention was described in a patent granted on an applica-

tion for patent by another filed in the United States before the invention thereof by the applicant for...." 35 U.S.C. § 102(e).

Gault patent is not prior art under 35 U.S.C. § 102(e). Since the Gault patent does not qualify as prior art under Section 102(e), it cannot anticipate the claims of the '123 Patent.

## 2. The Haboush Patent

Defendants next argue that U.S. Patent No. 2,668,531 (the "Haboush patent"), DX–499, issued on February 9, 1954, discloses an acetabular component which contains every element of claims 1, 2, 14, 15, and 29–31, and, therefore, anticipates these claims of the '123 Patent. The Haboush patent discloses an acetabular component "formed of corrosion-resistant alloy of chromium, cobalt and molybdenum (Haynes Stellite No. 21) or a wrought sheet alloy such as Haynes Stellite No. 25." DX–499, col. 3, lines 14–17. The surface structure of the implant has the same geometry as the chemical mill surface referred to by Hahn as one of the possible embodiments of his invention. See PX–28, col. 3, lines 2–7. For example, the Haboush patent states: "To assure a firm bond between the socket 20, the resin 21 and the bone S, the back of the socket may be provided with a series of small undercut or dovetailed recesses or grooves 22 into which the resin may flow and harden." DX–499, col. 4, lines 22–26. Like Hahn's reference to "undercut pores", PX–28, col. 4, lines 42–45, the Haboush patent uses the term "undercuts." DX–499, col. 4, lines 22–26. Thus, Defendants argue that the Haboush patent disclosed a metallic bone implant that is completely biocompatible and nontoxic with a porous metallic layer that is extremely thin relative to the thickness of the base and extends over a portion of the base in contact with the bone that reads on claims 1, 2, 14, 15 and 29–31 of the '123 Patent.

Defendants' argument, however, is premised upon the suggestion of chemical milling in the specification of the '123 Patent as an alternative technique for applying a porous metallic surface to a metal substrate. The Court has previously construed the claims to require a separate and distinct layer applied to the metal substrate. Since "undercut pores" do not constitute a separate layer or coating, the Haboush Patent does not meet every element of the claims of the '123 Patent and therefore does not anticipate the '123 Patent.

In addition, the claims of the '123 Patent as properly construed require that the porous surface contain pore sizes that rang from 30 microns to 200 microns. PX–28, col. 3, lines 58–63. Thus, the Haboush Patent fails to read on the claims of the '123 Patent because there is no disclosure of pore size openings within the range of 30–200 microns.

## 3. The Ashuckian Patent

The Defendants argue that U.S. Patent No. 2,721,387 (the "Ashuckian patent"), DX–24, issued on October 25, 1955, anticipates claims 29–31. The Ashuckian patent describes an artificial tooth with depressions at the surface to obtain integration between the tooth and the jaw bone. DX–24, col. 1, lines 52–70. Although the tooth may be made out of metals which are biocompatible, such as chrome cobalt alloys, DX–24, col. 4, lines 62–64, it does not contain a porous surface layer. Instead, the tooth has pores cut into the surface so that the alveolar tissues, including calcified bone, will fill the openings. DX–24, col. 1, lines 60–70. Defendants contend that these holes constitute a "porous metallic surface layer" as required in claim 29. PX–28, col. 7, lines 15–16.

On cross-examination, Professor Ducheyne admitted that there is no disclosure of a coating or layer in the Ashuckian patent. D.I. 340, Vol. Q at 3787, 3791–92. Moreover, Professor Ducheyne testified that he interpreted the term "surface layer" to mean "surface features that allow skeletal fixation." Id. at 3784. However, Dr. Bougas testified that a rough surface is not the equivalent of a porous surface. D.I. 340, Vol. K at 2577. The Court accepts and adopts that interpretation. Consequently, Defendants have failed to show that each and every element of claims 29–31 is disclosed in the Ashuckian patent.

## 4. The Friel Patent

The Defendants next argue that U.S. Patent No. 470,322 (the "Friel Patent"), DX–496, anticipates claims 29–31 of

the '123 Patent. The Friel patent issued on March 8, 1892, describes a dental implant "manufactured of any material suitable in the premises, as porcelain, platinum, aluminum, ivory, etc.", DX–496, col. 2, lines 73–76, which has tapered perforations or holes on the surface to permit bone ingrowth so as to anchor the artificial tooth in the jaw bone, *id.* at col. 3, lines 84–90. For example, the specification states: "As the healing of the bone progresses, the perforations in the root of the tooth will become filled by the deposition of bone. In this way the root finally becomes practically integral with the jaw, the bone entering the several perforations, finally securing it in place." DX–494, col. 3, lines 84–90.

Defendants contend that the Friel Patent discloses all the elements of the claims 29–31. Although the Friel Patent does disclose a bone implant made of metal which is biocompatible, D.I. 340, Vol. P at 3696–97, the patent fails to disclose a porous surface layer bonded to the metal substrate as required by the claims of the '123 Patent. *Id.* at 3755. Instead, the Friel Patent only discloses tapered perforations or fenestrations cut into the surface of the implant. Thus, Defendants have failed to show that each and every element of claims 29–31 is disclosed in the Friel Patent.

## V. OBVIOUSNESS—35 U.S.C. § 103

■ Defendants next argue that even if the '123 Patent is not anticipated by the prior art, the claims of the '123 Patent are obvious and hence invalid under 35 U.S.C. § 103.[33] In support of their contention, the Defendants rely upon the porous coated flame sprayed heart valves of Dr. Julio C. Davila whose work was published from 1964–1967, the work of Dr. James Bougas and upon Dr. Samuel Hulbert's ceramic porous coated bone implants as publicly disclosed at a conference on January 12, 1968. As discussed *supra,* the '123 Patent is presumed valid. 35 U.S.C. § 282. Sub-

sumed within the presumption of patent validity is a presumption of non-obviousness which must be overcome by clear and convincing evidence. *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 894 (Fed.Cir.1984) (noting *American Hoist,* 725 F.2d at 1358; *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 960 (Fed.Cir.1983)).

■ Obviousness is a question of law based upon the factual inquiries established by the Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). Under *Graham,* the following factual inquiries must be made in order to reach a legal conclusion of obviousness: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the art. *Graham,* 383 U.S. at 17, 86 S.Ct. at 693–94; *Loctite,* 781 F.2d at 872. Additionally, such secondary considerations as commercial success, long felt but unresolved needs, failure of others must, when present, be considered. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1539 (Fed. Cir.1983); *Graham,* 383 U.S. at 17–18, 86 S.Ct. at 693–94. Once these facts are determined, "the Court must then step backward in time and into the shoes worn by the ghost, *i.e.,* the man of ordinary skill in the art 'when the invention was unknown and just before it was made.' " *Phillips,* 673 F.Supp. at 1313 (quoting *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1566 (Fed.Cir.1987)). "In light of all the evidence, the decisionmaker must then determine whether the patent challenger has convincingly established, 35 U.S.C. § 282, that the claimed invention as a whole would have been obvious at that time to that person. 35 U.S.C. § 103." *Id.*

### A. Scope and Content of the Prior Art

The scope and content of the prior art is that which is "reasonably pertinent to the

---

**33.** Section 103 provides in relevant part:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title if the differences between the subject matter sought to be patented and the prior art are

such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103.

particular problem with which the inventor was involved." *Lindemann,* 730 F.2d at 1460 (quoting *Stratoflex, Inc.,* 713 F.2d at 1535). In this case, the appropriate scope and content of the prior art does not appear to be in dispute. It includes the fields of prosthetic devices and suitable biomaterials for orthopedic, dental and cardiovascular implants. All the prior works of others that fall in the category of Section 102 material qualify as Section 103 prior art. *E.I. Du Pont de Nemours & Co.,* 849 F.2d at 1436. The relevant prior art includes the heart valve work of Dr. Davila and its extension to orthopedic implants by Dr. Bougas, the work of Dr. Hulbert with ceramics, the work of Dr. Jonathan Cohen, the Haboush Patent, and the Ashuckian and Friel Dental Patents.[34]

## B. The Level of Ordinary Skill in the Art

Section 103 provides that the obviousness of an invention is to be tested by reference to "a person having ordinary skill in the art." 35 U.S.C. § 103. In determining the level of ordinary skill in the art, the Federal Circuit has listed several factors to be considered: "(1) educational level of the inventor; (2) the type of problems encountered in the art; (3) prior art solutions to these problems; (4) the rapidity with which inventions were made; (5) the sophistication of the technology; and (6) the educational level of active workers in the field." *Environmental Designs v. Union Oil Co. of Cal.,* 713 F.2d 693, 696 (Fed.Cir.1983); *Orthopedic Equip. Co. v. All Orthopedic Appliances,* 707 F.2d 1376, 1382 (Fed.Cir.1983).

Although it appears uncontested that the parties are in agreement about the educational level and the appropriate scientific fields pertinent to the person of ordinary skill in the art, "it is crucial to understand that the inquiry under section 103 is directed to the *hypothetical* person of ordinary skill in the art", not the inventor's

skill. *Phillips,* 673 F.Supp. at 1316. As the Federal Circuit has previously noted in holding that the inventor's skill is irrelevant to the obviousness inquiry:

> Inventors, as a class, according to the concepts underlying the Constitution and the statutes that have created the patent system, possess something—call it what you will—which sets them apart from workers of *ordinary* skill, and one should not go about determining obviousness under § 103 by inquiring into what *patentees* (*i.e.* inventors) would have known or would likely have done, faced with the revelations of references.

*Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 454 (Fed.Cir.1985). The hypothetical person of ordinary skill is presumed to be aware of all the pertinent prior art. *Standard Oil,* 774 F.2d at 454. Further, "[a] person of ordinary skill in the art is presumed to be one who thinks along the line of conventional wisdom and is not one who undertakes to innovate, whether by patient, systematic research or extraordinary insights, it makes no difference which." *Id.*

In the matter *sub judice,* a hypothetical person of ordinary skill in the art in 1968–1969 included orthopedic and cardiovascular surgeons such as Drs. Galante, Bougas and Davila and metallurgists holding a post-graduate degree in either metallurgy or bioengineering such as Drs. Rostoker, Hirschhorn and Hulbert and Mr. Hahn and who possessed a working knowledge of prosthetic devices and biomaterials suitable for orthopedic implants.

As previously discussed *supra* at 90–91, the problem facing the orthopedic industry in 1968 was the adequate fixation of prosthetic replacement devices to the surrounding bone tissue. Prior to Hahn's invention, several attempts to provide adequate fixation of bone prosthesis had been made using polymers, ceramics and metals. D.I. 340, Vol. I at 2108–10; DX–102 at 102. For example, in the article "An Experimen-

---

**34.** The Court has previously determined that the work of Drs. Rostoker and Galante and Dr. Hirschhorn and Mr. Reynolds fail to qualify as prior art under Section 102(a) and (g). These references are relevant, however, inasmuch as

they demonstrate that prior to Hahn's invention, those of ordinary skill in the art were of the opinion that bone tissue would grow into a porous metal surface bonded to a metal substrate.

tal Study of Polyvinyl Sponge as a Substitute for Bone", 15 *Plastic Reconstruction Surgery* 274–289 (1955), DX–611, A.M. Struthers described the growth of bone tissue into the pores of a polyvinyl sponge. D.I. 340, Vol. I at 2108–10; DX–142 at 2. Similarly, bone ingrowth into a polyurethane or plastic sponge was disclosed in a 1961 publication by Drs. Salvatore, Gilmer, Kashgarian and Mr. Barbee. DX–886, Salvatore, J.E., Gilmer, W.S., Kashgarian, M. and Barbee, W.R., "An Experimental Study of the Influence of Pore Size of Implanted Polyurethane Sponges upon Subsequent Tissue Formation", 113 *Surgery, Gynecology and Obstetrics* 143 (April, 1961). Thus, the hypothetical person of ordinary skill in 1968 would have known that bone tissue would grow into holes or open pores. D.I. 340, Vol. H at 1777–78, Vol. I at 2111.[35]

This knowledge of bone ingrowth was utilized to make bone implants which had holes so as to promote the growth of bone tissue into the openings. For example, the Austin Moore prosthesis developed in the 1950's consisted of a substrate made from Vitallium which had holes in the stem to encourage the ingrowth of bone tissue. D.I. 340, Vol. I at 2112–14; DX–610 at 2, Fig. 1. In 1963, Lyman Smith was able to produce a porous surface on a ceramic-plastic composite by filling the composite with an epoxy resin and then leaching the resin away from the outer surface of the composite. DX–880, Smith, "Ceramic–Plastic Material as a Bone Substitute", 87 *Archives of Surgery* 653–661 (1963). After experimental ceramic knee prostheses were implanted in the femora of dogs, fibrous tissue and perhaps bone were thought to have invaded the open structure even though the results could not be confirmed histologically. *Id.*[36] Because the porous surface weakened the integrity of the ceramic substrate, Smith's ceramic implant

lacked sufficient structural strength in order to function as a prosthetic device.

Work done in other fields of art, such as dental and cardiovascular implants, are relevant to solve the problem of developing a high strength prosthetic device which could be adequately attached to the surrounding soft or bone tissue. Like the invention disclosed in the '123 Patent, several attempts were made in the dental and cardiovascular fields to apply a porous layer to an implant to achieve fixation. For example, as early as 1891, Wright disclosed in U.S. Patent 448,745, a porous surface layer made from porcelain applied on an artificial tooth comprised of solid gold or platinum. DX–495, col. 4, lines 26–30. The porous surface was designed to permit the adjacent tissue to grow into the pores in order to anchor the artificial tooth in place. *Id.*, col. 3, line 17 to col. 4 line 24. In 1964, Dr. Davila created a heart valve prosthesis made from Vitallium covered by a thin, porous metal layer to permit soft tissue to grow into the holes to achieve fixation in the heart muscle.

Defendants contend that the work of Mr. Reynolds and the works of Drs. Bougas and Hulbert demonstrate that one of ordinary skill in the art would have considered the jump from the growth of soft tissue into a porous metal layer as disclosed by Davila's heart valve to the growth of bone tissue into a porous metal layer as a reasonable and logical scientific extension of the known art.

C. Differences Between the Prior Art and the Claimed Invention

 As the language of Section 103 makes clear, the critical issue for the resolution of the question of obviousness is whether the invention as a whole disclosed in the '123 Patent would have been obvious

---

**35.** It was also well known in 1968 that the growth of soft or non-calcified tissue into open pores would precede the growth of bone tissue into the pores. D.I. 340, Vol. L at 2743, Vol. G at 1521, Vol. I at 2146, Vol. M at 3208–12.

**36.** A study on the same material published in June, 1969, however, confirmed that bone formation was evident eight to twelve weeks after

implantation into rat femora. Petersen, C.D., Miller, J.S., Solomons, C., Predecki, P.K. and Stephens, J.S., "Union Between Bone and Implants of Open Pore Ceramic and Stainless Steel: A Historic Study, in Proceeding of the Orthopedic Research Society", 51–A *J. Bone and Joint Surgery* 805 (June 1969). *See* DX–102; DX–142.

to one of ordinary skill in the art during the critical time period. 35 U.S.C. § 103; *Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1566 (Fed.Cir.1984); *Phillips*, 673 F.Supp. at 1314. Thus, the Court must view the claims of the '123 Patent in their entirety. *See W.L. Gore*, 721 F.2d at 1550; *Schenck v. Nortron Corp.*, 713 F.2d 782, 785 (Fed.Cir.1983). Of course, it is "[t]he *claims,* not [the] particular embodiments [which] must be the focus of the obviousness inquiry." *Jackson Jordan, Inc. v. Plasser American Corp.*, 747 F.2d 1567, 1578 (Fed.Cir.1984) (noting *Graham*, 383 U.S. at 17, 86 S.Ct. at 693–94). Similarly, the prior art reference must be considered in its entirety in an obviousness inquiry and must include a "full appreciation of what such reference fairly suggests to one of ordinary skill in the art." *Application of Wesslau*, 353 F.2d 238, 241 (C.C.P.A.1965); *W.L. Gore*, 721 F.2d at 1550. Although each reference used in an obviousness inquiry does not have to be enabling, *Paperless Accounting v. Bay Area Rapid Transit Sys.*, 804 F.2d 659, 665 (Fed.Cir.1986), *cert. denied*, 480 U.S. 933, 107 S.Ct. 1573, 94 L.Ed.2d 764 (1987); *Reading & Bates Const. v. Baker Energy Res.*, 748 F.2d 645, 651–52 (Fed.Cir.1984), disclosures in the references that "teach away" from the claimed invention cannot be disregarded. *W.L. Gore*, 721 F.2d at 1550 (noting *Application of Kuderna*, 426 F.2d 385, 388–89 (C.C.P.A.1970)).

### 1. *Porous Coated Flame Sprayed Heart Valves of Dr. Davila*

Several years prior to the filing date of the '123 Patent, Dr. Julio C. Davila designed and successfully implanted in laboratory animals a porous coated heart valve with a thin porous plasma flame sprayed metal surface on a solid metal substrate.[37] It is uncontested that Dr. Davila published

the results of his work relating to the porous coated heart valves in 1964–1967 and these publications are relevant prior art under Section 103. It is also uncontested that Dr. Davila's porous coated heart valve meets every limitation of the claims of the '123 Patent with the exception that it is not a "bone" implant. The Plaintiff contests, however, the Defendants' argument that it would have been obvious to one of ordinary skill in 1968–1969 to take the teachings of the Davila heart valve and apply it to a bone implant. Plaintiff counters that the claimed combination of a porous metal coating on a solid metal substrate for bone ingrowth was not obvious in 1968–1969 because it was not generally known to those skilled in the art that (1) bone tissue would grow into a porous metal surface, (2) a porous metal coating could be sufficiently bonded to a solid metal substrate, and (3) there was only a certain range of pore sizes that would permit bone ingrowth of bone tissue into the porous metal coating. For the reasons discussed below, the Court finds that claims 1–2, 10–16, 18, 21–22 and 29–31 of the '123 Patent would have been obvious to one of ordinary skill at the time and, therefore, are invalid under 35 U.S.C. § 103.

In 1961–1962, Dr. Davila's research indicated the desire for a porous surface layer on a heart valve for the purpose of promoting tissue ingrowth into the pores. D.I. 340, Vol. J at 2196–2200. Accordingly, in the period 1963–1966, Dr. Davila employed an individual at General Electric Laboratories in Schenectedy, New York, to apply porous metal surface layers to solid metal heart cages by the process of plasma spraying or "shupping" for the purpose of achieving fixation through tissue ingrowth. *Id.* at 2196–2200, 2242–44; DX–960 at 5–8, 12–13, 17, 22, 27–29, 31–34; D.I. 340, Vol. D at 907–08, Vol. J at 2344.[38] The process

---

**37.** Dr. Julio C. Davila is a board certified thoracic and cardiovascular surgeon who has published over a hundred scientific publications and who had been doing research and clinical work involving heart valves in humans and several hundred prototype artificial heart valves in animals. D.I. 340, Vol. J at 2185–87, 2191–94. Dr. Davila performed research from 1959 to 1969 on artificial heart valves. Several hundred were

implanted in animals, leg prostheses, joint prostheses and artificial blood vessels. *Id.* at 2194–95.

**38.** Dr. Davila testified that his heart valve consisted of a solid metal cage (*e.g.,* a ring with some struts on it) inside of which was a captured ball known as the occludes. The cage was made of a solid metal, Stellite 21 on Vitallium

of applying the porous metal surface is called "shupping" or "the process of flame spraying fine droplets of metal which would then fuse as a layer of droplets onto the surface of the device." D.I. 340, Vol. J at 2197. The heart valves which Dr. Davila implanted in calves in 1963–1964 were found to completely achieve the intended ingrowth of tissue into the porous surface layer.

Dr. Davila specified to Mr. Safford in 1963–1966 that he was to apply a porous layer of the same metal as the substrate and make it to a thickness of 0.01–0.02 of an inch, and with intersticial pores ranging from 100 to 300 microns in size. D.I. 340, Vol. J at 2203–04. A visual examination by Dr. Davila at trial of the pore sizes of the porous metal surface of the heart valves that were made indicated that the pore sizes were approximately 200 microns in size. Id. at 2203–04, 2285–86. In the period 1963–1966, Dr. Davila implanted 20–30 heart valves having a porous metal surface layer plasma sprayed to a solid metal base in young calves with most of the implantations occurring in 1964–1965. Id. at 2196–97, 2200–01.

In addition, Mr. Richard Berlin examined a sample of the Davila heart valve by means of a scanning electron microscope and concluded that the flame sprayed surface contained an interconnected porosity with an average pore size of 104.9 microns, which would be within the 20–300 micron range of pore sizes disclosed in the '123 Patent. D.I. 340, Vol. L at 2870–74. Additionally, Dr. Davila's publications in 1964, 1966 and 1967 each disclosed that the heart valves had a thin porous Vitallium metal coating applied by the plasma flame spray process to a solid Vitallium base in order to achieve the growth of tissue into the porous surface to help anchor the heart valve in place. DX–250; DX–251; DX–246. Additionally, the 1964 publication illustrated the growth of healthy tissue into the porous of the metal surface. DX–250.

But for the fact that it was not a "bone" implant, testimony at trial by Dr. Davila, which was corroborated by Dr. Burstein and Messrs. Safford and Berlin, established by clear and convincing evidence that the porous metal coated heart valves successfully implanted by Dr. Davila and his associates as described in his 1964, 1966 and 1967 publications "read on" the claims of the '123 Patent and met the structural limitations of the claims in suit.[39] Even Plaintiff's witness, Dr. Lemons, conceded under cross-examination that in 1966 Dr. Davila disclosed to the world a metal prosthetic heart valve with a non-porous metal substrate and a porous metal surface. D.I. 340, Vol. D at 907. Thus, every condition and limitation contained in the claims of the '123 Patent, as previously construed, is met by Dr. Davila's porous coated heart valve except that it is not a "bone" implant.

The Defendants contend that Dr. Davila's work is relevant prior art because those skilled in the field of bone implant and biomaterials would have routinely looked to and relied upon work in the cardiovascular implant field and would have known in 1968–1969 that a flame sprayed porous metal surface could be applied to

which was manufactured by a process known as lost wax casting. Although initial versions of the heart valve contained a highly polished surface, it was later determined to be undesirable and, in the later model, the metal cage contained a porous metal surface to facilitate tissue ingrowth. D.I. 340, Vol. J at 2196–97.

39. For example, the Davila heart valve had (1) a strong Vitallium metal base, (2) which was non-toxic to the biological system to which it was intended to be placed, (3) a porous Vitallium metallic region at the surface of the Vitallium metal base, (4) the porous surface layer being thin relative to the dimension of the base metal, (5) the function of the porous surface layer being to promote adherence of the tissue to the porous surface of the prosthetic device that was implanted adjacent to tissue, (6) the porous metal surface layer being bonded to the metal base by plasma flame spraying, and (7) the porous metal surface and the solid metal base being chemically, electrochemically and thermally compatible with each other and non-toxic to the tissue in which the prosthesis was implanted. D.I. 340, Vol. J at 2230–31, 2280–81, Vol. N..at 3481–82; DX–960 at 37–39, 41; DX–246; DX–247; DX–250; DX–251; DX–960–12–1 through 960–1205.

bone implants.[40] In support of this contention, the Defendants offered the testimony of Dr. Bougas to show that one working in the field of bone implants in 1968 actually looked to the Davila heart valve to apply a porous metal coating to an orthopedic implant.

At trial, several witnesses, including Plaintiff's expert, Dr. Lemons, testified that the field of biomaterials included both orthopedic and cardiovascular surgery. Indeed, Dr. Lemons testified that the surgical disciplines of cardiovascular and orthopedics are typically found in the same department of surgery. D.I. 340, Vol. D at 851–82, 866–67. More importantly, in the years prior to 1968, it was routine for those doing research in the orthopedic or bone implant field to refer and rely upon work done in the cardiovascular field. D.I. 340, Vol. D at 781, Vol. I at 2095, 2102–06, Vol. J at 2229–30, Vol. L at 2738–39, Vol. N at 3479–80.

Defendants further maintain that not only would the hypothetical person of ordinary skill in the instant art refer to and rely upon work done in the field of cardiovascular surgery but that Dr. Bougas, in fact, looked to Dr. Davila's teaching and applied it to a bone implant prior to the alleged conception date of the '123 Patent.[41] In 1967, Dr. Bougas discussed Dr. Davila's porous metal heart valve with Dr. Davila on at least one occasion. D.I. 340, Vol. J at 2341. Dr. Davila gave a speech entitled "Tissue Behavior at Biolateral Interfaces" at the 1967 Gordon Research Conference and Dr. Davila discussed his porous coated heart valve openly to the entire assemblage which was attended by scientists working in all the biomaterials fields. D.I. 340, Vol. E at 1045–46, Vol. J at 2326–27, 2329, 2332–33, Vol. L at 2782; DX 12–1.

At the same conference, on April 5, 1968, which was a workshop on the status of research and training in biomaterials, Dr. Bougas gave a speech on the application of metals, particularly porous metals, to prosthetic devices. D.I. 340, Vol. J at 2346–47, 2355–56; DX–319.[42] Bougas expressly referred to Dr. Davila and his work with the plasma flame sprayed heart valve. DX–319. Dr. Bougas testified at trial that he referred to Dr. Davila in his 1968 speech because he believed that Dr. Davila was the first person to work with a porous metal surface to achieve tissue ingrowth. D.I. 340, Vol. J at 2377; DX 311.[43]

Dr. Bougas also testified that Dr. Davila's prior work with porous coated heart valves encouraged him to conduct research

---

**40.** It is not contested in this case that the references to the work of Drs. Davila and Bougas are sufficiently related to the biomaterial implant field, such that the hypothetical person skilled in the art would presumably be familiar with their work.

**41.** Dr. James A. Bougas received an undergraduate degree in physical biology from M.I.T. and graduated from Harvard Medical School in 1948. Dr. Bougas is a cardiothoracic surgeon who did work in the field of porous metals for bone implants in the period of 1966 to 1970. D.I. 340, Vol. J at 2321–23; DX–317. Thus, Dr. Bougas is representative of one of ordinary skill in the art at the time of Hahn's invention.

**42.** Dr. Bougas testified that the conference was attended by 10–30 people, including polymer scientists, physicists, physicians, a dentist, one orthopedic physician and one orthopedic surgeon. D.I. 340, Vol. J at 2396–97, Vol. K at 2478–81; DX–967 at 29. Since the purpose of the meeting was to disseminate information to stimulate research in the field of biomaterials, the attendees of the conference had no restric-

tions as to how they used the information they obtained at the workshop. D.I. 340, Vol. K at 2481–82. The proceedings of the conference, including a summary of Dr. Bougas' April 5, 1968, presentation referencing the work of Dr. Davila, were subsequently published in 1969 in a book entitled "Biomaterials." DX–319; DX–967 at 23–26, 30–31; D.I. 340, Vol. M at 3082. Thus, the contents of Dr. Bougas' speech qualifies as prior art since it was publicly "known ... in this country" before the invention date of the '123 Patent. *Massachusetts Institute of Technology v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir.1985); *Friction Div. Products v. E.I. DuPont de Nemours*, 658 F.Supp. 998, 1008 (D.Del.1987).

**43.** Prior to April, 1968, Dr. Davila provided Dr. Bougas with a shupped heart valve which was very similar to Defendants' Exhibit 960–12–1 in its porosity and its surface and also in its cutaway at the upper portions of the hoops. D.I. 340, Vol. J at 2342, 2344–45; DX 960–12–1. Prior to April 1, 1968, Dr. Bougas believed that the purpose of Dr. Davila's shupped heart valve was to obtain tissue ingrowth. D.I. 340, Vol. J at 2342.

in the area of applying a porous metal surface to a metal implant for the purpose of achieving fixation by means of bone tissue ingrowth. D.I. 340, Vol. J at 2418. Specifically, Dr. Bougas relied upon the concept disclosed in Dr. Davila's cardiovascular implant in which a metal substrate was covered with a porous metal surface so as to permit fixation by means of soft tissue ingrowth into the porous layers when he decided to design an *orthopedic* implant with a porous metal surface. *Id.* at 2427–28. Dr. Bougas also testified that based upon a review of the literature in 1967 or 1968, it was well known that bone tissue would grow into an metallic implant covered with a porous metal surface. *Id.* at 2431–32.

The testimony of Dr. Bougas demonstrates that a person of ordinary skill in the art could have taken Dr. Davila's disclosure of a cardiovascular implant with a porous metal coating on a metal substrate for fixation by tissue ingrowth and applied this teaching in the field of orthopedic implants as described in the claims of the '123 Patent.

Plaintiff argues, on the other hand, that the Davila heart valve does not render the claims of the '123 Patent obvious under Section 103 because the repeated failure of the heart valve would have discouraged others from using a porous surface on a heart valve. Dr. Davila testified at trial that when his device was implanted inside the heart:

> in some portions of the device there would be a progressive thickening of the layers or capsule ... which was enclosing the device and as this layer got thicker and thicker, it became a barrier to the nutrition of the deeper layers and, therefore, the deeper layers would degenerate and flake off.

D.I. 340, Vol. J at 2226. Plaintiff believes that this "failure" caused Dr. Davila to abandon his research with porous metal coating in 1965 or 1966 and would have lead the hypothetical person of ordinary skill away from using a porous surface on a heart valve because of the disastrous consequences that would result. Although implantation of the heart valve could be disastrous if a piece of tissue escaped the retaining cage and caused a blood clot, this danger has not been linked to a metallic *bone* implant covered with a porous surface. As Dr. Davila previously explained, a thin porous metal layer, such as is described in the '123 Patent, would permit viable, healthy tissue to grow into it.

Notwithstanding the observed flaking of dead tissue, Dr. Davila considered the performance of the porous coated valves to be successful in having achieved tissue ingrowth. *Id.* Although Plaintiff urges this Court to find that Dr. Davila considered his work on the heart valve unsuccessful due to the flaking of tissue, Dr. Davila testified that he never abandoned his work. Instead, after publishing all his work on porous coated heart valves and after accomplishing a substantial part of what he had hoped to accomplish, Dr. Davila went on to other areas of research. *Id.* at 2260–61, 2293–95; DX–960 at 74–76. For example, the record indicates that at the end of 1966, Dr. Davila expanded the character of his work beyond application to heart valves to include "tissue healing in response to prosthetic implants as the broad heading for the work and this progressively involved other disciplines such as eventually plastic surgeons, dentists, hematologists and so forth." D.I. 340, Vol. J at 2228–29. Moreover, Dr. Davila concluded prior to 1968 that the results of his work could be applied to artificial implants in other parts of the body. *Id.* at 2229.

Plaintiff further argues that Dr. Bougas' testimony does not "bridge the gap" between Dr. Davila's shupped heart valves and orthopedic implants because Dr. Bougas declined to use plasma flame spray technology to provide a "reproducible, definable pore size." D.I. 340, Vol. J at 2426. The Plaintiff's second argument simply misses the mark. Like the '123 Patent, the teaching of the Davila heart valve is that "tissue could grow into pores in the surface of metal implants." *Id.* at 2422. Dr. Bougas testified that the teaching of Davila's heart valve encouraged him to try porous metal surfaces for orthopedic implants. *Id.* at 2427. Dr. Bougas con-

sidered Davila's work as a "starting point" for the application of a porous metal surface for "orthopedic implants and of prosthetic implants to the skeleton." *Id.* at 2401. Although Dr. Bougas did not conduct experiments with the application of a porous metal surface to a solid metal or using plasma flame spray technology, Dr. Bougas used Davila's teaching of a porous metal coating on a solid metal substrate to permit tissue ingrowth and proposed "powder metallurgy as a solution for orthopedic implants and prosthetic implants." *Id.; see also* DX–324 at 15, 17, 25. Thus, Dr. Bougas intended to follow Dr. Davila's idea of placing a porous surface next to living tissue by creating a porous metal implant which would allow tissue to grow into the pores. DX–324 at 17.

In an application for a grant from the NIH dated June 1, 1968, Dr. Bougas noted that the objectives of the research included the development and study of new forms of porous metal bioimplants which can simultaneously achieve: "structural strength and rigidity, positive fixation of the implant to host tissues, minimal tissue cell toxicity and reduced cost of fabrication." DX–324 at 15. Dr. Bougas noted that heart valve prostheses and artificial heart components will have dimensional stability, will be better fixed to host tissues and will better hold neo-intimal surfaces at the blood-prosthesis interface than do currently used polymer-covered metals. *Id.* The fact that Dr. Bougas did not use plasma flame spray technology or a porous metal coating bonded to a metal substrate does not render his testimony, offered to "bridge the gap", useless.

It is quite evident from the record that the hypothetical person of ordinary skill in the art during the 1968–1969 era, conducting research into knee implants as demonstrated by the work of Dr. Bougas, routinely looked to the cardiovascular implant field. Thus, the Court concludes that Dr. Davila's work using plasma flame spraying to apply a porous coating to a solid metal substrate for fixation through tissue ingrowth would lead one of ordinary skill in the art to apply the same techniques to orthopedic implants. The application for the fixation technique was directly applicable to the orthopedic field because (1) the field of biomaterials crossed the orthopedic, dental and cardiovascular specialties, and (2) it was well known at the critical time that soft and bone tissue would grow into pores. The required thinness of the layer would have also been resolved through minimal experimentation.

### 2. *Dr. Hulbert's Ceramic Porous Coated Implants*

On August 12, 1965, Dr. Samuel F. Hulbert[44] applied for an NIH Grant in which he proposed a plan to research the design and development of a bone implant with a porous ceramic coating on an impervious ceramic coating on the surface of a solid metal substrate for the purpose of achieving fixation through the growth of tissue.[45] The object of Dr. Hulbert's work was to overcome the problem of implant fixation by "combining the corrosion resistance of ceramics with the [high] strength of metals in a composite structure" to achieve "a closer approach to the ideal prosthetic material." D.I. 340, Vol. L at 2742–44; DX–200 at 6.[46]

---

**44.** Dr. Samuel F. Hulbert was a Professor of ceramic and metallurgical engineering at Clemson University from 1964 to 1973 and has taught biomaterial courses for the past 20 years and has authored about 160 to 180 publications in the field of biomaterials. D.I. 340, Vol. L at 2734–39; DX–199.

**45.** Dr. Hulbert submitted an application for his first NIH Grant relating to biomaterials on August 12, 1965 which was approved for the period May 1, 1966, to April 30, 1967, and he worked under that grant for four years. D.I. 340, Vol. L at 2735–36, 2744; DX–200; DX–201.

**46.** Dr. Hulbert testified at trial that in his 1965 NIH Grant application he was trying to convey the idea that in most prosthetic applications, particularly in orthopedics, one would need the strength of a metal to handle the forces to be applied. By combining a ceramic which would have more biocompatibility, one would achieve the optimum with regard to necessary mechanical properties and the strength. D.I. 340, Vol. L at 2741–42; DX–200 at 6.

Dr. Hulbert disclosed in the grant application two techniques for applying the porous ceramic coating to the metal substrate: one was the use of plasma spraying and the other was conventional enamelling technology. The porous ceramic coated implant disclosed by Dr. Hulbert would accept either soft or bone tissue ingrowth depending only on whether it interfaced with soft tissue or bone tissue. D.I. 340, Vol. L at 2743. On August 31, 1966, Dr. Hulbert submitted a renewal application to the National Institute of Health which was approved for the period September 30, 1967, through August 31, 1970. *Id.* at 2745; DX–202.

On January 12, 1968, Dr. Hulbert publicly presented his ceramic porous coated implants earlier described in his NIH Grant application to an audience of approximately 75 to 100 people at a meeting of the South Carolina Society of Engineers and the South Carolina Section of the American Society of Civil Engineers, which presentation was subsequently published in the June, 1968, issue of "South Carolina Engineer." D.I. 340, Vol. L at 2755–56; DX–204.[47] In his presentation, Dr. Hulbert described a bone implant. The 1968 publication also provided a table which revealed a composite of a solid metal substrate to provide the required strength, covered by a flame sprayed porous ceramic coating for fixation by tissue ingrowth.[48] It is uncontested that except for the fact that Dr. Hulbert's plasma flame sprayed coating was ceramic instead of metal, every limitation of claims 1, 2, 10–16, 18, 21, 22, 29, 30 and 31 of the '123 Patent are met by the porous coated implants disclosed and de-

scribed in Dr. Hulbert's January 12, 1968, speech.[49] Thus, the sole difference between the prior art work of Dr. Hulbert and the '123 Patent is the fact that Dr. Hulbert's plasma flame sprayed coating is ceramic instead of metal.

In determining the obviousness of the claims of the '123 Patent, the question to be resolved is whether Dr. Hulbert's porous ceramic coated implant would suggest to one of ordinary skill in the art how to produce or use a porous metal coated surface on a solid substrate as disclosed in the '123 Patent. *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve*, 796 F.2d 443, 448 (Fed.Cir.1986); *Cable Elec. Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1025 (Fed.Cir.1985). Defendants contend that it was well known prior to 1968 that plasma flame spray ceramic and metal coatings were interchangeable. Plaintiff counters that there was no suggestion in any of Dr. Hulbert's publications to use a porous metal coating on a metallic bone implant.

Prior to 1968, it was well known to those working with flame spray art, as well as those of ordinary skill in the art, that one could use flame spray technology for spraying either ceramic or metal coating on a substrate. This fact was corroborated by the testimony of Drs. Hulbert and Burstein and Plaintiff's expert witness, Dr. Lemons. D.I. 340, Vol. L at 2752–54, Vol. N at 3473–74, Vol. A at 129–32, 139–40. Moreover, Dr. Burstein testified without contradiction that someone working in 1968 with metal porous surfaces for orthopedic implants would have looked to and relied

**47.** The January 12, 1968, oral presentation by Dr. Hulbert and the subsequent June 1, 1968, publication are for all practical purposes the same. D.I. 340, Vol. L at 2756–57; DX–204. Moreover, the contents of Dr. Hulbert's speech in January, 1968, constitutes prior art under Section 102(a). *See Massachusetts Institute of Technology*, 774 F.2d at 1109; *Friction Div. Products*, 658 F.Supp. at 1008.

**48.** The proposed prosthetic composite shown at the top of Figure 1 on page 36 of the publication of the January 12, 1968, talk is substantially the same as that shown at the top of page 7 of the 1966 NIH Grant. D.I. 340, Vol. L at 2758; DX–202 at 7; DX–204 at 36.

**49.** Dr. Hulbert's flame sprayed porous coated device, as disclosed and described by him on January 12, 1968, was (1) a bone implant, (2) comprising a strong metal base, (3) which is substantially non-toxic to the biological system, (4) the porous region being thin relative to the thickness of the base, (5) the purpose of the porous coating being for tissue ingrowth, and (6) the coating and the substrate being chemically, electrochemically and thermally compatible in application as a prosthetic device and non-toxic to the bond.

upon Dr. Hulbert's work with ceramics. D.I. 340, Vol. N at 3476.

In addition, the specification of the '123 Patent itself corroborates the conclusion about the interchangeability of a porous ceramic coating with a porous metal coating. In this regard, the '123 Patent cites the "Flame Spray Handbook", Volume III (Metco Ltd.1965) to illustrate the proper method to flame spray a porous metal coating onto a metal substrate. PX–28, col. 4, lines 4–11, PX–16.[50] More importantly, however, the '123 Patent also cites to a 1966 publication entitled "Nuclear Application of Non–Fissionable Ceramics" by J.L. Pentecost and Henry Hahn as teaching the way to apply a porous metal coating. In fact, the publication deals only with the flame spraying of ceramic coatings on metal and there is no mention in that article of flame spraying of a metal coating on a metal surface. PX–17; D.I. 340, Vol. L at 2753–54; PX–28, col. 4, lines 6–9.[51] In relying on references to plasma flame ceramic coating to teach his metal flame spray coatings, Hahn acknowledged what the Court has concluded; that is, it was well known in 1968–1969 that ceramics and metals were interchangeable for applying a porous coating to a metal substrate. Consequently, evidence of the interchangeability of a porous metal coating with a porous ceramic coating is a strong indicia of obviousness. *See, e.g., In re Dow Chemical Co.,* 837 F.2d 469, 473 (Fed.Cir.1988); *In re Merck & Co., Inc.,* 800 F.2d 1091, 1097 (Fed.Cir. 1986).[52]

Plaintiff's only response is that Dr. Hulbert's work with ceramics taught away from the concept of using a porous metal coating on a solid metal substrate. In support of this argument, Plaintiff cites to Dr. Hulbert's testimony on cross-examination that "there is no suggestion in any of those [prior art publications] to use a porous metal coating on a solid metal substrate." D.I. 340, Vol. L at 2729. Nevertheless, this reference is taken out of context and is not credible evidence that one of ordinary skill would not find it obvious to use plasma flame spray technology to produce a metal porous coating on a solid metal substrate in 1968. Instead, Dr. Ducheyne testified that Dr. Hulbert "proposes as the 'ideal implant', an implant with metal and ceramic coating, but in so doing, he re-checks himself using a metal coating at the outside.[53] Therefore, the concept of [applying a] metal coating is clearly present in this paper." D.I. 340, Vol. P at 3722. Moreover, Dr. Hulbert's advocacy for ceramics is explained by his belief that metals used as bone implants are subject to microcorrosion. D.I. 340, Vol. L at 2740–42, 2747–48; DX–200 at 6. Nevertheless, it is uncontested that high strength metals such as Titanium and Vitallium were the primary materials used for prosthetic devices then and

**50.** The handbook also teaches that the same technology procedures and equipment are to be used for flame spraying both ceramics and metal interchangeably. PX–28, col. 4, lines 10–11; PX–16.

**51.** The publication's disclosure of a the technique for flame spraying ceramics entails the same technology for flame spraying metals. D.I. 340, Vol. L at 2754; PX–17; PX–28, col. 4, lines 6–9.

**52.** Since the mere "substitution of a new material (*e.g.,* metal instead of ceramics) in an old formulation (*e.g.,* plasma flame spraying) generally does not amount to [an] invention", *Friction Div. Products,* 693 F.Supp. at 130, it is not unreasonable to conclude that Dr. Hulbert's work would be obvious to one of ordinary skill. For example, in *Egley v. United States,* 216 Ct.Cl. 346, 576 F.2d 309, 317 (1978), the court held:

The combination, as a whole, that results from the addition of an old element in corresponding positions of interchangeable devices, especially where the addition produces only the function it is known to perform and no new or unexpected function, has long been held to be obvious within the meaning of 35 U.S.C. § 103. *See Ellicott Machine Corp. v. United States,* 186 Ct.Cl. 655, 667, 405 F.2d 1385, 1391 (1969).

*See also In re Fout,* 675 F.2d 297, 301 (C.C.P.A. 1982); *Brunswick Corp. v. Champion Spark Plug Co.,* 689 F.2d 740, 750 (7th Cir.1982); *Application of Siebentritt,* 372 F.2d 566, 568 (C.C.P.A. 1967); *AMP Incorporated v. Burndy Corporation,* 332 F.2d 236, 239 (3rd Cir.1964).

**53.** The reference may be to the fact that Dr. Hulbert excepted titanium from his list of objectionable surface layer materials. In any event, Ducheyne testified that, in spite of Hulbert's preference for ceramic, others of ordinary skill in the art would have opted for metal. D.I. 340, Vol. P. at 3724–25.

they still are today. Thus, the Court concludes that the work of Dr. Hulbert did not teach away from the use of a porous metal coating on a metal substrate.

### 3. *Other Prior Art References*

Defendants contend that an article written by Dr. Jonathan Cohen entitled "Tissue Reactions To Metals—The Influence Of Surface Finish" in *The Journal of Bone and Joint Surgery* in 1961, which teaches the use of a roughened surface to promote bone ingrowth against the surface of a metal implant, either anticipates the claims of the '123 Patent under Section 102 or renders them obvious under Section 103. DX–347. Dr. Cohen implanted bone screws with a roughened surface to promote bone ingrowth to determine the reasons that cobalt-chrome bone screws became "so firmly embedded that it was impossible to unscrew them." DX–347 at 687. Although the Cohen article demonstrates that it was known in 1961 that bone tissue would grow against a roughened surface, the article does not anticipate the claims of the '123 Patent or render them obvious because it fails to teach the application of a porous metal surface to a metallic bone implant. Instead, the Cohen article merely teaches that a roughened surface, as opposed to a smooth or polished surface, will promote bone ingrowth. Moreover, Defendants failed to offer any evidence that one of ordinary skill in the art would have found the claims of the '123 Patent obvious upon reading the Cohen article. Since a rough surface does not constitute a separate and distinct layer with interconnected pores, it fails to read on the claims of the '123 Patent and would not have lead the person of ordinary skill in the art to the invention.

Similarly, the Haboush Patent fails to render the claims of the '123 Patent obvious because it only teaches the use of recesses or grooves on a acetabular cup component of a hip prosthesis. DX–499; D.I. 340, Vol. Q at 3812. These grooves do not constitute a porous metal layer applied to the substrate. In addition, the patent does not disclose the interconnection of pores and does not require the growth of bone tissue into the grooves so as to achieve fixation because the Haboush Patent advocates the use of bone cement to achieve fixation. DX–499, col. 4, lines 18–19. Although the Haboush Patent, like the Austin Moore prosthesis, indicates the direction scientists were taking in the 1950's toward developing a bone implant which could achieve fixation by means of bone ingrowth into pores, it fails to suggest that such a method could be achieved by applying a porous metal layer to a metal substrate. In addition, Defendants did not introduce any evidence at trial that one of ordinary skill in the art would have found the claims of the '123 Patent obvious based upon the disclosure in the Haboush Patent. Thus, the Haboush Patent fails to render the claims of the '123 Patent obvious under Section 103.

Finally, the Ashuckian and Friel dental implants fail to render the claims of the '123 Patent obvious because neither reference teaches the application of a porous metal layer on the implant so as to achieve fixation through bone ingrowth. DX–24; DX–496. Instead, the Ashuckian Patent discloses deep impressions or holes in the wall of a dental implant to permit the expansion of the root so as to prevent movement of the implant. DX–24, col. 1, line 6–70. The Friel Patent only discloses holes or fenestrations in a dental implant. Although these references indicate that it was well known that bone tissue could grow into pores so as to achieve fixation of the artificial tooth, neither reference discloses a separate porous layer applied to a metal base. The Defendants also failed to introduce any evidence that one of ordinary skill in the art would have found the claims of the '123 Patent obvious based upon the disclosure in these two patents. Thus, the Court concludes that the Ashuckian and Friel Patents cannot render the claims of the '123 Patent obvious.

### D. Secondary Considerations

As noted, *supra*, "evidence of secondary considerations may often be the most probative and cogent evidence in the record." *Stratoflex*, 713 F.2d at 1538; *see also Phillips*, 673 F.Supp. at 1317. But a "nexus between the merits of the claimed invention

and the evidence of secondary considerations is required in order for the evidence to be given substantial significance in an obviousness decision." *Simmons Fastener Corp. v. Illinois Tool Works*, 739 F.2d 1573, 1575 (Fed.Cir.1984). Thus, objective evidence of secondary consideration is to be "carefully appraised in relation to the facts of the actual case in which it is offered." *Cable Elec.*, 770 F.2d at 1026; *EWP Corp.*, 755 F.2d at 905.

In the instant case, Plaintiff contends that the non-obviousness of the invention claimed in the '123 Patent is demonstrated by (1) the commercial success of the claimed invention, (2) the failure of others skilled in the art to solve the long standing problem of fixation, and (3) the long felt need for improved fixation of orthopedic implants. Defendants argue, on the other hand, that Plaintiff has failed to establish a nexus between the merits of the claimed invention and the secondary considerations. Instead, Defendants contend that the only relevant evidence of secondary considerations to the '123 Patent is the "contemporaneous development" of the claimed invention by the others.

### 1. *Commercial Success*

Commercial success of the claimed invention can be a strong factor favoring non-obviousness. *Simmons Fastener*, 739 F.2d at 1575–76. Of course, there must be a "nexus" between the merits of the claimed invention "as opposed to other commercial and economic factors unrelated to the technical quality of the patented subject matter" if evidence of commercial success is to be given substantial weight in determining the obviousness issue. *Cable Elec. Products*, 770 F.2d at 1027; *Stratoflex*, 713 F.2d at 1539. The patentee bears the burden of proving the existence of such a nexus. *Cable Elec. Products*, 770 F.2d at 1027. The Federal Circuit has established an "evidentiary routine" to be followed when a patentee asserts that commercial success supports its contention of non-obviousness. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392–94 (Fed.Cir.1988). In *Demaco*, the Federal Circuit stated:

In meeting its burden of proof, the patentee in the first instance bears the burden of coming forward with evidence sufficient to constitute a *prima facie* case of the requisite nexus.

\* \* \* \* \* \*

A *prima facie* case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent.

When the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger, as in any civil litigation.

*Id.* at 1392, 1393. Thus, as noted previously, it is "the task of the [patent] challenger to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention, such as advertising, superior workmanship, etc." *Id.* at 1393. Nevertheless,

A patentee is not required to prove as part of its *prima facie* case that the commercial success of the patented invention is *not* due to factors other than the patented invention. It is sufficient to show that the commercial success was of the patented invention itself. A requirement for proof of the negative of all imaginable contributing factors would be unfairly burdensome, and contrary to the ordinary rules of evidence.

*Id.* at 1394. If a *prima facie* case is established but not fully rebutted, then the Court may not totally ignore the objective evidence of commercial success. *Id.*; *see also W.L. Gore*, 721 F.2d at 1555.

In the present case, Plaintiff contends that there was ample evidence that the invention of the '123 Patent has been commercially successful. In support of this contention, Plaintiff introduced evidence that one of the leading manufacturers of prosthetic devices, Zimmer has paid royalties for licenses under the '123 Patent. Evidence at trial established that Zimmer paid royalties from 1980 until June, 1987, when it fully satisfied a cap of $2,000,000 under

an agreement dated December 22, 1986. PX–138. A licensing agreement in and of itself, however, does not indicate commercial success. *See EWP Corp.*, 755 F.2d at 907–08. Moreover, Defendants have introduced evidence which demonstrates that, except for the license to Zimmer in 1980, the orthopedic industry has refused to recognize the significance of the '123 Patent as evidenced by their general refusal for almost nine years to seek a license under the patent.[54]

Plaintiff argues, on the other hand, that the lapse of time between the issuance of the '123 Patent and the license to Zimmer is explained by the fact that orthopedic surgeons are required to be conservative in their judgment and require a significant body of favorable test results before applying a new medical device. D.I. 340, Vol. A at 179–80, Vol. I at 2038–39. Assuming *arguendo* that Plaintiff is correct, the decision to license a patent is a business decision undertaken by a company who is attempting to make a profit. The fact that surgeons are conservative in applying new medical technology, does not satisfactorily explain the refusal of the companies within the orthopedic industry to seek a license under the '123 Patent in order to develop a usable implant device. Instead, the refusal of the industry to seek a license is a factor to be considered.

At trial, Plaintiff also sought to introduce evidence that Boehinger Mannheim paid $3.4 million for a license under the '123 Patent in settlement of an infringement suit brought by American Standard in the U.S. District Court for the Northern District of Illinois.[55] Despite its admissibility, the Court finds the relevance and the weight of the settlement agreement and consent judgment to be *de minimis.* Plaintiff has not offered any evidence to show a "nexus" between the license taken by DePuy under the settlement agreement and consent judgment and the merits of the invention claimed in the '123 Patent. Instead, Defendants have clearly demonstrated that the decision to settle the case was purely a business decision. Mr. Steven L. Artusi, Corporate Counsel and Vice President, Legal and Regulatory Affairs of DePuy, stated in his affidavit that:

Throughout the pendency of the Indiana Action, DePuy vigorously defended American Standard's claims for relief against DePuy, including American Standard's claims of patent validity and infringement liability and damages. However, in February of 1987, DePuy, wishing to avoid future litigation expenses and uncertainties, settled the Indiana Action with American Standard by entering into a "Settlement and License Agreement" pursuant to which DePuy was licensed under the '123 Patent. The parties further stipulated to the entry of a "Consent Judgment" to end the pending civil suit.

---

54. The major companies manufacturing porous coated orthopedic implants are Zimmer, Howmedica, DePuy, Biomet, Richards, Stryker, Protech, Solsar and Intermedics and yet, of these manufacturers, only Zimmer and DePuy have rights under the '123 Patent. DePuy's rights were obtained only as a result of litigation and settlement. D.I. 340, Vol. B at 374–75, Vol. H at 1682–86. When Zimmer was looking for new a orthopedic implant technology in 1978, it looked at the porous beaded technology, which included the Pilliar patent, and it also looked at the Rostoker/Galante fiber mesh technology but it did not look at the '123 Patent or at the flame spray technology. D.I. 340, Vol. B at 414–16; DX–269; DX–270.

55. Defendants filed a motion in limine, D.I. 336, to preclude Plaintiff from introducing Boehinger Mannheim's settlement agreement and consent judgment in *American Standard v. Boeh-*

*ringer Mannheim,* C.A. No. S83–0552 (N.D.Ill. 1983) (Sharp, C.J.), under Rules 403 and 408 of the Federal Rules of Evidence. The Court took this motion under advisement at trial. D.I. 338, Appendix 1 and 2; D.I. 340, Vol. H at 1656; PX–297. Defendants argued in their brief that under Rule 408, evidence of a negotiated settlement is not admissible to prove liability. Nevertheless, Rule 408 also provides that "this rule does not require exclusion [of a negotiated settlement] when the evidence is offered for another purpose...." Fed.R.Evid. 408. Because Plaintiff did not offer the evidence to show infringement liability but instead offered it solely for the purpose of proving commercial success and the requisite nexus between success and the invention of the '123 Patent, the Court concludes the settlement agreement and consent judgment are admissible to show commercial success.

PX–297, Ex. 10 at 2–3, ¶ 7; *see also,* PX–96 at 296. It is also well established that a settlement agreement entered into between a plaintiff and a third party regarding infringement of a patent may not by itself be probative evidence of commercial success of the alleged invention. *See Rockwell v. Midland–Ross Corporation,* 438 F.2d 645, 651 (7th Cir.1971) (settlement agreement does not bear on non-obviousness of alleged invention since "[a]ll this evidence may indicate is that a manufacturer, for business reasons, may prefer to pay a royalty rather than be involved in litigation."); *L.D. Schreiber Cheese Co., Inc. v. Clearfield Cheese Co.,* 540 F.Supp. 1128, 1140 (W.D.Pa.1982) (the fact that third parties have taken patent licenses from plaintiff does not bear on the non-obviousness of plaintiff's alleged invention since others simply "may find the cost of a license cheaper than the expense of litigation." *Id. citing Philips Elec. & P. Indus. Corp. v. Thermal & Elec. Indus.,* 450 F.2d 1164 (3rd Cir.1971)). The Court thus finds that the settlement agreement and consent judgment bears very little on the issue of commercial success. *EWP Corp.,* 755 F.2d at 908.

In addition to the licensing agreements, Plaintiff introduced into evidence the dollar value of sales of Zimmer's and DePuy's porous coated products and the dollar value of Pfizer's sales of PCA products.[56] What the gross sales figures show in relation to commercial success of the claimed invention of the '123 Patent is incommensurable. In *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144 (Fed.Cir.1983), the Federal Circuit rejected the District Court's finding of "overwhelming commercial success" based solely upon sales figures. *Id.* at 1150. The court stated:

> The evidence of commercial success consisted solely of the number of units sold. There was no evidence of market share, of growth in market share, of replacing

earlier units sold by others or of dollar amounts, and no evidence of a nexus between sales and the merits of the invention. Under such circumstances, consideration of the totality of the evidence, including that relating to commercial success, does not require a holding that the invention would have been nonobvious at the time it was made to one skilled in the art.

*Id.* at 1151; *see also Cable Elec. Prods.,* 770 F.2d at 1026–27 ("Without further economic evidence for example, it could be improper to infer that reported sales represent a substantial share of any definable market or whether the profitability per unit is anything out of the ordinary in the industry involved."). Thus, without evidence of market share or some other economic bases for assessing the significance of these statistics in comparison with the rest of the orthopedic industry, it would be improper to infer commercial success on the basis of gross sales figures or royalties. *See Cable Elec. Prods.,* 770 F.2d at 1026. At most, it is a factor of small value.

### 2. *Nexus*

But even assuming for the moment that commercial success was clearly shown, the Plaintiff must clear the additional hurdle of proving a *prima facie* case that a nexus exists between the gross sales figures and the claimed invention. *Id.* at 1027. In the instant case, Plaintiff provides very little evidence to support the existence of such a nexus. Instead, in its post-trial brief, Plaintiff relies solely on the evidence of gross sales figures and failed to show their relationship to the claimed invention. Without evidence of such a nexus, the Court declines the invitation to infer the existence of a nexus.

Defendants, on the other hand, introduced evidence at trial to show that the success of their PCA products was the

---

**56.** Those figures are contained in documents submitted under seal to the Court at trial. The dollar amounts of the sales of Zimmer's porous coated products on which royalties were paid appears in the royalty statements submitted to American Standard. *See* PX–138. The dollar amount of sales of DePuy's porous coated prod-

ucts for the period 1981 to June 30, 1988, appears in a confidential document bearing Bates number 141 as part of PX–296. Finally, the dollar amount of Pfizer's PCA products for the period 1981 through the first quarter of 1988 appears on pages W25897, W25985 and W25906 of PX–134.

result of several different factors, including Defendants' reputation as an established leader in the orthopedic field.[57] Plaintiff argues in response that Defendants' reliance upon an "anatomic design" and instrumentation to explain why the PCA products are accepted in the marketplace is irrelevant to the issue of commercial success because neither is a part of the claimed invention of the '123 Patent. Plaintiff attempts to bolster its argument by pointing out that the "anatomic design" was merely an attempt to replicate some part of the human body, D.I. 340, Vol. N at 3361–62, which is an old feature in the art not expressly referred to in the '123 Patent although it recognized that a prosthetic device would have an "appropriate shape for the part it is to replace." PX–28, col. 2, line 27. Plaintiff's argument is misdirected. The very point of the Defendants' contention is that their PCA products are not accepted in the marketplace because of the *claimed* invention but because of other factors. Moreover, the reference to the specification of the '123 Patent about the appropriate shape of the prosthetic device is misplaced because it is not part of the *claimed* invention at issue.

Plaintiff also argues that Defendants' reliance upon their instrumentation used for implanting a variety of Howmedica implants to explain the success of their PCA products is belied by the fact that each manufacturer provides a set of instruments for its prosthetic products. D.I. 340, Vol. N at 3314. Defendants point out that Zimmer, DePuy or Pfizer sales do not depend solely upon the porous metal coating claimed in the '123 Patent. Instead, one of the other factors which influences the sales of porous coated implants is the instrumentation used to perform the surgery. In this regard, Dr. Burstein testified that there is a strong influence in a surgeon's choice of knee components based upon his preference for the instrument system. *Id.* at 3485–86. Just as important is the Defen-

dants' reputation in the marketplace. At the time the PCA knee prosthesis was introduced into the market place, Howmedica was also marketing and continued to market its Kinematic knee system, the total condylar knee system and the variable knee system. *Id.* at 3303–04. However, the instruments for the Kinematic knee and the total condylar knee system cannot be used to implant the PCA knee prosthesis. *Id.* at 3311.[58] The PCA universal instruments can only be used with the PCA total knee system. *Id.* at 3390–91. Even assuming the Plaintiff had established a nexus between the gross sale figures and the claimed invention and, even assuming Plaintiff had efficiently countered the Defendants' testimony on lack of commercial success, there are thirteen other factors which may account for the sales of the Defendants' prosthesis. Secondly, the Court finds that there is no evidence to infer commercial success of the claimed invention. Instead, the evidence is overwhelming that a porous metal surface alone is not the cause for the sales.

### 3. *Contemporaneous Development*

Defendants contend that the work of Dr. Robert Pilliar beginning in September, 1969, and continuing thereafter in 1970 in which he designed, developed, successfully tested and probably disclosed a sintered metal porous coated implant constitutes a "highly persuasive" evidence of obviousness. It is well settled that "[e]vidence that a number of other persons, working under the same state of the prior art, arrived at the same or similar solutions to that embodied in a patent claim has been relied upon in a number of decisions as tending to show that the claim solution was obvious." 2 D. Chisum, *Patents* § 5.05[7] (1988) and cases cited therein. "Evidence of contemporaneous invention is probative of 'the level of knowledge in the art' at the time the invention was made." *In re Far-*

---

57. For thirteen different but additional reasons, see DX–487–I.

58. At the time that the PCA hip prosthesis was introduced into the marketplace, Howmedica was also marketing and continued to market its

Au Franc Turner total hip system which is still marketed in an updated version termed the Total Precision Hip System. D.I. 340, Vol. N at 3311–12.

*renkopf,* 713 F.2d 714, 720 (Fed.Cir.1983); *In re Merck,* 800 F.2d at 1098.

In *Hybritech,* the Federal Circuit reversed a District Court's invalidation of a patent and criticized the court's reliance on evidence of contemporaneous development:

> Finding 10, which states that the invention was contemporaneously developed and disclosed in at least five publications and patent applications not listed above and dated well after the filing date of the '110 patent but before its issuance is irrelevant for purposes of the hypothesis based on the three factual inquiries required by § 103 as interpreted by *Graham v. John Deere,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 U.S.P.Q. 459 (1966), because obviousness must be determined as of the time the invention was made. Additionally, they are of little probative value in this case because they are dated December 1981 at the earliest, more than a year after the August 4, 1980, filing date here and roughly two years after conception occurred. Furthermore, simultaneous development may or may not be indicative of obviousness, the latter being the case here for the above reasons and because the other evidence of nonobviousness is adequate, such occurrences having been provided for in 35 U.S.C. § 135.

*Hybritech,* 802 F.2d at 1380 n. 4 (citations omitted). Thus, it appears clear that contemporaneous independent development *before* the patenting of the invention "can be evidence of obviousness" of the invention though not conclusive. *Fred Whitaker Co. v. E.T. Barwick Indus., Inc.,* 551 F.2d 622, 628 (5th Cir.1977); *Clarke v. K-Mart,* 481 F.Supp. 470, 473 (W.D.Pa.1979), *aff'd,* 639 F.2d 772 (3rd Cir.1980).

The Court finds that the work of Dr. Pilliar, which began on September 4, 1969, D.I. 340, Vol. K at 2661–63; DX–178, cannot be considered relevant evidence of contemporaneous independent development since it occurred well after the alleged May 24, 1968, effective date of the '123 Patent and several months after the April 29, 1969, filing date of the '123 Patent application. Although Dr. Pilliar's publication of July, 1971, came before the September 20, 1971, issuance of the '123 Patent to Mr. Hahn, evidence of obviousness, including contemporaneous development, must be prior art "at the time of the invention was made" not just prior to the issuance of the patent. 35 U.S.C. § 103; *Hybritech,* 802 F.2d at 1380 n. 4. Thus, the Court concludes that the work of Dr. Pilliar involving a metal porous coated bone implant is not relevant to the determination of obviousness.

### 4. *Failure of Others/Long Felt Need* [59]

Plaintiff contends that the problem of adequate fixation of orthopedic implants and its reciprocal loosening of implants had been a long standing unsolved problem at the time the '123 Patent was invented. Recognition of this fixation problem by Drs. Rostoker and Galante appears in a paper presented in October, 1969, DX–101A at 456, and in their abandoned patent application filed September 8, 1970, DX–118 at 2. The fixation problem is also mentioned in Smith U.S. Patent No. 3,314,420 issued April 18, 1967. PX–23, col. 1, lines 54–59. Dr. Pilliar also recognized the fixation problem sometime prior to July, 1971, DX–189 at 963, as did the PCA project manager, Mr. Kenna, in his April, 1979, proposal for porous coated implants. PX–74, at 2, W10775.

The first surgical technique that had evolved to address the fixation-loosening problem, namely, press fit implantation, was inadequate and the subsequent development of the bone cement surgical implantation technique, which was so widely hailed at the beginning, also proved to be a disappointment. D.I. 340, Vol. A at 69, 87–88. A non-surgical approach to the problem was taken in the 1960's by investigating materials other than the heavy, dense metals which were then in use. These materials included ceramics advocated by Dr. Hulbert and Lyman Smith and

---

**59.** Because the Plaintiff argues that both secondary considerations of failure of others and long felt need are relevant but fail to argue the latter point in its post-trial brief, the Court will consider the two issues together.

powder metallurgically produced metals which were the subject of experiments by Mr. Reynolds and Drs. Hirschhorn and Bougas. The purpose of the invention claimed in the '123 Patent was to overcome the problem of fixation by applying a porous metal coating to a solid metal substrate to permit fixation by the ingrowth of tissue. PX–28, col. 1, lines 21–23, col. 2, lines 20–23. Evidence of failure of others or long felt need is to be considered in the obviousness determination but is not conclusive. *Windsurfing Intern. Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed.Cir. 1986); *see also Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 740 (Fed.Cir.1984).

The need for strength led Dr. Hirschhorn and Mr. Reynolds to investigate the feasibility of powder metallurgical fabrication of orthopedic implants in 1967–1968. DX–1 at 1. Prior to the experiments with powder metallurgy, both Mr. Reynolds and Dr. Hirschhorn believed that bone tissue would grow into the porous substrate. D.I. 340, Vol. M at 3208. They also believed that a porous bone implant made by powder metallurgy would be stronger than previous metal bone implants. Mr. Reynolds then implanted an entirely porous sample made from compressed Vitallium into the rib cage of dog specimens. Although Mr. Reynolds ultimately concluded in his Thesis that a porous implant fabricated by powder metallurgy is superior to cast or wrought forms, he suggested that "sintering powder particles to the cast or wrought implants could conceivably give a surface porosity effect that would help hold the device in place." DX–1 at 50. This reference indicates that, at the time the '123 Patent was invented, it was obvious to more than one person of ordinary skill in the art to apply a porous metal coating on a metal substrate as a solution to the problem of adequate fixation and strength.

The work of Drs. Rostoker and Galante from 1967 to 1970 demonstrates that other people skilled in the art believed that one solution to the problem of adequate fixation is the bonding of a porous metal layer or coating to a metallic implant to permit the growth of bone tissue into the pores. For example, beginning in January, 1969,

Drs. Rostoker and Galante implanted a metallic implant specimen covered by a porous fiber metal mesh sleeve into the femur of dogs. D.I. 340, Vol. H at 1805–06, 1815–16; DX–103. Thus, the work of Drs. Rostoker and Galante demonstrates that Hahn was not the only person working with the concept of applying a porous metal layer to a metal implant to solve the problem of adequate fixation. In addition, the work of Dr. Davila demonstrates a successful use of an implant with a porous metal layer.

The Court concludes that since more than one person created or conceived of applying a porous metal layer to a metallic bone implant, the invention of the '123 Patent was an obvious solution to the long felt need to overcome the problem of adequate fixation.

### 5. *Conclusion*

In sum, the Court finds that Defendants have carried their burden of proof of establishing the obviousness of the claimed invention of the '123 Patent under Section 103 based on the prior art of Dr. Davila's porous coated heart valves in combination with the level of knowledge available in 1968–1969 and the work of Dr. Bougas. The Court also finds that a conclusion of obviousness of the '123 Patent is also reached upon the alternative evidence of Dr. Hulbert's work with ceramic porous coated implants based on the interchangeability of metal and ceramic in the plasma flame spray process. These prior art references combined with the level of knowledge at the time demonstrate that the subject matter of the '123 Patent constituted the natural and obvious progression of the state of the art so as to produce a bone implant with a porous metal surface.

Although Plaintiff introduced evidence of commercial success in an attempt to show the non-obviousness of the '123 Patent, gross sales figures of the Defendants' PCA Products and the products of Zimmer and DePuy are insufficient evidence by themselves to show commercial success of the claimed invention without demonstrating that a nexus exists between the sales and the merits of the claimed invention. Sec-

ondly, the licensing agreements and a settlement/consent agreement are not conclusive evidence of commercial success of the claimed invention because they may be the result of a business decision to avoid the costs of litigation rather than represent a recognition of the merits of the claimed invention. Moreover, Defendants' evidence indicated that the orthopedic industry had not recognized the uniqueness of the '123 Patent based on the nine year lapse before a license was granted. In addition, the Defendants have introduced persuasive evidence of at least thirteen factors, most of them uncontested, to explain the success of their PCA products.

The other secondary considerations of the Plaintiff equally fail to indicate the non-obviousness of the patent. Although there was a long felt need to overcome the problem of adequate fixation, demonstrations of success were evident from which one could deduce the principle of the '123 Patent.

## VI. INEQUITABLE CONDUCT

It is well settled that applicants for patents have an uncompromising duty of candor before the Patent Office. That duty is not an irrelevant legal fiction; the duty of candor is and has long been as essential ingredient in the patent process. *Precision Co. v. Automotive Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945). Failure to conform to that duty represents "inequitable conduct" which renders the entire patent unenforceable, not just those claims to which the inequitable conduct was directed. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1561 (Fed.Cir.1984). In its most recent pronouncement on inequitable conduct, the Federal Circuit stated: "[i]nequitable conduct resides in failure to disclose material information, or submission of false material information with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." *Kingsdown Medical Consultants v. Hollister Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988). In order to be guilty of inequitable conduct, a party "must have intended to act inequitably."

*FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed.Cir.1987).

In the present case, Defendants contend that the '123 patent is unenforceable based on the inequitable conduct of Mr. Hahn before the PTO. This claim of Hahn's inequitable conduct is founded on two events: (1) Hahn intentionally misled the Patent Office by purposely withholding the Reynolds Thesis from it, although he knew the Thesis was extremely material, and (2) Hahn intentionally misled the Patent Office by stating that histology of his test pins had confirmed bone ingrowth when Hahn knew this representation was utterly false. One who alleges inequitable conduct based upon failure to disclose allegedly material prior art must offer clear and convincing proof of: (1) prior art or information that is material, (2) knowledge chargeable to applicant of that information and of its materiality, and (3) failure of the applicant to disclose the art or information resulting from an intent to deceive the PTO. *FMC Corp.*, 835 F.2d at 1415. Intent need not be proven with direct evidence but can be inferred from all the relevant evidence. *Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1540 (Fed. Cir.1984).

### A. The Reynolds Thesis

#### 1. *Materiality*

The Reynolds Thesis discloses a nonporous metal bone implant with a porous metal layer to achieve fixation by bone tissue ingrowth. For example, as previously discussed, the Reynolds Thesis suggests that:

> Sintering powder particles to the cast or wrought implants could conceivably give a surface porosity effect that would help hold the device in place. This process might be used in cases where, for example, a smooth surface (hip ball and socket joint) is required to hold the prosthesis in place. The stem of the ball joint is normally inserted into the soft intra-medullary region of the human femur, where tissue ingrowth would be beneficial.

DX–1 at 50. The Reynolds Thesis describes at least claims 18, 21–22 and 29–31 of the '123 patent because it discloses the use of a porous metal layer bonded to a metal substrate to permit fixation by bone tissue ingrowth into the surface porosity. In his patent application, Hahn cited prior art which showed bone implants with metal bases but without the metal coating. For example, Hahn stated: "Admittedly, Wright shows a metal reinforced tooth, and employs a porous mineral coating. But mineral is not metal. . . ." PX–15 at 30. Reynolds supplies the missing element, a metallic bone implant coupled with the suggestion that metal particles be applied to the metal substrate to create a porous coating so as to permit fixation of the implant by means of bone tissue growing into the surface porosity. DX–1 at 50. It is one of the important teachings which was missing from the prior art references considered by the Patent Office. Nothing could be more material.

Plaintiff argues, however, that the Reynolds Thesis is not material because the reference on page 50 only revealed a "mere concept", and therefore, there was no duty to disclose it to the Patent Office, particularly since it was not prior art. *See, e.g., Environmental Designs,* 713 F.2d at 698. This argument is misplaced because the language on page 50 of the Reynolds Thesis teaches to one of ordinary skill in the art how to produce a metallic bone implant by applying a porous metal layer to a solid metal substrate which meets all the limitations of claims 18, 21–22 and 29–31 of the '123 Patent. D.I. 340, Vol. I at 2128, 2142–46, Vol. M at 3160–61. The Reynolds Thesis, therefore, is an enabling disclosure and not a "mere concept." *See e.g., Struthers Scientific & Int. Corp. v. Rappl & Hoenig Co.,* 453 F.2d 250, 255 (2nd Cir. 1971); *Austin Powder Co. v. Atlas Powder*

*Co.,* 568 F.Supp. 1294, 1307 (D.Del.1983).[60] Thus, if the Reynolds Thesis were prior art, it would be material information since it anticipates claims 18, 21–22 and 29–31 of the '123 Patent.

Although the Court has previously determined that the Reynolds Thesis was not prior art under Section 102(a) or (g), it does not preclude a finding that the Thesis was material information which should have been disclosed to the Patent Office during the pendency of the '123 Patent application. The legal standard for materiality is "whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent." *J.P. Stevens,* 747 F.2d at 1559. Since the inquiry is directed to what a reasonable examiner would have considered important, the fact that this Court has determined that the Reynolds Thesis is not a prior art reference, *see supra,* is insignificant if a reasonable examiner would have found the Reynolds Thesis "important information" in his decision to allow the application to issue as a patent. *FMC Corp.,* 835 F.2d at 1415. The Reynolds Thesis was approved on June 14, 1968, and it was material because it supplied important information about the teaching of a porous metal coating which was missing from the other prior art references cited by Hahn in his application.

This materiality was confirmed by Plaintiff's corporate counsel, Mr. Crooks, when in prosecuting another similar application for Hahn, cited the Thesis to the Patent Office and the Patent Office in turn specifically cited pages 50–52 of the Reynolds' Thesis. D.I. 340, Vol H at 1718–25, 1736; DX–41; DX–172; DX–173. Furthermore, when Bristol–Myers began evaluating the validity of the '123 Patent in deciding

---

**60.** Even if the Reynolds Thesis only revealed a mere concept, "[t]he fact that prior art may not render a device invalid because of obviousness or anticipation does not necessarily mean that the prior art is not material for disclosure purposes." *RCA Corp. v. Data General Corp.,* 701 F.Supp. 456, 8 U.S.P.Q.2d 1305, 1320 (D.Del. 1988); *see also A.B. Dick Co. v. Burroughs Corp.,* 798 F.2d 1392, 1397–98 (Fed.Cir.1986). As this

Court has previously stated, "if prior art had to meet such a high standard, the entire inequitable conduct defense would be subsumed by the substantive analysis of section 102 and section 103." *RCA Corp.,* 701 F.Supp. at 474, 8 U.S.P.Q.2d at 1320 (*citing Afros S.P.A. v. Krauss-Maffei Corp.,* 671 F.Supp. 1402, 1425 (D.Del. 1987)).

whether to license the patent, it found the Thesis so material that it questioned Crooks about it, who in turn questioned Hahn. The Court finds that a reasonable examiner faced with the Thesis and Mr. Hahn's patent application in 1968 would also have considered the Thesis important in deciding whether to issue the patent. Thus, the Court holds that the Defendants have demonstrated a high level of materiality with respect to the Reynolds Thesis.

2. *Patentee's Knowledge of Materiality*

It is uncontested that Mr. Hahn was aware of the Reynolds Thesis during the pendency of his patent application.[61] Thus, the question is whether Hahn knew that the Reynolds Thesis provided material information which should have been offered to the Patent Office during the pendency of his application for the '123 Patent.

It is clear from the record that Mr. Hahn was aware Mr. Reynolds had been doing work with powder metallurgy with Dr. Hirschhorn in May 1968.[62] In May, 1968, both Mr. Hahn and Dr. Hirschhorn attend-

ed the Inter–American Seminar on Metallurgy in San Antonio, Texas.[63] At the conference, Dr. Hirschhorn spoke on the evolutionary changes in powder metallurgy that had led to improvement in processing materials which had potential application in certain manufacturing industries. DX–55. The work of Mr. Reynolds, which was a new application of powder metallurgy, was pertinent to the theme of Dr. Hirschhorn's speech. D.I. 340, Vol. M at 3165, Vol. N at 3254; DX–55. Dr. Hirschhorn believed that his enthusiasm for the results attained in his laboratory, his desire to establish a name for himself and his practice of pro· moting his new work to seek funding, notoriety and hence tenure, led him to discuss the work described in the Reynolds Thesis at the San Antonio conference. D.I. 340, Vol. M at 3165, Vol. N at 3253–54. Moreover, Dr. Hirschhorn and Mr. Hahn were the only two lecturers at the conference to speak back-to-back on the topic of powder metallurgy and the two saw each other at the conference and spoke to each other.[64]

**61.** Hahn testified that he "consciously and intentionally withheld the Reynolds Thesis from the Patent Office", D.I. 340, Vol. F at 1370, 1375, Vol. G at 1426, 1515–16, that he possessed a copy of the Thesis in his "A" file and that he gave his attorney a brief oral synopsis of the Thesis prior to the publication of the Hahn–Palich Article. D.I. 340, Vol. F at 1357. The article was published in late 1970 and the '123 Patent was not allowed until March 15, 1971. PX–15 at 31–32.

**62.** Hahn testified that he learned of the Reynolds Thesis from Mr. Speaker in 1969. D.I. 340, Vol. G at 1424. Mr. Speaker testified, however, that he had never seen the Reynolds Thesis prior to his deposition and that his knowledge of the prior work of others generally came from Hahn and Dr. Palich. Speaker Dep., DX–983 at 265. Dr. Palich testified that he first became aware of the Reynolds Thesis when it was brought to his attention by Mr. Hahn. Palich Dep., DX–970 at 73. Further, Hahn admitted that in May, June, 1968, he had heard "rumors" or had suspicions that Reynolds, along with his thesis advisor, Dr. Hirschhorn, were implanting porous powder metallurgically produced materials. D.I. 340, Vol. G at 1427–29, Vol F. at 1202; PX–181. No explanation was provided of the circumstances under which Hahn heard these rumors or why he had these suspicions.

**63.** Dr. Hahn and Dr. Hirschhorn knew each other from 1962 when Hahn, then an employee

of Curtis–Wright Corporation, approved and administered the funding of Hirschhorn's Masters Thesis researched by Curtis–Wright. D.I. 340, Vol M at 3111–12. Hahn and Hirschhorn met frequently while Hirschhorn's research was funded. *Id.* at 3112; DX–593. Six years later, Hahn and Hirschhorn saw each other at the conference. *Id.* at 3166–67; D.I. 340, Vol. F at 1388.

**64.** Hahn's description of events in San Antonio is difficult to accept. Mr. Hahn sought to imply that he never spoke to Dr. Hirschhorn at the conference. D.I. 340, Vol. E at 1140, 1388 ("We passed one another."). In response to the question, "Did you have any discussion with Dr. Hirschhorn at the San Antonio meeting?", Mr. Hahn unequivocally answered, "I did not." Hahn, *Id.* at 1141. On cross-examination, however, Mr. Hahn first stated that he did not talk to Dr. Hirschhorn, then testified that he said hello to him and then stated that he talked to Hirschhorn in the hall. D.I. 340, Vol. F at 1389. Hahn also sought to suggest that he and Dr. Hirschhorn could not have heard each other speak and did not attend each others' presentations. For example, Hahn testified that Hirschhorn did not attend his presentation, D.I. 340, Vol. E at 1141, and that he did not attend Dr. Hirschhorn's speech but also testified that 100 to 200 people attended his speech. *Id.* at 1141. When confronted with the conference program which listed the two presentations back to back and as the only two discussions under the head-

In fact, Dr. Hirschhorn probably sent a copy of the Thesis to Mr. Hahn in the summer of 1968 as a result of seeing him at the conference. D.I. 340, Vol. M at 3236.[65]

Although Mr. Hahn refused to admit that Dr. Hirschhorn discussed the subject matter of the Reynolds Thesis with him, the series of subsequent events and circumstances support an inference that Hahn learned about the Reynolds Thesis at the San Antonio Conference and understood the work underlying the Thesis was important and certainly relevant to his application for a patent filed on April 29, 1969. For example, Hahn testified that he conceived of his invention on an airplane traveling back from the San Antonio Conference, which, except for Dr. Hirschhorn's speech, had nothing to do with bone implants. D.I. 340, Vol. E at 1114. Although he was not currently working on any projects involving bone implants, Hahn testified that he immediately prepared an Invention Disclosure form within one to three days of his return on May 24, 1968. D.I. 340, Vol. E at 1114. In his Invention Disclosure, Hahn first disclosed the purpose of his invention and then his description of the old methods of performing the function of the invention. PX-6. The purpose, according to Hahn, was "To stimulate growth of bone tissue into implant (for improved adhesion) without necessitating use of a structurally weak implant material." PX-6. It is also clear that Mr. Hahn was concerned about powder metallurgy implants because the closest prior art, according to Hahn's Invention Disclosure, "utilizes weak porous powder metallurgically produced implant materials. Conventional, fully dense, cast or wrought implants which afford no bone tissue ingrowth possibility." PX-6. This document conclusively demonstrates that Hahn knew, contemporaneously with his alleged conception, that someone had utilized "porous powder metallurgically produced implant materials." PX-6. Nevertheless, Hahn never disclosed the reference to powder metallurgy by Reynolds or anyone else to the Patent Office even though he cited it as one of the old methods for bone implants in his invention disclosure form. PX-6; PX-15.[66]

Finally, the Hahn-Palich article, PX-31, which was drafted simultaneously with Hahn's patent application and published in late 1970, almost one year before the '123 patent issued is probative evidence that Mr. Hahn was aware of the materiality of the Reynolds Thesis. The Hahn-Palich article contained only four cited references and two of the four citations are to the Reynolds Thesis.

In the article's first reference, and indeed the only reference to the use of porous metals for implants, Hahn cited the Reynolds Thesis and wrote, "Several studies of porous orthopedic implants have recently appeared in the literature. While successful porous titanium prostheses have not as yet been reported, powder metallurgical techniques have recently been applied to the preparation of experimental Stellite (H-25 and H-21) alloy implants." PX-31 at 571. This introductory paragraph re-

ing "Powder Metallurgy", DX-815, Hahn insisted that the program was incorrect. D.I. 340, Vol. E at 1141.

65. In October, 1968, Dr. Hirschhorn gave a presentation of the powder metallurgy implant work and immediately thereafter he and Mr. Reynolds published an article incorporating the work described in the Thesis. D.I. 340, Vol. M at 3171-72; DX-52. Dr. Hirschhorn testified that once the Thesis was done, he had many copies made and sent them to those he believed would be interested. *Id.* at 3183-85.

66. Hahn testified that the reference to powder metallurgy in his Invention Disclosure could refer to the Reynolds' work but that he was unsure. D.I. 340, Vol. F at 1319. Hahn's faulty memory on this critical point is not credible, however, given the fact that Hahn was enthusiastic about his conception and allegedly acted with immediacy upon his return from the San Antonio Conference and that Hahn was knowledgeable about patents and allegedly began discussions with his attorney on this application within a month of conception. D.I. 340, Vol. F at 1333-40, Vol. M at 3183 (Reynolds and Hirschhorn were the only ones who had applied powder metallurgy to test porous metal bone implants by May, 1968). If Hahn knew of any prior art reference relating to porous powder metallurgy bone implant work of another, he was under a duty to disclose this work to the Patent Office. In any event, Plaintiff concedes at another point in its brief that Hahn's reference was to the Reynolds Thesis. D.I. 349 at 62.

veals that porous metals could be used for bone implants and would permit tissue ingrowth into the porosity. This particular citation to the Reynolds Thesis demonstrates that Mr. Hahn was aware of the Reynolds Thesis during the pendency of his patent application. Hahn indicated that while the porous material he wished to use, titanium, had not yet been proven capable of accepting bone ingrowth, Reynolds had shown that porous Stellite, another biocompatible material, was useful. Using the results disclosed in the Reynolds Thesis, Hahn concluded that a porous metal implant alone might not be strong enough to withstand load-bearing stress. Of course, this is also Reynolds' conclusion as disclosed on page 50 of the Thesis where he suggests applying a porous coat of metal to a solid metal implant in order to achieve fixation of the implant to the surrounding bone tissue and also to provide the necessary strength. DX–1 at 50.

When the Patent Office conducted a search of the prior art for Hahn's patent application, the Hahn–Palich article had been drafted, though not published. PX–15 at 34; PX–31 at 571. As will be discussed later, Hahn professed to have disregarded the Reynolds Thesis completely as material prior art.[67] The court concludes that Hahn knew the Reynolds Thesis was material information during the pendency of his patent application which should have been disclosed to the Patent Office.

### 3. Intent

■ A finding of intent to mislead must be based upon the totality of the circumstances. *Kingsdown*, 863 F.2d at 876. In *Kingsdown*, the Federal Circuit decided, *en banc*, that gross negligence alone was insufficient to establish inequitable conduct:

We adopt the view that a finding that particular conduct amounts to "gross negligence" does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of

good faith, must indicate sufficient culpability to require a finding of intent to deceive.

*Kingsdown*, 863 F.2d at 876. The requisite intent required for inequitable conduct "need not be proven by direct evidence or by proof of deliberate scheming." *In re Jerabek*, 789 F.2d 886, 891 (Fed.Cir.1986); *Hycor Corp.*, 740 F.2d at 1540. Intent can be also inferred from indirect evidence. For example, intent may be inferred from the applicant's knowledge of the prior art and its materiality. *A.B. Dick*, 798 F.2d at 1398. Intent can also be proven by showing acts, the consequences of which are presumably intended by the actor. *American Hoist*, 725 F.2d at 1363. "[I]nequitable conduct may be inferred from actions the natural consequences of which would be to mislead or misinform the PTO." *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 692 F.Supp. 1118, 1133 (N.D.Cal.1988).

Materiality "does not presume intent, which is a separate and essential component of inequitable conduct.... The withholding of information must meet the thresholds of both materiality and intent, ... and absent intent to withhold it is not controlling whether the reference is found to anticipate or otherwise to be material." *Allen Organ Co. v. Kimball Intern., Inc.*, 839 F.2d 1556, 1567 (Fed.Cir.1988) (citations omitted). In *FMC*, the Federal Circuit recently stated the proper relationship between the materiality of a withheld reference and proof of intent to mislead:

Considerations touching materiality and applicant's knowledge thereof overlap those touching applicant's intent because of inferences of intent that may be drawn from the former; yet intent is a question of fact, [citation omitted], and an applicant who knew or should have known of the art or information, and of its materiality, is not automatically precluded thereby from an effort to convince the fact finder that the failure to disclose was nonetheless not due to an intent to mislead the PTO; i.e., that, in light of all the circumstances of the case,

---

**67.** This notion is incredible in light of Hahn's citations to the Reynolds' work as the closest prior art to plasma flame spray technique. PX–

6; PX–31 at 1; *See e.g., Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 694 F.Supp. 1, 34–35 (D.Del.1988).

an inference of intent to mislead is not warranted. [footnote omitted]. No single factor or combination of factors can be said always to *require* an inference of intent to mislead; yet a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to mislead. A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances.

*FMC*, 835 F.2d at 1416. Since the Reynolds Thesis contains a disclosure of the one element missing from the prior art references cited in Hahn's patent application (*e.g.*, a porous metal coating), there is no question that the Reynolds Thesis has a high level of materiality. In addition, it has been previously demonstrated that Hahn knew of the important relationship of the Reynolds Thesis to his invention and finally the Court has already concluded the materiality of the Reynolds Thesis to Hahn's invention, that is, that an examiner would have found it material as that word is understood. The issue now before the Court is whether Hahn's decision in not disclosing the Reynolds Thesis to the Patent Office was based on an intent to mislead. Although there is no obligation on the part of the applicant to disclose all pertinent prior art of which he is aware, the applicant must disclose information that a reasonable examiner would consider

important in deciding whether to allow the application to issue as a patent. *J.P. Stevens*, 747 F.2d at 1560–61; *Driscoll v. Cebalo*, 731 F.2d 878, (Fed.Cir.1984). At trial, Hahn testified that he "consciously and intentionally made the decision … not to tell the patent office about [the] Reynolds [Thesis]." D.I. 340, Vol. G at 1515–16. While Hahn stated that he briefly discussed the Reynolds Thesis with his patent attorney, he admits that his attorney did not have a copy of the Thesis. D.I. 340, Vol. F at 1357. Hahn also admitted that his attorney's only information about the disclosure of the Thesis came from what Hahn told him and that Hahn and not his attorney made the decision not to disclose the Thesis. *Id.* at 1357, 1375.

Plaintiff argues that Mr. Hahn's testimony at trial establishes that he acted in "good faith" in deciding not to disclose the Reynolds Thesis to the PTO.[68] In the only evidence offered to support this claim, Plaintiff points to Hahn's testimony that he believed the powder metallurgical facts discussed in the Reynolds Thesis to be "structurally weak", D.I. 340, Vol. F at 1211, and concluded that the Thesis was not "pertinent" to his invention. *Id.* at 1375. There is no evidence in the record, however, to support Hahn's belief that the Reynolds Thesis is not pertinent. In fact, at trial, Hahn failed to offer any reason which would have explained his conclusion to discredit the Reynolds Thesis. Instead, he simply stated that it was "structurally weak." D.I. 340, Vol. F at 1211.[69] Indeed,

---

**68.** Plaintiff also argues that the *Journal of Biomedical Materials Research,* PX–31, in which the Hahn–Palich Article appeared is a "referred periodical." This means that before a paper is published, it is reviewed by scientists knowledgeable in the field and who have the editorial right to reject a paper that does not meet the standards of the Journal. Interestingly, Plaintiff points out that "the citation of a 'reference' in a scientific publication signifies a key article upon which opinions are based." D.I. 349 at 61; *see also* D.I. 340, Vol. D at 703. Although Plaintiff believes this undercuts any argument that Hahn understood the Reynolds Thesis to be material or had an intent to deceive, the record is devoid of any possible enlightenment on this issue. Instead, Plaintiff's argument only supports this Court's conclusion that a citation to the Reynolds Thesis as a "key article" is a factor

in deciding materiality and Hahn's recognition of it.

**69.** The evidence supports the conclusion that Hahn did not fail to appreciate the true disclosure of the Reynolds Thesis. By the time Hahn submitted the Hahn–Palich article for publication, November, 1969, he had studied the reference in depth. Hahn referenced the Thesis in the Hahn–Palich Article not only for its direct meaning but as the source of another reference to a publication by Dr. Burstein. PX–31 at 576. Additionally, Hahn analyzed a graph in the Reynolds Thesis on page 41 and retrieved from that graph data on tensile strength of Stellite which he included in his article at page 572. Williams, D.I. 340, Vol. I at 2170–74; PX–31 at 5721. Based on the foregoing, the inventor

the porous metal implants might have been weak but the disclosure on page 50 of the Thesis was the solution to the problem.

Additional evidence that Hahn's refusal to disclose the Reynolds Thesis was not a good faith exercise of judgment is the fact that Hahn's counsel, Mr. Hurvitz, wrote to the Patent Office and distinguished Hahn's invention from the prior art previously submitted to the Patent Office as art which does "not disclose a porous metal coating on a strong base, in a bone implant." D.I. 15 at 29. For example, Mr. Hurvitz stated that the Wright Patent teaches a bone implant with a porous coating but the coating is made of mineral not metal.[70] Thus, Hahn focused upon distinguishing the prior art based on the characteristic of a "metallic bone implant with a metallic porous surface...." *Id.* at 30. Hahn's rejection of the Reynolds Thesis is even more puzzling given that in a patent filed January 31, 1984, and issued as Patent No. 4,542,-539 on September 24, 1985, entitled "Surgical Implant Having a Graded Porous Coating", D.I. 173, Hahn specifically stated the Reynolds Thesis "suggested porous surgical implants having a surface [fabricated by powder metallurgy] amenable to the ingrowth of tissue." *Id.* at col. 1, lines 62–64.

The Court concludes that Hahn's statement that he withheld the Reynolds Thesis because it was not pertinent is rejected. Indeed, since Hahn failed to provide any rationale or justification to support his belief, the bald assertion of irrelevancy represents nothing more than a denial of his intent to mislead. As stated in *FMC*, where there is clear evidence of materiality and knowledge of materiality, subjective good faith is difficult to prove. Moreover, "[a] mere denial of intent to mislead (which

would defeat every effort to establish inequitable conduct) will not suffice in such circumstances." *FMC*, 835 F.2d at 1416. In this case, there is no evidence of subjective good faith, rather only a pattern of inconsistent conduct based on Hahn's own testimony. Here Hahn was guilty of material omission in relation to the Reynolds Thesis. The high degree of materiality of the reference withheld from the Patent Office, together with the clear intent on the part of the inventor Hahn to keep this reference from the Patent Office, as well as Hahn's clear knowledge of the materiality of the Reynolds Thesis, establishes inequitable conduct as a matter of law and equity.

The Court concludes that the '123 patent is unenforceable because Hahn intentionally withheld from the Patent Office information that a reasonable examiner would have considered important in determining whether the claims should issue. *J.P. Stevens*, 747 F.2d at 1559; 37 C.F.R. § 1.56.

## B. Histological Study

■ Pfizer also charges that Hahn made a material affirmative misrepresentation to the PTO based upon an alleged inconsistency in reporting the results of the microscopic examination of the plasma flame sprayed specimens implanted in the sheep. In the "Description of the Preferred Embodiment" of the '123 Patent, Hahn stated: "A *histological study* of the coated pins in the bone revealed growth of bone tissue into the pores at the surface of the coating. Thus, the plasma coated prosthetic part was firmly anchored in place." PX–28, col. 5, lines 42–45. The alleged inconsistency is based upon the following statement in the Hahn–Palich Article:

Hahn did not merely scan or quickly review the Reynolds Thesis; rather Hahn studied the Thesis at length and was aware of the disclosure on page 50 of the Thesis of an implant with a porous metal coating on a solid metal base.

**70.** Hahn testified that his attorney sent him copies of the references the Patent Office cited against his application and he discussed those references, as well as the Office Action rejection of Hahn's original claims, with his attorney.

D.I. 340 Vol. F at 1351; PX–15 at 22–23. Hahn reviewed the response to the Office action, which distinguishes the prior art because of no citation to porous metal coating, before it was submitted to the Patent Office. D.I. 340, Vol. F at 1352. Hahn never showed the Reynolds Thesis to his attorney, *id.* at 1357, so he alone knew that the Reynolds Thesis provided the missing element and linked usage of porous metal and a solid metal base.

*Sectioning and etching techniques* were not carried out successfully, and hence actual bone ingrowth into the open porosity of the coating could not be confirmed. However, the high bond strength observed indicates the occurrence of ingrowth which would be required to achieve a strength of bond capable of shearing the test pins.

PX–31 at 576. The Defendants believe that Hahn's misrepresentation is a compound one: (1) there is no evidence that a histological study was ever done, (2) an attempted histological study of the implant specimens by means of transmitted light was not successful, and (3) bone ingrowth into the porous metal coating was never confirmed by histology or any other scientific method. D.I. 347 at 58. Thus, Defendants argue that these three circumstances "taken together" demonstrate that Hahn's representations to the PTO that " 'a histological study' substantiated bone tissue growing into the pores" was false. *Id.* at 58–59.

Although it is uncontested that Hahn had sections of the implant specimens prepared and viewed under a microscope by *reflected* light, Defendants contend that the term "histological study" as used in the '123 Patent requires a microscopic examination of a very thin section of an implant specimen by means of *transmitted* light. The record is devoid of any reference that such a restrictive definition of the term "histological" was well known or even required by the scientific community at that time.[71] In fact, Plaintiff's expert at trial, Dr. Mayor, testified that "the term histologic implies the acquisition of knowledge about the fine cellular details of tissues as disclosed by microscopic examination." D.I. 340, Vol. A at 186. Dr. Mayor also testified that "the term histological study by itself [could] imply any particular technique for making that observation", including "the examination of cells under low power magnification ... by reflected light." *Id.* at 186–87; *see also* D.I. 340, Vol. A at 94, Vol. D at 782–83, 793, 795; DX–970 at 77–78; DX–983 at 115–116. The Court finds that the term "histological", as used, was a general term which refered to an examination of tissue by a variety of means and is not restricted only to microscopic examination of a thin section of tissue under transmitted light.

The Court also finds that there is no inconsistency between the statement in the '123 Patent concerning a histological study and the statement in the Hahn–Palich Article concerning the inability to successfully section the implant specimen in light of the testimony by Dr. Palich and Mr. Speaker. Although Dr. Williams, Defendants' only expert witness on this issue, testified that such an inconsistency did, in fact, exist, he never explained the basis of his belief to the Court and Defendants' counsel declined to inquire further into the issue. D.I. 340, Vol. I at 2168. Plaintiff, on the other hand, offered substantial evidence that there was no inconsistency between the two statements. For example, Plaintiff's expert, Dr. Mayor, testified at trial that there is no inconsistency between the term "histological study" and "sectioning and etching techniques" because they are entirely different methodologies. D.I. 340, Vol. A at 184–85.

Defendants also contend that bone ingrowth was never confirmed by any scientific methodology, histological or otherwise. This argument is not supported by the facts in the record. The reference to a histological study in the '123 Patent was based on information given by Dr. Palich and Mr. Speaker to Melpar's outside counsel, Mr. Hurvitz, based on visual and microscopic observations with reflected light.

---

71. For example, at trial, Williams testified that:
Q: What do you understand this [statement concerning bone ingrowth in the '123 Patent] to mean?
A: My understanding of this sentence is that a conventional histological study was done on the sections which contained both the pins and the surrounding tissue to reveal growth of bony tissue into that porosity.

D.I. 340, Vol. I at 2167–68. Despite Defendants' attempt to stretch the meaning of this testimony, the record clearly demonstrates that Dr. Williams did *not* specifically testify that a "conventional" histology meant to one of ordinary skill in the art in 1968–1969 that Hahn's disclosure in the '123 Patent conveyed that he prepared a thin section of the implant specimen and observed it under transmitted light.

DX–970 at 76–77. Mr. Speaker also testified that he observed "pretty clear evidence of in-growth of osteoblasts, but could not establish [whether] it had been porous bone in-growth." DX–983 at 116.[72] Although Defendants suggest that this last statement is probative evidence that bone ingrowth was never confirmed, the Defendants' argument is premised upon the narrow view that bone *cells* rather than bone *tissue* must be present in order to confirm the presence of bone ingrowth. As discussed previously, the Court declines to adopt such a narrow interpretation of the term "histological." Thus, Hahn's assertion in his patent application that a histological study had been undertaken which confirmed bone ingrowth is not false in view of Dr. Palich's and Mr. Speaker's deposition testimony.[73]

Even if there were an inconsistency between these two statements, the Court specifically concludes that it was not a material misrepresentation since the claims do not explicitly require bone tissue ingrowth as part of the invention of the '123 Patent. *See supra.* The Defendants' argument in this matter is explicitly premised upon the theory that the basis for Hahn's invention was "that his bone implant was useful for implantation and fixation by bone tissue ingrowth into the porosity of the implant." D.I. 347 at 58. By Defendants' own concession, their argument further hinges on the assertion that Hahn allegedly made his misrepresentation in "conjunction" with an asserted basis for patentability. Defendants have failed to establish by clear and convincing evidence a "conjunction" (presumably "nexus") between the asserted basis of patentability and the alleged misrepresentation before the Patent Office because the claimed invention does not require bone ingrowth. Thus, a reasonable examiner would not be likely to consider Hahn's reference to "histological study" in the "Description of the Preferred Embodiment" truly important in making his decision to issue the '123 Patent. *J.P. Stevens,* 747 F.2d at 1559. Moreover, the Court finds that Hahn did not act with an intent to deceive the PTO. His representations were based upon a good faith belief that his team had conducted appropriate scientific tests to determine whether bone ingrowth had occurred.

The Court concludes, therefore, that the charge of inequitable conduct based on this alleged inconsistency between the statement in the '123 Patent (PX–28, col. 5, lines 43–46) and the statement concerning inability to section the implant specimen in the Hahn–Palich Article (DX–31) is unfounded. Pfizer has not produced clear and convincing evidence that Hahn's use of the term "histological study" was either a material affirmative misrepresentation or that it was used by Hahn with the intent to deceive the PTO. *J.P. Stevens & Co.,* 747 F.2d at 1559.

## VII. UTILITY AND ENABLEMENT

■ Defendants next raise the related issues of utility under 35 U.S.C. § 101 and enablement under 35 U.S.C. § 112. Utility is a question of fact. *See Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1268 (Fed.Cir.1986) (noting *Cross v. Iizuka,* 753 F.2d 1040, 1044 n. 7 (Fed.Cir.1985)); *Phillips,* 673 F.Supp. at 1325. Enablement, on the other hand, is a question of law. *Moleculon,* 793 F.2d at 1268 (noting *Cross,* 753 F.2d at 1044 n. 7; *Phillips,* 673

---

**72.** Both Dr. Palich and Mr. Speaker based their conclusions in part on the torque tests conducted earlier by Mr. Hahn which suggested bone ingrowth had occurred. DX–970 at 78; DX–983 at 116. Although Defendants argue that a torque test cannot differentiate between tissue ingrowth and tissue growing against the bone, the microscopic observation by Dr. Palich and Mr. Speaker of tissue in the porous region discounts the possibility of bone growing against the implant specimen instead of into it.

**73.** Even though the statement in the Hahn–Palich Article indicates the sectioning and etching techniques were unsuccessful, Dr. Rostoker, Defendants' expert witness, testified that bone tissue can be observed within the porosity of a fiber metal coupon extracted from an animal by the naked eye without the need for microscopic examination. D.I. 340, Vol. I at 1955. Thus, to the extent that Hahn and others reached the conclusion that bony ingrowth had occurred, the Court is satisfied that a histological examination was performed and the statement in the '123 Patent is not false or misleading.

F.Supp. at 1325). They argue that the claims of the '123 are invalid inasmuch as the disclosure is nonenabling under Section 101 because a plasma flame sprayed coating could not achieve the necessary bonding between the porous metal coating and the metal substrate to be a *useful* bone implant. Defendants also contend that the claims of the '123 Patent are indefinite under Section 112 because the claims are not specific to any pore size and cover a vast range of inoperative pore sizes.

◼ Section 101 provides in relevant part that "[w]hoever invents or discovers any new and *useful* process, machine, manufacture, or composition of matter, or any *useful* improvement thereof, may obtain a patent therefor...." 35 U.S.C. § 101 (emphasis added). In order to be "useful" under Section 101, the invention must (1) be operable and capable of use, (2) achieve some minimum human purpose, and (3) that purpose must not be illegal, immoral or contrary to public policy. *Phillips*, 673 F.Supp. at 1325 (citing 1 D. Chisum, *Patents* § 4.04[1]). In other words, the product or process must be capable of being used to effect the object proposed. *Phillips*, 673 F.Supp. at 1325; 1 D. Chisum, *Patents* § 4.04[1]; *accord, Brenner v. Manson*, 383 U.S. 519, 534–35, 86 S.Ct. 1033, 1041–42, 16 L.Ed.2d 69 (1966); *Cross*, 753 F.2d at 1046.

◼ In determining the question of utility, the claims of the invention must be interpreted in order to define the invention to be tested for utility. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956 (Fed.Cir. 1983); *Phillips*, 673 F.Supp. at 1325. Indeed, the Defendants bear a "heavy burden" of showing that the patent lacks utility on the basis that it will not operate as disclosed. *See Phillips*, 673 F.Supp. at 1325 and cases cited therein. For example, the Federal Circuit has noted: "[T]he fact that an invention has only limited utility and is only operable in certain applications is not grounds for finding lack of utility. [citations omitted]. Further, *the defense of*

*non-utility cannot be sustained without proof of total incapacity.*" [citation omitted]. *Envirotech*, 730 F.2d at 762 (emphasis added).

◼ Under Section 112, the test for adequacy of the written description is whether "one skilled in the art would understand the language in the claims read in light of the specification." *Orthokinetics*, 806 F.2d at 1576; *Seattle Box Co. v. Indus. Crating & Packing*, 731 F.2d 818, 826 (Fed.Cir. 1984). If the "claims, read in light of the specification, reasonably apprise those skilled in the art and are as precise as the subject matter permits[,] [a]s a matter of law, no court can demand more." *Hybritech*, 802 F.2d at 1385. There is a close relationship between the enablement aspect of Section 112 and the utility requirement of Section 101. *Phillips*, 673 F.Supp. at 1326 (citing 2 D. Chisum, *Patents* § 7.03[6]). For example, the Court of Customs and Patent Appeals has opined that "surely Congress intended § 112 to presuppose *full satisfaction* of the requirement of § 101. Necessarily, compliance with § 112 requires a description of how to use a presently useful invention, otherwise an applicant would anomalously be required to teach how to use a useless invention." *Application of Kirk*, 376 F.2d 936, 942 (C.C.P.A.1967); *see also* 2 D. Chisum, *Patents* § 7.03[6].

◼ Defendants argue that the evidence at trial establishes that Hahn did not disclose to the world an implant which was actually usable in 1969 and, therefore, is invalid under Section 112.[74] At trial, Defendants introduced the expert testimony of Dr. Burstein to show that plasma flame spraying in 1969 would not create a useful bone implant. Dr. Burstein testified at trial that if a flame sprayed porous metal surface were applied to a solid metal substrate as disclosed in the '123 Patent, the resulting orthopedic implant would not be a *useful* device because either the porous surface would peel off or the underlying metal substrate could fail. D.I. 340, Vol. N

---

**74.** Although Defendants claim that the '123 Patent is invalid under Section 112 for failing to be "useful", the Court believes that it is more appropriate to address their arguments under Section 101.

at 3415–17, 3431; PX–192, PX–193. Defendants argue that this conclusion is supported by evidence that the flame spray coating applied to one of Hahn's test pins completely separated from the solid metal base. D.I. 340, Vol. N at 3428–29, Vol. I at 2153–54; PX–28, col. 5, lines 21–23.

Dr. Burstein testified, however, that he never actually tested flame sprayed coatings in animals. D.I. 340, Vol. N at 3420. Moreover, on cross-examination, Dr. Burstein examined the photomicrograph of Dr. Davila's plasma flame sprayed heart valve which had a porous coating with interconnected porosity. D.I. 340, Vol. P at 3547. Dr. Burstein then examined with a 10X magnifier five physical samples of Dr. Davila's heart valves and did not observe any sections of the porous metal coatings peeling off of the metal substrate. *Id.* at 3550; DX–960–12–1 through 12–5.

More importantly, Dr. Burstein concluded that the test pins used by Hahn in his sheep trials contained adequate porosity, *e.g.*, 15% or 20%, and that the photographs of the plasma flame sprayed pins revealed some interconnected porosity. D.I. 340, Vol. N at 3431–32. Moreover, the evidence at trial failed to established that the bond between the plasma porous coating and the underlying metal substrate of the pins used in the sheep experiments separated. The heads of the pins were either sheared off or deformed in the course of the torque measurements. D.I. 340, Vol. F at 1280; PX–145; DX–970 at 94; DX–983 at 112. In fact, the only evidence of failure of the bond between the porous coating and the metal substrate occurred when one of the pins was hammered out of the sheep femur. D.I. 340, Vol. F at 1280; DX–970 at 65; DX–983 at 65; PX–14. Indeed, all of Defendants' evidence relating to adhesion strength of the porous coating was based solely upon observations by Defendants' trial experts of photomicrographs of cross-sections of pins. D.I. 340, Vol. I at 2157–58, Vol. N at 3431. Since the Defendants have failed to show by clear and convincing evidence a *total incapacity* of the usefulness of the claimed invention of the '123 Patent, the Court concludes that the '123 is

not invalid under Section 101. *Envirotech*, 730 F.2d at 762.

▮▮▮▮ Defendants contend that the claims of the '123 Patent are indefinite under Section 112 because they cover a vast range of inoperative pore size ranges. Defendants' argument is premised upon the foundation that the claims at issue in the '123 Patent are not limited to any particular pore size as a matter of law because only claim 7 (not at issue in this case) recites a pore size range of 30–200 microns and a limitation in a dependent claim may not be read into the other claims. *See, e.g.*, *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985). Defendants then maintain that the validity of the claims of the '123 Patent have been dealt a fatal blow because evidence introduced at trial established that viable bone ingrowth cannot be maintained if the pore sizes are less than 150 microns. *See, e.g.*, D.I. 340, Vol. I at 1936–38, 1940–41, 1970–72, 2098–99; *but see* D.I. 340, Vol. A at 93–94, Vol. L at 2690–91 (bone tissue will grow into pore size of 100 microns). Thus, Defendants conclude that since the claims of the '123 Patent include pore sizes in the range from 0–150 microns, an ineffective pore size range, the claims of the '123 Patent are inoperative and, therefore, invalid under 35 U.S.C. § 112.

As indicated earlier in this opinion, porosity standing alone is an inherently relative term and, under those circumstances, the word must be interpreted "in light of the specification." *See Orthokinetics*, 806 F.2d at 1516; *Hybritech*, 802 F.2d at 1384; *Shatterproof*, 758 F.2d at 624. Although claim 7 is the only claim in the '123 Patent which limits the range of pore sizes, Defendants overlook the fact that the specification states "[i]n practice, the pores will range from about 30 microns to about 200 microns wide at the opening, although the range of widths from about 40 microns to 70 microns appears to be optimum." PX–28, col. 3, lines 63–66. Thus, the range of pore sizes disclosed in the '123 Patent does not approach infinity as the Defendants would like to have the Court to believe. Moreover, to the extent that bone tissue

may not grow into pores which range from 30 microns to 100 microns, the Court finds that the existence of such a small subset of pore sizes is not fatal to the validity of the '123 Patent especially when it is understood that the technique of plasma flame spraying necessarily yields a porous coating that is not uniform in porosity and will result in small variations in the range of available pore sizes. The fact that some tissue, albeit not *bone* tissue, will grow into the smaller pore sizes indicates that the implant will still achieve fixation. This conclusion is further supported by the Court's previous interpretation of the proper scope of the claims of the '123 Patent. Thus, to the extent that Defendants' argument relies upon a pore size that is incapable of sustaining bone ingrowth, it is misplaced and the Court refuses to read such a requirement into the claims through the "back door."

Since the range of pore sizes in the '123 Patent has been adequately defined in the specification, one skilled in the art would have looked to the specification and would have understood the appropriate range of pore sizes to utilize in making a porous metal coating to be applied to a metal substrate. *See* D.I. 340, Vol. L at 2964–65, 2989. Thus, the Court finds that the claims of the '123 Patent are not invalid under Section 112 for covering a small range of pore sizes which may not sustain the growth of bone tissue.

## VIII. CONCLUSION

In conclusion, the Court finds that the '123 Patent, if valid, was infringed, but not willfully. The Court also finds that the '123 Patent is not invalid under 35 U.S.C. §§ 101, 112 and 102 or any of its subparts. The Court concludes, however, that the '123 Patent is invalid for obviousness under 35 U.S.C. § 103. The Court also concludes that the '123 Patent is unenforceable because of inequitable conduct before the Patent Office.